UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                          :
                          :
In re REFCO, INC. SECURITIES LITIGATION   :      05 Civ. 8626 (GEL)
                          :      **OPINION AND ORDER**
                          :
-----------------------------------------------------------x

John P. Coffey, Max W. Berger, Salvatore J. Graziano, John C. Browne, and Jeremy P. Robinson, Bernstein Litowitz Berger & Grossman LLP, New York, New York, and Stuart M. Grant, James J. Sabella, Megan D. McIntyre, Jeff A. Almeida, Christine M. Mackintosh, and Jill Agro, Grant & Eisenhofer P.A., New York, New York and Wilmington, Delaware, <u>for Lead Plaintiffs Pacific Investment Management Company, LLC and RH Capital LLC and the Prospective Class</u>.

Robert B. McCaw, Lori A. Martin, John V.H. Pierce, and Dawn M. Wilson, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York, <u>for the "144A" or "Bond Underwriter" Defendants</u>.

Jeffrey T. Golenbock and Adam C. Silverstein, Golenbock Eiseman Assor Bell & Peskoe LLP, New York, New York, <u>for Defendants Phillip R. Bennett, Refco Group Holdings Inc., and Phillip R. Bennett Three Year Annuity Trust</u>.

Bruce R. Braun, Bradley E. Lerman, Linda T. Coberly, and David Mollón, Winston & Strawn LLP, New York, New York and Chicago, Illinois, and Margaret Maxwell Zegel and Tracy W. Berry, Grant Thornton LLP, Chicago, Illinois, <u>for Defendant Grant Thornton LLP</u>.

Michael T. Hannafan, Blake T. Hannafan, and Nicholas A. Pavich, Hannafan & Hannafan, Ltd., Chicago, Illinois, and Norman Eisen and Melinda Sarafa, Zuckerman Spaeder LLP, New York, New York, <u>for Defendant Tone Grant</u>.

Helen B. Kim and Marc D. Powers, Baker & Hostetler LLP, New York, New York and Los Angeles, California, and Richard E. Nathan, Nathan Law Office, Los Angeles, California, <u>for Defendant Dennis A. Klejna</u>.

Stuart L. Shapiro, Matthew J. Sava, and Yoram J. Miller, Shapiro Forman Allen Sava & McPherson LLP, New York, New York, <u>for Defendants Joseph J. Murphy and Gerald M. Sherer</u>.

Ivan Kline, Stuart I. Friedman, and Elizabeth D. Meacham, Friedman & Wittenstein, New York, New York, <u>for Defendant William M. Sexton</u>.

Holly K. Kulka, Heller Ehrman LLP, New York, New York, <u>for Defendant Philip Silverman</u>.

Greg A. Danilow and Paul Dutka (Seth Goodchild and Joshua S. Amsel, on the brief), Weil, Gotshal & Manges LLP, New York, New York, <u>for the "THL" and "Audit Committee" Defendants</u>.

Barbara Moses and Rachel Korenblat, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, New York, <u>for Defendant Robert Trosten</u>.

GERARD E. LYNCH, <u>District Judge</u>:

Various defendants in this large securities class action arising from the collapse of Refco

Inc. and its affiliated companies ("Refco") move for dismissal or partial dismissal of the First

Amended Complaint as to them. This opinion addresses ten motions to dismiss by twenty-eight

defendants, many of whom raise overlapping arguments. Accordingly, to avoid an unduly

duplicative and lengthy opinion, the movants' legal arguments will be grouped together.

Detailed discussions of relevant factual allegations will be reserved for the legal analyses that

require them, and the initial discussion of background facts will accordingly be brief.

**BACKGROUND**

I.    **The Allegations**

    A.    **The Alleged Fraudulent Scheme**

Refco was a provider of brokerage and clearing services in the international derivatives, currency and futures markets.[1]  Part of Refco's business model involved giving loans to its trading clients, which the clients then used to leverage larger trades.  (Compl. ¶¶ 2, 87, 382.)  At a certain point, Refco began making loans without adequately assessing the customers' credit-worthiness or their trading activities.  These risky loans began to backfire in 1997 and 1998, when several global financial crises caused Refco and a number of its largest customers to suffer massive trading losses.  (Compl. ¶¶ 31, 383-97.)  The loans were now "uncollectible receivables" that would never be paid.  (P. Mem. 8.)

Rather than disclose these uncollectible receivables to the public and Refco's investors, Refco's management allegedly devised a scheme to hide them.  First, they transferred the loans onto the books of Refco Group Holdings, Inc. ("RGHI"), an entity owned and controlled by defendant Phillip R. Bennett, Refco's president, CEO, and Chairman (Compl. ¶ 32) and Tone Grant, Bennett's predecessor as CEO (id. ¶ 41).  As a result, RGHI owed hundreds of millions of dollars to Refco.  In order to hide RGHI's obligation to Refco, the complaint alleges, a series of fraudulent transactions were arranged by which the RGHI receivable was made to disappear from Refco's books.

---

[1] The name "Refco," as used throughout this opinion, refers to Refco Inc., the publicly traded company formed pursuant to the August 2005 initial public offering ("IPO") described below, as well as to Refco Group Ltd., LLC, the company through which Refco's business was primarily conducted prior to the IPO.  (Compl. ¶¶ 20-21.)

The transactions all worked in essentially the same way.  First, Refco Capital (a Refco subsidiary) would make loans to a third party.[2]  This money was transferred into accounts in the third party's name at Refco.  (Compl. ¶¶ 417-18).  The third party would then loan an equivalent amount to RGHI; the loan agreements between the third party and Refco Capital required that the money be used only for that purpose.[3]  (Id. ¶ 411.)  These loans to RGHI were guaranteed by Refco itself; Bennett — on behalf of Refco as guarantor — signed the loan agreement between the third party and RGHI.  (Compl. ¶¶ 415-18.)  RGHI then used the loan from the third party to pay down the money it owed to Refco for the uncollectible receivables.  (Compl. ¶ 416.)  Thus, Refco Capital was loaning money to RGHI for use in temporarily paying off its debt to Refco.  This series of transactions would take place a few days before the end of the relevant financial period, and would be undone within two weeks.  (Compl. ¶ 409).

The loans in question were substantially greater than Refco's reported net income.  A February 2005 loan, for example, was for $595 million, 337% of Refco's reported net income for the relevant fiscal year.  (Compl. ¶ 560.)  A February 2004 loan was for $970 million, 518% of Refco's reported net income for the relevant fiscal year.  (Id.)  If compared to quarterly income,

---

[2] It appears from the complaint that most or all of the loans at issue originated from Refco Capital, a subsidiary, not from Refco itself.  (Compl. ¶¶ 403, 405.)  Although the Complaint in various places uses "Refco" and "Refco Capital" interchangeably, it is clear in context that Refco Capital was the source of the loans.  For example, paragraph 409 of the complaint clearly uses "Refco" to refer to "Refco Capital," as is apparent from the allegation that the loan agreement was signed by David Weaver, the Chief Administrative Officer at Refco Capital.

[3] The third parties were compensated for this service by the interest on their loans to RGHI, which was greater than the interest they were charged by Refco Capital.  (Compl. ¶ 413.)  The payments of interest, however, were made by Refco Capital, not RGHI.  (Id. ¶ 418.)

of course, the size of the loans is even more dramatic: a November 2004 loan for $545 million

was the equivalent of 3,045% of Refco's reported net income for that quarter.  (Id.)[4]

Thus, Refco Capital was loaning enormous sums of money to the third party while Refco

guaranteed an equivalent loan from the third party to RGHI.  Meanwhile, Refco Capital — not

RGHI — paid to the third party the interest purportedly owed by RGHI.  (Id. ¶ 563.)  The

transactions took place in substantially the same form over the course of six years.

None of these transactions was disclosed to the public in the filings discussed below.

Thus, in effect, Refco was loaning money to itself, through third parties, to hide its dismal

financial situation from the public and its investors.

**B.      The Relevant Transactions**

The various transactions at issue in this case took place while the fraudulent scheme

above was ongoing.

**1.      *The Rule 144A Bonds and the* Exxon Capital *Exchange***

In June 2004, Refco issued $600 million of 9% Senior Subordinated Notes due in 2012.

These bonds were sold to the defendants referred to by plaintiffs as the "Bond Underwriter

Defendants," who call themselves the "144A Defendants."  These defendants then immediately

resold the bonds to institutional buyers, including some of the plaintiffs.  (See Compl. ¶¶ 94-95,

100-08.)  The bonds were unregistered pursuant to Securities and Exchange Commission

("SEC") Rule 144A, 17 C.F.R. § 230.144A, which exempts private placements to qualified

institutional buyers from the registration requirements of the Securities Act, and were thus issued

---

[4] Plaintiffs argue that loans for sums in excess of Refco's net earnings were unusual
(Compl. ¶ 562), but do not provide information about other loans with which to compare the
fraudulent loans.  Defendants point out that the loans represented less than 1% of Refco's
alleged assets during the Class Period.  (See id. ¶¶ 177, 515).

pursuant to an offering memorandum rather than a registration statement.  (Compl. ¶¶ 105-108.)
Plaintiffs allege that this offering memorandum contained various false statements concerning
Refco's financial performance and viability. (Id. ¶¶ 109-143.)  The unregistered bond offering
was marketed to institutional investors at a nationwide road show in July 2004 (the "Road
Show").

Plaintiffs argue that this unregistered bond offering was the first step in a single plan of
financing.  The second step in this putative plan came when Refco issued registered bonds,
which holders of the Rule 144A Bonds acquired by exchanging their Rule 144A bonds for
registered bonds in a transaction known as an "Exxon Capital exchange."

The registered bond offering was made pursuant to a Form S-4 Registration Statement
(Wilson Decl. Ex. C) (the "Bond Registration Statement"), which was filed with the SEC on
October 12, 2004, and became effective on the day the registered bonds were issued, April 13,
2005.  The registration statement was not yet effective at the time of the Rule 144A offering.
(Compl. ¶¶ 149-50.)  Plaintiffs allege that this statement, too, contained various false statements
of material fact.  (Id. ¶¶ 153-65.)

2.    *The August 2005 IPO*

In August 2005, Refco conducted a successful initial public offering ("IPO"),
underwritten by fifteen banks including the three banks that served as underwriters for the Rule
144A offering.  (See P. Mem. 14 n.8).  In the IPO, Refco sold approximately 20% of its shares to
plaintiff RH Capital and other members of the putative class.  (Compl. ¶ 166.)  The IPO was
conducted pursuant to a Form S-1 registration statement dated April 8, 2005, Form S-1/A
registration statements dated May 27, July 1, July 20, July 25, August 8, and August 10, 2005,

6

and a Form 424B1 prospectus dated August 10, 2005.  (Id. ¶ 168.)  Again, plaintiffs allege that

these filings contained false statements of material fact.  (Id. ¶¶ 172-98.)

> ### 3.     *The October 2005 Press Release and Refco's Collapse*

On October 10, 2005, Refco issued a press release announcing that it had discovered an

"undisclosed affiliate transaction."  (Id. ¶ 199.)  The press release disclosed the existence of a

$340 million receivable owed to the company by "an entity controlled by Phillip R. Bennett"

(that is, RGHI), and indicated that Bennett had repaid the receivable in cash as of October 10.  It

suggested that the receivable represented RGHI's assumption of a debt owed by a third party to

Refco, which "may have been uncollectible."  (Id.)  Because this receivable had not been

disclosed in the previously-filed financial statements, the press release concluded that these

statements "should no longer be relied upon."  (Id. ¶ 200.)  Refco's stock price dropped 45% in a

single day.  (Id. ¶ 202.)  Plaintiffs allege, however, that this press release did not disclose the full

extent of Refco's troubles, because it downplayed the impact that the disclosure would have on

Refco's business.  (Id. ¶¶ 202-03.)  An investigation by the SEC was immediately commenced,

and on October 12, 2005, Bennett was arrested as a flight risk.  (Id. ¶¶ 205-06.)  Refco's stock

price continued to decline sharply until the New York Stock Exchange ("NYSE") halted trading

of Refco shares on October 13, 2005.  (Id. ¶ 208.)  On October 17, 2005, Refco announced that it

was filing for bankruptcy.  (Id. ¶ 209.)

This litigation was initiated on October 11, 2005.  In an order dated February 8, 2006

(Doc. # 63), the Court appointed RH Capital Associates LLC ("RH Capital") and Pacific

Investment Management Company LLC ("PIMCO") as lead plaintiffs pursuant to 15 U.S.C.

§ 78u-4(a)(3)(B) and 15 U.S.C. § 77z-1(a)(3).  A consolidated class action complaint was filed

on April 3, 2006, and the First Amended Consolidated Class Action Complaint (Doc. # 86) (the

"complaint") was filed on May 5, 2006.  Papers relating to the ten motions to dismiss now

pending were submitted between July and November of 2006, and the motions are now fully

briefed.  Before discussing the substance of these motions, a brief introduction to the various

movants is appropriate.

### C.    The Movants

There are ten separate motions to dismiss pending, several of which are filed on behalf of

more than one defendant.  This section briefly identifies the movant or group of movants behind

each of the ten motions.

### 1.    *Phillip R. Bennett, RGHI, and the Bennett Trust*

Defendant Phillip R. Bennett was the President, Chief Executive Officer and Chairman of

Refco until he was forced to resign in October 2005.  (Compl. ¶ 32.)  Bennett held his interests

in Refco both directly and through RGHI and the Phillip R. Bennett Three Year Annuity Trust

(the "Bennett Trust"), both of which he controlled.  (Id. ¶¶ 26-28.)

### 2.    *Tone Grant*

Tone Grant was the President of Refco Group before Bennett was promoted to that

position in September 1998, at which time Grant ended his employment with Refco.  Grant

continued to own 50% of RGHI, which in turn owned approximately 43% of Refco Group, until

the August 2004 bond offering.  (Id. ¶ 23.)  To avoid confusion with defendant Grant Thornton,

this opinion will refer to Tone Grant by his full name.

### 3.    *William Sexton*

William Sexton was Executive Vice President and Chief Operating Officer ("COO") of

Refco Group beginning in August 2004.  He briefly served as CEO of Refco after Bennett's

resignation.  (Id. ¶ 34.)

### 4.  *Joseph J. Murphy and Gerald M. Sherer*

Joseph Murphy was an Executive Vice President for global marketing at Refco beginning in 1999.  Plaintiffs also allege that he served as an officer of certain Refco subsidiaries, but these do not include Refco Capital or RGHI, the subsidiaries most directly involved in the allegedly fraudulent transactions.  (Id. ¶ 36.)

Gerald Sherer was Chief Financial Officer ("CFO") and an Executive Vice President of Refco Group beginning in January 2005.  (Id. ¶ 33.)

### 5.  *Robert Trosten*

Robert Trosten was Sherer's predecessor as CFO of Refco Group.  He served in that capacity from 2001 to October 2004.  (Id. ¶ 40.)

### 6.  *Philip Silverman*

Philip Silverman was secretary of several Refco entities, including RGHI, and was Controller of Refco Group during 2004 and 2005.  (Id. ¶ 37.)

### 7.  *Dennis Klejna*

Dennis Klejna was an Executive Vice President and General Counsel of Refco Group from 1999 until the company's collapse.  (Id. ¶ 38.)

### 8.  *The THL and Audit Committee Defendants*

The "THL Partners Defendants"[5] and the "THL Individual Defendants"[6] (together, the "THL Defendants") are entities and individuals affiliated with Thomas H. Lee Partners, L.P., a

---

[5] The "THL Partners Defendants" are Thomas H. Lee Partners, L.P., Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V. L.P., THL Equity Advisors V, LLC, Thomas H. Lee Investors Limited Partnership, and The 1997 Thomas H. Lee Nominee Trust.

[6] The "THL Individual Defendants" are Thomas H. Lee, David V. Harkins, Scott L. Jaeckel and Scott A. Schoen.

private equity firm that invested $507 million in Refco prior to its collapse.  In June 2004, the THL Defendants helped Refco with a leveraged buyout, in which the THL Defendants acquired a 57% equity stake in Refco.  The remaining 43% was held by RGHI, which, in turn, was owned by Bennett.  This gave the THL Defendants a dominant position on Refco's board of directors and a controlling interest in Refco's stock.

The Audit Committee Defendants[7] are three former Refco outside directors who were members of Refco's audit committee.

### 9.    *Grant Thornton LLP*

Grant Thornton LLP was Refco's outside auditor.  It is the subject of two claims under the Securities Act involving the October 2004 Bond Registration Statement, and one claim under Section 10(b) of the Exchange Act.  Each of the three claims arises from the audit reports Grant Thornton prepared on Refco's year-end financial statements beginning in the year 2003.

### 10.    *The Bond Underwriter Defendants*

Defendants Credit Suisse Securities (USA) LLC ("Credit Suisse"), Banc of America Securities LLC ("BAS"), and Deutsche Bank Securities Inc. ("Deutsche Bank") refer to themselves as the "144A Defendants," while plaintiffs refer to them as the "Bond Underwriter Defendants."  (P. Mem. 53-54.)  These banks were the underwriters for the Rule 144A private placement of Refco bonds.  This opinion will refer to them as the "Bond Underwriter Defendants."

---

[7] The "Audit Committee Defendants" are Ronald L. O'Kelley, Leo R. Breitman and Nathan Gantcher.

**DISCUSSION**

The complaint makes claims under both the Securities Act of 1933 and the Securities Exchange Act of 1934.  While few defendants move to dismiss all the claims against them, many defendants move to dismiss some, and many of their arguments overlap.  There are several overarching issues raised: (1) whether there can be liability under Securities Act §§ 11 and 12 for involvement in the Rule 144A private placement of unregistered bonds; (2) the sufficiency of allegations of control-person liability under Securities Act § 15 based on the Bond Registration Statement; (3) whether the Exchange Act § 10(b) and Rule 10b-5 claims are adequately pled with respect to scienter and specific allegations of misrepresentation; (4) whether plaintiffs have adequately alleged their Exchange Act claims against Grant Thornton, Refco's auditor; (5) whether plaintiffs have adequately stated a claim for control-person liability under the Exchange Act; and (6) whether the insider-trading allegations against a few of the defendants are adequate.

**I.     Standards for Motions to Dismiss**

On a motion to dismiss, the allegations in the Complaint are accepted as true, and all reasonable inferences drawn in favor of the plaintiffs.  Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998).  The Court's task is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  Therefore, motions to dismiss should only be granted if it appears that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief.  Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984).

In deciding motions to dismiss, the Court may consider documents that are referenced in the Complaint, documents that the plaintiffs relied on in bringing suit and that either are in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken.  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).  "[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it relies and which is integral to the complaint, the court may nonetheless take the document into consideration in deciding the . . . motion to dismiss, without converting the proceeding to one for summary judgment."  Int'l Audiotext Network, Inc. v. AT & T Co., 62 F.3d 69, 72 (2d Cir. 1995) (internal citation and quotation marks omitted).  Thus, for purposes of a motion to dismiss, a court may consider:

> any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.

Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000) (internal citations omitted).

## II.    Claims Under Sections 11 and 12 of the Securities Act

Several defendants move to dismiss Counts One and Three of the Amended Complaint, which involve §§ 12 and 11 of the Securities Act, respectively.  Essentially, § 12 creates liability for misstatements in registration statements for public offerings, 15 U.S.C. § 77*l*, while § 11 creates liability for misstatements in prospectuses.  15 U.S.C. § 77k.

The first set of transactions on which the relevant claims are based was the private placement offering of $600 million in Senior Subordinated Notes.  (See Confidential Offering Circular, July 22, 2004, Wilson Decl. Ex. B. (the "Offering Memorandum").)  As discussed

above, the notes were unregistered pursuant to SEC Rule 144A, 17 C.F.R. § 230.144A, which exempts private placements to qualified institutional buyers from the registration requirements of the Securities Act.  See 15 U.S.C. § 77d(2) (exempting from registration requirements "transactions by an issuer not involving any public offering"); see also In re Livent, Inc. Noteholders Secs. Litig., 151 F. Supp. 2d 371, 431 (S.D.N.Y. 2001).  Among the purchasers of unregistered bonds in this offering were plaintiffs PIMCO and PIMCO High Yield Fund.  The Bond Underwriter Defendants acted as lead initial purchasers — that is, underwriters — for this issue.

The second set of transactions was the public offering of registered bonds pursuant to a Form S-4 Registration Statement (Wilson Decl. Ex. C) (the "Bond Registration Statement").  In this offering, Refco allowed holders of unregistered bonds to exchange their bonds for registered bonds in a transaction known as an "Exxon Capital exchange."  (Compl. ¶ 149.)  See Exxon Capital Holding Corp., SEC No-Action Letter (May 13, 1988).  The Bond Underwriter Defendants are not identified as underwriters in the Bond Registration Statement, and claim not to have been involved in this transaction in any fashion whatsoever.

A.     **Claims Arising From the Rule 144A Offering and the Subsequent Public Offering**

Count One of the Complaint makes claims under § 12(a)(2) of the Securities Act based on alleged misstatements in the Rule 144A Offering Memorandum.  This count is challenged by a group of defendants that includes the Bond Underwriter Defendants and several defendants whom plaintiffs claim "solicited the [plaintiffs'] purchases of the 144A Bonds."  (Compl.

¶ 275.)[8]  This group of defendants argues that § 12(a)(2) does not apply to private offering memoranda.

The Bond Underwriter Defendants also move to dismiss Count Three of the complaint, which makes claims under § 11 of the Securities Act based on the Bond Registration Statement, on the grounds that their involvement in Refco's collapse was limited to underwriting the June 2004 private placement of bonds pursuant to Rule 144A, and that this private placement is not a "public offering" subject to the terms of the Act.

Plaintiffs make three arguments in defense of their claims arising from the Rule 144A offering: first, that the Rule 144A offering itself is covered by § 12(a)(2); second, alternatively, that the Rule 144A offering should be treated as part of a two-step transaction which, viewed as a whole, falls within the coverage of § 12(a)(2) or § 11; and third, that the Bond Underwriter Defendants were directly involved with the creation of the Bond Registration Statement and are therefore subject to liability under § 11 even if the Rule 144A offering is not covered.

### 1.    *The Rule 144A Offering Cannot Give Rise to Liability Under § 12(a)(2)*

Section 12(a)(2) of the Securities Act extends liability to any person who

> offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading.

15 U.S.C.A. § 77l(a)(2).  Thus, if the Offering Memorandum or some other relevant document does not qualify as a "prospectus or oral communication" within the meaning of the statute, then plaintiffs' § 12(a)(2) claims based on the Rule 144A offering must be dismissed.

---

[8] Specifically, the defendants who make this argument are Bennett (Bennett Mem. 9-12), Trosten (Trosten Mem. 8-14), and the THL Partners Defendants (THL/Audit Comm. Mem. 11-20).  Murphy makes the same argument in the context of contesting control-person liability (Sherer/Murphy Mem. 34-35), as does Silverman (Silverman Mem. 13-14).

The Supreme Court held in <u>Gustafson v. Alloyd Co., Inc.</u>, 513 U.S. 561 (1995), that the work "prospectus" refers to "documents related to public offerings by an issuer or its controlling shareholders," that is, documents that "*must* include the information contained in registration statement." <u>Id</u>. at 569 (emphasis added; internal quotation marks omitted). The phrase "oral communication," the Court explained, refers only to oral communications relating to a prospectus, and therefore does not change the analysis. <u>Id</u>. at 567-68. Thus, § 12(a)(2) liability "cannot attach unless there is an obligation to distribute the prospectus in the first place." <u>Id</u>. at 571.

The Second Circuit further clarified this rule in <u>Yung v. Lee</u>, 432 F.3d 142 (2d Cir. 2005), holding that § 12(a)(2) does not apply to the distribution of a prospectus prepared in connection with a public offering to a purchaser in a private transaction. <u>Id</u>. at 149. Even where the defendants' marketing efforts in connection with the private transaction relied heavily upon the same prospectus used in a public offering, there was no liability because defendants were not obligated to distribute the prospectus in connection with that transaction. <u>Id</u>. Under <u>Yung</u>, therefore, the issue is whether the defendants in this case were obligated to distribute a prospectus in connection with the Rule 144A transaction at issue.

Rule 144A specifically provides that securities sold in compliance with its provisions "shall be deemed not to have been offered to the public." 17 C.F.R. § 230.144A(c). Plaintiffs rely heavily on the fact that the Rule 144A Offering Memorandum included the same information that would later be included in the Bond Registration Statement, but the test is whether there was any requirement that that information be included in the Offering Memorandum. <u>See</u> <u>Gustafson</u>, 513 U.S. at 569. Plaintiffs point to no such requirement.

The complaint explicitly acknowledges that "the Bonds were exempt-from-registration pursuant to Rule 144A." (Compl. ¶ 273.)  To concede that an issuance is properly exempted from registration under Rule 144A is to concede that the issuance complies with the conditions of the rule, and securities issued in compliance with the conditions of the rule "shall be deemed not to have been offered to the public."  17 C.F.C. § 230.144A(c).[9]  In other words, exemption from registration and non-public status are necessary consequences of compliance with the conditions of Rule 144A.  If the Rule 144A bonds were exempt from registration because they complied with Rule 144A, they were non-public by definition.[10]  District courts in the Second Circuit have consistently dismissed § 12(a)(2) claims based on Rule 144A offerings on the grounds that "offerings under Rule 144A are by definition non-public, and offering memoranda distributed in connection with such offerings cannot give rise to Section 12(a)(2) liability."  Am. High-Income Trust v. Alliedsignal, 329 F. Supp. 2d 534, 543 (S.D.N.Y. 2004); see also AIG Global Secs. Lending Corp. v. Banc of Am. Secs. LLC, 254 F. Supp. 2d 373, 388-389 (S.D.N.Y. 2003).

---

[9] Plaintiffs note that the full text of Rule 144A provides that securities sold pursuant to its terms "shall be deemed not to have been offered to the public *within the meaning of section 4(3)(A) of the [Securities] Act*," 17 C.F.R. § 230.144A(c) (emphasis added), and argue that it would therefore be inappropriate to deem Rule 144A offerings non-public for purposes of § 12(a)(2).  The regulation's language hardly suggests, however, that an offering that is private by its terms, and by federal regulation for purposes of one provision of the act, should be considered public for purposes of another provision.  Indeed, Gustafson itself was based on the premise that the Securities Act "is to be interpreted as a symmetrical and coherent regulatory scheme, one in which the operative words have a consistent meaning throughout."  Gustafson, 513 U.S. at 569.

[10] Plaintiffs argue that § 12 liability does not depend upon whether an offering was registered.  See Gustafson, 513 U.S. at 579 (noting that dealings may violate § 12 "even though they are not related to the *fact* of registration) (emphasis in original) (internal quotation marks omitted)).  This is true, but irrelevant.  If the bonds were entitled to an *exemption* from registration under Rule 144A, they were also entitled to be deemed non-public.

Plaintiffs assert that the SEC "has made clear that its promulgation of Rule 144A was not intended to limit the reach of § 12(a)(2), and that it believes § 12(a)(2) *should* apply to Rule 144A/Exxon Capital exchange transactions" (P. Mem. 47 (emphasis in original)), conveying the impression that the SEC agrees with their legal analysis.  However, although the SEC would be "in sympathy on policy grounds" with a finding of § 12(a)(2) liability, it believes that "the more likely reading of Gustafson . . . is that . . . the Supreme Court would not have deemed the offering memorandum in the Rule 144A offering to be a prospectus."  (Letter of Aug. 9, 2001, from David M. Becker, General Counsel of the SEC, to the U.S. Dist. Ct. for the Dist. of S.C., In re Safety-Kleen Bondholders Litig., No. 3:00-1145-17, Coffey Dec. Ex. 1, at 3.)  This Court agrees with the SEC and with prior courts in this district that under current law a Rule 144A offering does not give rise to liability under § 12(a)(2).

Plaintiffs rely on the pre-Gustafson case of Hill York Corp. v. Am. Int'l Franchises, Inc. 448 F.2d 680 (5th Cir. 1971), for the proposition that "the question of public offering is one of fact and must depend upon the circumstances of each case."  Id. at 687.  It is true that a few post-Gustafson cases in other districts have applied this reasoning to find that a § 12(a)(2) claim based on a Rule 144A offering could survive a motion to dismiss.  See, e.g., In re Enron Corp. Secs., Derivative & ERISA Litig., 310 F. Supp. 2d 819, 859-866 (S.D. Tex. 2004).  As noted above, however, courts in the Southern District of New York have repeatedly declined to follow this reasoning.  Even if it were followed, nothing in the alleged facts of this case suggests that the Rule 144A offering was public.

Plaintiffs assert that "the Rule 144A Bonds were offered to a subset of the investing public" (P. Mem. 44), but this is disingenuous.  In a broad sense, any private transaction involves "a subset of the investing public" — every investor is a "subset" of the investing public just as

every citizen is a subset of the general public.  The Offering Memorandum by its terms, however, required the terms of the offer not to be made public, and made clear that the offering was "personal to the offeree . . . and [did] not constitute an offer to any other person or to the public generally."  (Offering Memorandum, Wilson Decl. Ex. B., at ii.)  The Offering Memorandum also provided that the notes were not registered with the SEC (id. at ii-iii), which, for the reasons discussed above, clearly implies that they are non-public under Rule 144A.  See In re Worldcom, Inc. Secs. Litig., 294 F. Supp. 2d 431, 454 (S.D.N.Y. 2003) ("WorldCom I") (relying on similar language to hold that "[t]he fact that the [offering in question] was a private placement is clear from its face").  Nothing in the complaint suggests that the Rule 144A offering was directed at the general investing public.  "[N]o matter how the plaintiff might word the claim, the document involved cannot be 'silkenized' into a § 12[(a)](2) 'prospectus'." Glamorgan Coal Corp. v. Ratner's Group PLC, No. 93 Civ. 7581, 1995 WL 406167, at *3 (S.D.N.Y. July 10, 1995).  In short, plaintiffs have offered no persuasive reason why the Rule 144A offering should be treated as public within the meaning of § 12(a)(2).

### 2. *The Rule 144A Offering and the* **Exxon Capital** *Exchange Do Not Constitute a Single Transaction Covered By § 12(a)(2) or § 11*

Plaintiffs argue that even if the Rule 144A offering itself is not covered by § 12(a)(2), it should be treated as part of a single, two-step transaction that is covered by that provision.  They argue that an initial purchaser or underwriter that prepares an offering memorandum for a private placement of notes is liable under § 12 when the issuer of the notes later exchanges them for registered bonds in an Exxon Capital exchange.  In other words, plaintiffs contend that the entire two-step process (the initial offering of unregistered bonds, followed by the Exxon Capital

exchange) was a single "public offering."  They make the same argument with respect to § 11 of the Securities Act, 15 U.S.C. 77k.

District courts have rejected similar efforts to subject Rule 144A transactions to § 12(a)(2) liability by treating them as part of larger transactions.  See Am. High-Income Trust, 329 F. Supp. 2d at 543; In re Interbank Funding Corp. Secs. Litig., 329 F.Supp.2d 84, 94-95 (D.D.C. 2004).  "The process by which an issuer offers bonds through a private placement under Rule 144A of the Securities Act, and subsequently offers to exchange the Rule 144A notes for registered securities — an "'Exxon Capital exchange offer' — is typical of high-yield debt issuance." Am. High-Income Trust, 329 F. Supp. at 541.  Therefore, to treat the two transactions as part of a single plan "would render Rule 144A ineffective for a very substantial number of securities transactions, and defeat the capital market financing objectives the Rule 144A exemption was designed to achieve." Livent, 151 F. Supp. 2d at 431-32 (addressing a similar integration argument in a § 11 context).  If an Exxon Capital exchange brought unregistered bonds within the scope of § 11 or § 12, qualified institutional buyers who participated in the exchange would be considered underwriters under the Securities Act and would be required to file their own registration statement, which would significantly undermine Rule 144A's goal of promoting liquidity in secondary securities markets. Id. at 431.

The SEC, like courts in this district, has taken the position that no liability under § 12(a)(2) arises in a two-step transaction of this kind.  Letter from Jacob H. Stillman, Solicitor, Office of the General Counsel of the SEC, to the U.S. Dist. Ct. for the N. Dist. of Ala., dated Nov. 28, 2006, In re HealthSouth Secs. Litig., No. CV-03-BE-1500-S (Letter from Robert B. McCaw to the Court, dated Dec. 1, 2006, Ex. A), at 8-11.  As the SEC noted, the concept of "integration" on which the plaintiffs' theory is premised is a specific doctrine in securities law

by which courts determine whether multiple securities transactions should be considered part of the same offering for purposes of determining whether exemptions from the registration requirements apply.  To apply it to the facts of this case would be "to apply 'integration' in an entirely novel manner which stands the concept on its head," because "[t]he Commission, and securities market participants, recognize the two steps to be separate transactions."  Id. at 11.  Indeed, as the SEC noted, the qualified institutional buyers certainly relied on that understanding when they decided to become involved in the Rule 144A transaction.  Id.

Plaintiffs allege that the Offering Memorandum was used as the foundation for preparing the Bond Registration Statement, that the two documents were substantially similar in content, and that the parties preparing the Offering Memorandum knew and understood that they were preparing statements that would also be included in the Bond Registration Statement.  (Compl. ¶ 153.)  Two transactions do not become one, however, simply because they involve the same statements.  Plaintiffs have failed to show that the two transactions were one for purposes of § 12(a)(2).  Thus, Count One of the complaint, which makes claims under § 12(a)(2) based on the Rule 144A offering, must be dismissed.

Count Three of the complaint makes claims against various defendants — including the Bond Underwriter Defendants[11] —  pursuant to Section of 11 of the Securities Act, 15 U.S.C. § 77k.  Count Three is based on alleged misstatements in the Bond Registration Statement, not the Rule 144A Offering Memorandum.  Section 11 imposes liability for material misrepresentations in a registration statement, and by its terms applies only to registered

---

[11] Specifically, Count Three names defendants Bennett, Murphy, Lee, Sexton, Silverman, Maggio, Klejna, the THL Individual Defendants, the Audit Committee Defendants, Refco Futures, Westminster-Refco, Lind-Waldock, Grant Thornton, and the Bond Underwriter Defendants.  (Compl. ¶ 300.)

offerings.[12]  Plaintiffs argue, however, that the Bond Underwriter Defendants may be liable

under § 11 for misstatements in the Rule 144A Offering Memorandum because the unregistered

and registered offerings should be treated as one transaction for purposes of § 11.  The

arguments against plaintiffs' integration theory discussed above apply with equal force to

plaintiffs' § 11 claims, and so the Rule 144A offering and the subsequent public offering will not

be treated as one integrated transaction for purposes of § 11.  See Livent, 151 F. Supp. 2d at 431-

32.

> ### 3.   *The Bond Underwriter Defendants Are Not Liable Under § 11 For Their Involvement in the Preparation of the Bond Registration Statement*

The only remaining question with respect to liability under §§ 11 and 12 is whether the

Bond Underwriter Defendants are subject to § 11 liability for direct involvement in the creation

of the Bond Registration Statement.  The Bond Underwriter Defendants move to dismiss Count

Three as against them on the grounds that their involvement was limited to the Rule 144A

offering.  In order to be liable under § 11 for misstatements in the Bond Registration Statement,

the defendants must qualify as "underwriters" within the meaning of § 11(a)(5).[13]  The term

"underwriter" is defined by the Securities Act as:

> any person who has purchased from an issuer with a view to, or
> offers or sells for an issuer in connection with, the distribution of
> any security, or participates or has a direct or indirect participation
> in any such undertaking, or participates or has a participation in the
> direct or indirect underwriting of any such undertaking; but such
> term shall not include a person whose interest is limited to a

---

[12] Of course, there are no registration statements for offerings of unregistered bonds.

[13] Section 11(a) lists five categories of defendants who may be held liable under its provisions.  The first four categories are those who are named in or sign the registration statement, or who are partners or directors of the issuer.  15 U.S.C. § 77k(a)(1)-(4).  Thus, only the remaining category, "underwriter[s]," is potentially applicable here.

>commission from an underwriter or dealer not in excess of the
>usual and customary distributors' or sellers' commission.

15 U.S.C.A. § 77b(11).

In this case, plaintiffs allege "upon information and belief" that the Bond Underwriter Defendants "participated in the preparation of the Bond Registration Statement." (Compl. ¶¶ 153, 307.)[14]  This conclusory allegation of participation in the preparation of the statement includes no detail whatsoever; plaintiffs make no specific allegations as to the extent of this participation or what actual actions the defendants took.

The term "underwriter" in the Securities Act has been broadly interpreted.  Thus, the Seventh Circuit has held that it includes "a party retained solely to make minimum interest rate recommendations and participate in the preparation of a registration statement but which does not purchase or sell securities, solicit orders, take part in the actual distribution, assume any risk of sale of the securities or do other things commonly associated with an underwriter's role." Harden v. Raffensperger, Hughes & Co., Inc., 65 F.3d 1392, 1396 (7th Cir. 1995). "Underwriter" is not, however, a term of unlimited applicability that includes anyone associated with a given transaction.  "It is crucial to the definition of 'underwriter' that any underwriter must participate in the distribution of a security." McFarland v. Memorex Corp., 493 F. Supp. 631, 644 (D.C. Cal. 1980).  Thus, parties have been found not to meet the definition where there was "no allegation . . . that the [the parties] purchased any [of the relevant] securities with a view to distribution or that they offered or sold any security on behalf of [the issuer]." Id.

_____

[14] It appears that plaintiffs do not rely upon this allegation as a basis to maintain Count One, which does not explicitly rely on this allegation; nor does plaintiffs' memorandum of law rely on this claim in opposing the Bond Underwriter Defendants' motion to dismiss the § 12(a)(2) claims against them.  Presumably this is because plaintiffs' § 12(a)(2) claim involves misstatements in the Rule 144A Offering Memorandum, rather than the Bond Registration Statement for the subsequent public offering.

"[U]nderwriters are subjected to liability because they hold themselves out as professionals who are able to evaluate the financial condition of the issuer." Id. at 646.  This is precisely what the Underwriting Defendants did *not* do with respect to the public offering in this case.  Plaintiffs have alleged no facts suggesting the Bond Underwriter Defendants held themselves out in any respect as to the public offering; on the contrary, any role they may have played in that offering was never publicly acknowledged.  Nor do any of the allegations in the Amended Complaint suggest that the Bond Underwriter Defendants bore any risk with respect to that transaction.  "An underwriter buys securities directly or indirectly from the issuer and resells them to the public, or he performs some act (or acts) that facilitates the issuer's distribution.  He participates in the transmission process between the issuer and the public." Ingenito v. Bermec Corp., 441 F. Supp. 525, 536 (S.D.N.Y. 1977).

Because the plaintiffs have failed to make any specific allegations of "participation" of the kind that would qualify the Bond Underwriter Defendants as underwriters of the public offering, the plaintiffs' conclusory allegation that they "participated" in the creation of a registration statement, read in isolation, would likely be insufficient to survive a motion to dismiss.  "Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss." Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d. Cir. 2002) (internal citation omitted).  Even if this bare allegation could suffice in some circumstances, it does not here, because in the context of the entire complaint it is clear that the word "participated" refers entirely to defendants' participation in the Rule 144A offering — not to actual participation in the creation of the Bond Registration Statement.[15]

---

[15] Of course, if the Court has misconstrued the complaint and the plaintiffs intended to allege some other participation in the creation of the Bond Registration Statement, plaintiffs can seek leave to file an amended complaint explaining the participation on which they rely.

Plaintiffs state that the Bond Underwriter Defendants were "paid as underwriters and . . . performed the functions of underwriters in connection with the Bond Offering — including contacting potential investors, organizing road shows, preparing the offering documents, and conducting a 'due diligence' investigation."  (P. Mem. 54.)  Despite plaintiffs' artful use of the phrase "Bond Offering" to describe both the Rule 144A offering and the subsequent public offering, it is clear from the Amended Complaint that all of these actions took place in the context of the Bond Underwriter Defendants' work on the Rule 144A offering, not the subsequent public offering.  (Compl. ¶¶ 107, 144, 147-48, 153.)  Plaintiffs' memorandum of law clarifies that the "indirect participation" alleged (P. Mem. 55) includes the Bond Underwriter Defendants' participation in the Road Show in July 2004 during which the Rule 144A bonds were marketed to investors.[16]  Plaintiffs' theory is that because the Rule 144A bonds by their terms anticipated the possibility of an exchange for registered bonds, the Bond Underwriter Defendants by soliciting purchasers for the Rule 144A bonds in fact "solicited [investors] to participate in both steps of the Bond Offering."  (P. Mem. 54.)  Once plaintiffs' theory that the "two-step process" was in fact a single transaction is rejected, therefore, plaintiffs' claim of "indirect participation" (P. Mem. 55) in this context becomes irrelevant.  The alleged "indirect participation" also includes the actual underwriting of the Rule 144A offering, with the knowledge that the bonds would later be exchanged for registered bonds (P. Mem. 54-55), an argument that also necessarily fails once the plaintiffs' single-transaction theory is rejected.

---

[16] The relevant factual allegation here is that "[t]he Offering Memorandum [for the Rule 144A bonds], which described and provided for the entire two-step process by which the Bonds were transmitted into the market . . . was used . . . to solicit [plaintiffs] not only to participate in the first step of the offering, but also to participate in the second step."  (Compl. ¶ 106.)

Of course, a court reviewing a motion to dismiss is required to draw all inferences in favor of the non-moving party.  Here, however, the single sentence alleging that the Bond Underwriter Defendants participated in the public offering presents a legal conclusion, not a factual allegation, and must be read in the context of the factual allegations to which it refers.  "Conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal of Section 11 claims."  In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig., 272 F. Supp. 2d 243, 253 (S.D.N.Y. 2003) (internal citations, alterations and quotation marks omitted).  Plaintiffs have in fact failed to allege any specific role whatsoever in the underwriting of the public offering; their only relevant allegation is simply a reproduction of the statutory requirement of "direct or indirect participation," 15 U.S.C. § 77b(11), and in context even that allegation pertains to matters that do not give rise to § 11 liability.  Accordingly, the Bond Underwriter Defendants' motion to dismiss Count Three as to them will be granted.

**B.      Motions to Dismiss the § 11 Claims For Failure to Allege Fraud With Sufficient Particularity**

Defendants Silverman, Klejna, Bennett, and Grant Thornton[17] argue that the claims relating to § 11 of the Securities Act (Compl. ¶¶ 299-132, 313-328) sound in fraud, and are therefore subject to a higher pleading standard.  (Silverman Mem. 22-24; Klejna Mem. 30-33; Bennett Mem. 19-21[18]; Grant Thornton Mem. 15-18.)  This argument is without merit.

---

[17] Grant Thornton does not argue that the § 11 claims are insufficient if Rule 9's standards do not apply.

[18] Bennett makes this argument as a challenge to the claims of control-person liability against RGHI and the Bennett Trust.  (Bennett Mem. 19-21.)

Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  To meet the requirements of Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993).

The Second Circuit has acknowledged that "fraud is not an element or a requisite to a claim under Section 11," and that "a plaintiff need allege no more than negligence to proceed under Section 11."  Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004).  Accordingly, Rule 9(b)'s standards apply to Section 11 claims only "insofar as the claims are premised on allegations of fraud."  Id.  Applying this analysis, however, the court found implications of fraud in language that closely tracked the language of Section 11 itself:

> Plaintiffs assert that their Section 11 claims "do[] not sound in fraud" but the wording and imputations of the complaint are classically associated with fraud: that the Registration statement was "inaccurate *and* misleading;" that it contained "*untrue* statements of material facts;" and that "materially *false* and *misleading* written statements" were issued.

Rombach, 355 F.3d at 171 (emphasis in original).  This passage presents something of a conundrum, because applied literally, it would seem to require applying a 9(b) standard to all claims under § 11.  Section 11 applies when "any part of the registration statement . . . contained an *untrue statement of a material fact* or *omitted to state a material fact* required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C.A. § 77k(a) (emphasis added).  See Johnson v. NYFIX, Inc., 399 F. Supp. 2d 105, 122 (D. Conn. 2005).[19]

---

[19] Johnson noted that "the terms of section 11 require *any* plaintiff to establish that a registration statement 'contained an untrue statement of material fact or omitted to state a

Fraud, of course, implies more than falsity, and the mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does not make it fraudulent.

It is clear that the Second Circuit did not intend Rombach as an instruction that all § 11 pleadings should be subjected to the Rule 9(b) standard.  See Rombach, 355 F.3d at 178 (finding that § 11 claims against certain defendants sounded in negligence, not fraud).  Nor can the Second Circuit have intended that all allegations directly reproducing the language of § 11 be subject to Rule 9(b); as Rombach acknowledges, violations of § 11 claims do not necessarily involve fraud.  355 F.3d at 171.  Therefore, the court's conclusion that the particular language in Rombach was indicative of fraud should be read in the context of the pleadings at issue in that case, in which the plaintiffs "[did] not assert any claim of negligence on the part of the Individual Defendants, nor [did] they specify any basis for such a claim."  Rombach v. Chang, No. 00 Civ. 0958, 2002 WL 1396986, at *4 (E.D.N.Y. June 7, 2002).  Rombach necessarily requires a case-by-case analysis of particular pleadings to determine whether "the gravamen of the complaint is plainly fraud."  355 F.3d at 172, quoting In re Stac Elecs. Secs. Litig., 89 F.3d 1399, 1405 n. 2 (9th Cir. 1996).  In this case, the gravamen of the § 11 claims is plainly *not* fraud.

The complaint in this case is carefully structured so as to draw a clear distinction between negligence and fraud claims.  The Securities Act claims are found in the first half of the complaint (¶¶ 86-379); the Exchange Act allegations, which include allegations of fraud by some — but not all — of the defendants named in the Securities Act claims, are found in the second

---

material fact required to be stated therein or necessary to make the statements therein not misleading,'" but applied a Rule 9(b) standard because the allegations referred to "materially false and misleading statements."  399 F. Supp. 2d at 122 .

half of the complaint (¶¶ 381-720). This careful division makes it easy to distinguish between the two, and the substance of the allegations keeps the distinction as clear as does the complaint's structure. The relevant factual allegations are contained in a section called "Defendants' Negligence" (Compl. ¶¶ 249-258), which alleges exactly that.

The Securities Act section of the complaint alleges various untrue or misleading statements in the Offering Memorandum, the Bond Registration Statement, and the IPO Registration Statement. As to the defendants' intent, however, these claims are carefully couched in the language of negligence. For example, plaintiffs allege that Refco's corporate officers and auditors "did not conduct a reasonable investigation of the statements contained in the Offering Memorandum and the Bond Registration Statement, and did not possess reasonable grounds for believing that the statements in those documents were true and not misleading." (Compl. ¶ 252.) Defendants have pointed to no allegations in the Securities Act section of the complaint that contain even a hint of fraud.

As Silverman notes (Silverman Mem. ¶ 24), the complaint certainly accuses Refco itself of concealing uncollectible receivables. (Compl. ¶ 199.) Indeed, it is clear that plaintiffs believe that Refco and various persons associated with it, including most, if not all, of the defendants, were engaged in a massive fraud. This fact, however, does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence. See Rombach, 355 F.3d at 171 ("The same course of conduct that would support a Rule 10b-5 claim may as well support a Section 11 claim or a claim under Section 12(a)(2).").

Of course, "[p]laintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness." In re JP Morgan Chase Secs. Litig., 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005). Thus, the language at the beginning of each Securities Act

28

claim disclaiming any intent to allege fraud is by itself insufficient to protect those claims from Rule 9(b)'s stringent requirements.[20]   In this case, however, plaintiffs have done more than disclaim fraud; they have specifically pled alternate theories of fraud and negligence.  As the Third Circuit held in a similar case,

> plaintiffs . . . do not merely disavow already-pled allegations of fraud in connection with their Section 11 and Section 12(a)(2) claims, leaving the court to sift through those allegations in search of some lesser included claim of strict liability.  Rather, both plaintiffs have expressly pled negligence in connection with their Section 11 and 12(a)(2) claims.  We regard this difference in pleading as dispositive.

In re Suprema Specialties, Inc. Secs. Litig., 438 F.3d 256, 272 (3d Cir. 2006) (internal citations, alterations, and quotation marks omitted).  Defendants do not argue that the complaint is insufficiently specific if Rule 9(b)'s standards are not applied.  Accordingly, the motions by defendants Silverman, Klejna, Bennett, and Grant Thornton to dismiss the § 11 claims (Count Three) and the control-person claims based on underlying § 11 violations (Count Four) for failure to satisfy Rule 9(b)'s standards will be denied.

### C.   Whether Unregistered Bondholders Have Standing to Make § 11 Claims Based on the Bond Registration Statement

Several defendants move to dismiss the § 11 claims as to those plaintiffs who acquired the Registered Bonds by exchanging unregistered Rule 144A bonds for them.  (See Sexton Mem. 23-26, Klejna Mem. 33-35, THL/Audit Comm. Mem. 22, and Grant Thornton Mem. 20-23; response at P. Mem. 58-62.)  This argument applies to the § 11 claims made on behalf of plaintiffs who purchased unregistered bonds and then traded them for registered bonds in the

---

[20] Each Securities Act claim begins with this careful sentence: "Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly."  (Compl. ¶¶ 270, 284, 299, 313, 329, 342, 361, 369.)

Exxon Capital exchange, but does not reach the claims of those plaintiffs who acquired

registered bonds on the open market.

The defendants frame the argument in several different ways, all of which are based on

the idea that the Bond Registration Statement had nothing to do with the unregistered

bondholders' decision to exchange their unregistered bonds for registered bonds.  Thus, Grant

Thornton frames the question as one of what statements are material under § 11, arguing that

"any positive or negative news contained in the registration statement would have impacted the

bondholder's holdings regardless of whether he exchanged his stock."  (Grant Thornton Memo

21.)  Sexton argues these plaintiffs have no standing (Sexton Mem. 23-23) and that they "lack

the required causation nexus with the Registration Statement" (Sexton Reply 14).[21]  Klejna, who

is not being sued for any role in the unregistered bond offering, argues that it would be unfair to

hold him responsible for an investment decision by plaintiffs in which he had no involvement.

(Klejna Reply 14.)

The questions of standing, reliance, materiality, and causation are related, because

"materiality is intimately bound up with the concept of reliance," and "[r]eliance, in turn, is

linked to causation."  In re McKesson HBOC, Inc. Secs. Litig., 126 F. Supp. 2d 1248, 1260

---

[21] Relatedly, Klejna argues that unregistered bondholders cannot "'trace' their [securities] to the allegedly defective registration statement."  DeMaria v. Andersen, 318 F.3d 170, 176 (2d Cir. 2003).  (See Klejna Mem. 34.)  See also Guenther v. Cooper Life Sciences, Inc., 759 F. Supp. 1437, 1439 (N.D. Cal. 1990). ("[T]o have standing under section 11, plaintiffs must establish that they purchased shares either (1) directly in the public offering for which the misleading registration statement was filed or (2) traceable to that public offering.")  The Second Circuit held in Barnes v. Osofsky, 373 F.2d 269, 271-73 (2d Cir. 1967), that § 11's private right of action was available only to plaintiffs who had purchased the securities in question directly from the issuer.  Id. at 272-73.  In other words, § 11's coverage is available only to those who acquired a security issued pursuant to the registration statement, not to those who purchased other similar securities already on the market at the time the registration statement was issued. In this case, plaintiffs did purchase the securities issues pursuant to the registration, so the "traceability" requirement is not directly implicated here.

(N.D.Cal. 2000).  Put another way, a misstatement is material if an investor acted in reliance upon it and was thereby caused to suffer damages.

The parties argue at some length about whether it is appropriate to impose a reliance requirement on § 11 claims.  Although the caselaw is not entirely clear as to the circumstances in which reliance can be relevant to a § 11 claim, the better reading of § 11 seems to be that it "creates a presumption that 'any person acquiring such security' was legally harmed by the defective registration statement."  APA Excelsior III L.P. v. Premiere Techs., Inc., 476 F.3d 1261, 1271 (11th Cir. 2007).  "To say that reliance is 'presumed' is simply not the same thing as saying that reliance is 'irrelevant.'"  Id. at 1272.  But see Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc., 821 F. Supp. 212, 218 (S.D.N.Y. 1993) ("Reliance is not a factor in a § 11 action, and thus impossibility of reliance can be no bar to a § 11 claim.  As long as a plaintiff can show that the particular securities he purchased were registered by means of a materially false registration statement, he has a claim under § 11." (internal citations omitted).)  Whether framed as a question of materiality or reliance, it seems clear as a matter of law and logic that plaintiffs should be entitled to no recovery when it can be established with certainty that they were not harmed in any way by the relevant misrepresentations.

Defendants offer at least two different reasons to think that reliance was impossible in the present case, that is, that any misstatements in the Bond Registration Statement were immaterial as to plaintiff unregistered bondholders.  The first contention is that the unregistered bondholders' relevant investment decision was already made at the time they purchased the unregistered bonds.  As Sexton puts it, "[p]laintiffs' investment decision could not have possibly been affected or 'impelled' by the registration statements because their investment commitment to Refco was made when they purchased the Rule 144A Bonds prior to the issuance of the

31

registration statement." (Letter from Stuart I. Friedman to the Court, dated Mar. 1, 2007; see

Sexton Mem. 24-25.) In other words, "[c]ompletion of the mandated exchange was the

performance of a ministerial act." (Klejna Mem. 34.)[22]

In a case to which defendants seek to analogize this one, the Eleventh Circuit concluded

that where plaintiffs had made a binding and irrevocable commitment to purchase the relevant

investments prior to the issuance of the registration statement, there could be no liability under

§ 11. APA Excelsior, 476 F.3d 1261, 1275-76. Section 11's presumption of reliance is rebutted,

in other words, where the plaintiffs were irrevocably committed to purchase the securities before

the registration statement issued, because "[t]o hold otherwise would mean that an impossible

fact will be presumed in Plaintiffs' favor." Id. at 1273. Defendants argue that plaintiffs' claims

similarly should be dismissed on the grounds that the unregistered bondholders, like the parties

in APA Excelsior, were irrevocably committed to the Exxon Capital exchange when they

purchased the unregistered bonds.

At this stage of the litigation, however, it cannot be said with certainty that "the plaintiffs

lacked the power or authority to back out" of the Exxon Capital exchange. Pell v. Weinstein,

---

[22] This version of the argument relies on the so-called "commitment theory" of securities law, which originally developed in the context of statute of limitations questions as the proposition that "the time of a 'purchase or sale' of securities within the meaning of Rule 10b-5 is to be determined as the time when the parties to the transaction are committed to one another." Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876, 891 (2d Cir. 1972). Thus, in any case where a contract requires subsequent payments, those payments are do not affect the statute of limitations, because "once plaintiff has committed itself to the transaction, the claim accrues and thus the statute begins to run." Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1040 (2d Cir. 1992). This concept was subsequently expanded to other areas of securities and contracts law as the principle that "[o]nce the decision is made and the parties are irrevocably committed to the transaction, there is little justification for penalizing alleged omissions or misstatements which occur thereafter and which have no effect on the decision." SEC v. Nat'l Student Mktg. Corp., 457 F. Supp. 682, 703 (D.D.C. 1978). Defendants contend that it would be similarly pointless to penalize them for statements made after the plaintiffs' decision to invest in the relevant bonds was already made.

759 F. Supp. 1107, 1114 (M.D. Pa. 1991). It is true that, according to the complaint, the unregistered bondholders would not have bought the unregistered bonds without the understanding that they would be exchanged for Registered Bonds. (Compl. ¶ 104.) Furthermore, the complaint alleges that the <u>Exxon Capital</u> exchange was "*mandated* by the Offering Memorandum and the underwriting contracts." (Compl. ¶ 100 (emphasis added).) In context, however, it is clear that it was the *issuers* of the bonds, not the purchasers, who were obligated under this arrangement. Plaintiffs allege that the "co-issuers" of the bonds "undertook to use their best efforts to offer the Registered Bonds in exchange for the 144A Bonds." (Compl. ¶ 103.) An undertaking on the offeror's side does not oblige the offeree to accept.

Nothing in the plaintiffs' allegations suggests that plaintiffs were irrevocably committed to the <u>Exxon Capital</u> exchange. Indeed, plaintiffs contend that "unless and until they affirmatively exchanged the bonds . . . the Rule 144A bondholders retained the option of rejecting the exchange offer and keeping their registered bonds." (Letter from Stuart M. Grant to the Court, dated Mar. 12, 2007.) Defendants have pointed to no language in the relevant documents suggesting otherwise. Defendants point out that the unregistered bondholders allegedly decided to buy the unregistered bonds specifically because they understood that the bonds would be exchanged for registered bonds. Alleging that plaintiffs had made a decision, however, is not the same as alleging that they had entered into a commitment. Although plaintiffs certainly intended to exchange their 144A bonds for registered bonds, there is at least a question of fact as to whether the Bond Registration Statement could have had any impact on their decision to participate in the <u>Exxon Capital</u> exchange.

As a question of irrevocable commitment, therefore, defendants' arguments are unpersuasive. There are other ways to frame the issue, however. Plaintiffs argue that "a jury

could find . . . that there is a substantial likelihood that a reasonable investor would consider that information [in the Registration Statement] important when deciding whether to *purchase the [144A Bonds] and exchange them* for Registered Bonds."  (P. Mem. 61 (emphasis added).) Plaintiffs' phrasing assumes that the unregistered and registered bond offerings may be treated as a single transaction, a theory that has already been rejected for the reasons discussed above.  It is therefore necessary to ask what the unregistered bondholders — already owners of non-tradeable Refco bonds — could have done differently had the Bond Registration Statement been fully candid about Refco's alleged foul deeds and dreadful prospects.  Under this line of inquiry, it is not an irrevocable commitment that rebuts the presumption of reliance, but rather the fact that plaintiffs had no other options.

"[W]hen presented with a Rule 12(b)(6) motion, a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).[23] The Second Circuit has held that where "the omitted information would not have made a reasonable shareholder any less likely to favor the objected-to transaction, . . . such an omission, material or not, could not have caused the injury for which damages are sought."  Minzer v. Keegan, 218 F.3d 144 (2d Cir. 2000).  Applying this materiality analysis to a case where plaintiffs' only options were to trade their preferred stock for common stock, or to redeem it at a price substantially below the market price, the Fifth Circuit held that there could be no liability for misrepresentations because "respondents d[id] not indicate how they might have acted

---

[23] Goldman was analyzing materiality for purposes of the Exchange Act, but the materiality analysis is the same in both the Securities Act and Exchange Act contexts.  Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726, 731 (2d Cir. 1987).

differently had they had prior notice" of the true facts behind the misrepresentations.  Dwoskin

v. Rollins, Inc., 634 F.2d 285, 291 n.4 (5th Cir. 1980).  See also Elfenbein v. Am. Fin. Corp., 487

F. Supp. 619, 627 (S.D.N.Y. 1980).

     The same principle applies here, because plaintiffs have not alleged that unregistered

bondholders would have been any less likely to go through with the Exxon Capital exchange had

the Bond Registration Statement been accurate.  Plaintiffs have not alleged that the unregistered

bonds differed in any respect from the registered bonds for which they were exchanged, except

that the registered bonds were freely tradeable.  Had the plaintiffs known the true state of

Refco's affairs, they would have had no reason to avoid making make their holdings tradeable;

on the contrary, they would have had every reason to rid themselves of the bonds as soon as

possible.  Plaintiffs have failed to allege that the omitted information would have made a

reasonable shareholder any less likely to favor the Exxon Capital exchange.  They have therefore

failed to show that any omissions or misrepresentations were material.  Accordingly, Counts

Three and Four will be dismissed as to any plaintiffs who obtained registered bonds in the Exxon

Capital exchange.

## III.    Control-Person Liability Under Securities Act § 15

### A.    Standards for Control-Person Liability

     To make out a claim for control-person liability under section 15 of the Securities Act,

plaintiffs must allege "(a) a primary violation by a controlled person, and (b) control by the

defendant of the primary violator."  In re Global Crossing, Ltd. Secs. Litig., No. 02 Civ. 910,

2005 WL 2990646, at *7 (S.D.N.Y. Nov. 7, 2005) ("Global Crossing III").  Control entails " 'the

power to direct or cause the direction of the management and policies of a person, whether

through the ownership of voting securities, by contract, or otherwise.' "  SEC v. First Jersey

Secs., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996), quoting 17 C.F.R. § 240.12b-2.  To prevail on a § 15 claim, "[a] plaintiff is required to prove actual control, not merely control person status."  In re IPO Secs. Litig., 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003) (emphasis omitted).

     **B.**     **Control Person Liability for the Rule 144A Offering Memorandum**

     As an initial matter, the dismissal of Count One, the count pertaining to the Rule 144A Offering Memorandum, necessarily requires the dismissal of Count Two, which pertains to control-person liability for the statements made in the Rule 144A Offering Memorandum.  As noted above, control-person liability exists only where there is a primary violation, and so the conclusion that misstatements in the Offering Memorandum cannot give rise to liability requires the further conclusion that those misstatements cannot give rise to control-person liability.  Accordingly, Count Two will be dismissed in its entirety.

     **C.**     **Control Person Liability for the Bond Registration Statement and the IPO Registration Statement**

     Count Four of the complaint alleges control-person liability for misstatements in the Bond Registration Statement.  Counts Six and Eight allege control-person liability for misstatements in the August 2005 IPO Registration Statement and prospectus.  There is no dispute that misstatements in these documents would constitute a primary violation of the Securities Act; therefore, the sole issue with respect to Counts Four, Six and Eight is whether the plaintiffs have adequately alleged that the defendants named in these counts exercised control over Refco at the time the statements became effective.

     As this Court found in an earlier case, allegations of control under Section 15 are subject only to notice-pleading requirements, and accordingly survive motions to dismiss "as long as it is at least plausible that plaintiff could develop some set of facts that would pass muster."  In re

36

Global Crossing III, 2005 WL 2990646, at *8.  Thus, the Court in that case concluded that even though the facts alleged in the complaint, taken alone, were insufficient to constitute control, the case did not fit "into that narrow category of cases in which it is 'implausible' or mere 'unlikely speculation' that plaintiffs can develop a record that would support a finding of control, especially given the decidedly fact-based nature of the control inquiry."  Id. (internal citations and quotation marks omitted).[24]

Under these standards, defendants' arguments for dismissal are unpersuasive.  Defendant Bennett moves to dismiss the Section 15 allegations against defendants RGHI and the Bennett Trust, noting that this Court has previously held that mere minority ownership is insufficient to constitute control under Section 15.  See Global Crossing III, 2005 WL 2990646, at *8.  However, the Court held in the same case that such allegations were sufficient to survive a motion to dismiss, because it was not implausible that plaintiffs could develop a record that could support a finding of control.  Bennett also argues that RGHI and the Bennett Trust cannot be liable under a control theory because the complaint alleges that they were controlled by him.  (Bennett Mem. 15.)  As a matter of logic, however, it makes little sense to say that controlling entities should escape liability on the grounds that other entities in turn controlled them.  The issue is whether the entity has "the power to direct or cause the direction of the management and policies of a person," First Jersey, 191 F.3d at 1472-73, not whether that power is exercised at the direction of another.  In fact, "[t]he 'control person' provisions were included in the federal securities laws to 'prevent people and entities from using 'dummies' to do the things that they

---

[24] Sexton contends that "culpable participation" is an element of a claim under Section 15.  (Sexton Mem. 21.)  It is not.  In re Global Crossing, Ltd., Secs. Litig., No. 02 Civ. 910, 2005 WL 1907005, at *11 (S.D.N.Y. Aug. 8, 2005) ("Global Crossing II"); see In re Vivendi Universal, S.A., 381 F. Supp. 2d 158, 188 (S.D.N.Y. 2003) ("the apparent majority of judges in the Southern District . . . have determined that culpable participation is not an element of § 15").

were forbidden to do by the securities laws.'" In re Flag Telecom Holdings, Ltd. Secs. Litig., 352 F. Supp. 2d 429 (S.D.N.Y. 2005) (internal citations and quotation marks omitted).[25]

Defendant Klejna argues that the mere signing of the Bond Registration Statement is insufficient to support control liability.  Klejna notes the principle that one purpose of control liability is to prevent powerful individuals or entities from arranging for "dummies" to sign in their stead, and contends that this principle militates against finding control as to the actual signatories.  (Klejna Mem. 25-26.)  However, "[t]he very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents."  WorldCom I, 294 F. Supp. 2d at 420.  "It does comport with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report."  Jacobs v. Coopers & Lybrand, L.L.P., No. 97 Civ. 3374, 1999 WL 101772, at *18 (S.D.N.Y. Mar. 1, 1999).  Thus, signature on an SEC filing containing the misrepresentations that are the subject of a claim is suggestive of control.  In any event, the complaint goes on to allege that Klejna's position as Executive Vice President and General Counsel gave him some degree of control over Refco, and that he was directly involved in its day-to-day operations, including financial reporting and accounting.  (Compl. ¶¶ 321, 350, 678, 697.)  That suffices as an allegation of control.

---

[25] Bennett also argues that the pleading standard of Rule 9(b) should apply to the Section 15 allegations, because "allegations of fraud permeate the Complaint."  (Bennett Mem. 21.)  This argument is no more meritorious as applied to Section 15 than it was when applied to Section 11.

Sexton argues that the allegations of control against him with respect to the IPO Registration statement must be dismissed because they are based "solely upon Sexton's status as an officer of Refco Group." (Sexton Mem. 22.) "However, where . . . the corporate officers are a narrowly defined group charged with the day-to-day operations of a public corporation, it is reasonable to presume that these officers had the power to control or influence the particular transactions giving rise to the securities violations." Maywalt v. Parker & Parsley Petroleum Co., 808 F. Supp. 1037, 1054 (S.D.N.Y. 1992) (internal citations and quotation marks omitted). Moreover, the complaint specifically alleges that Sexton "prepared and approved" the IPO Registration Statement. (Compl. ¶ 34.) This is sufficient for purposes of a motion to dismiss.

Murphy argues that the Section 15 allegations against him should be dismissed (Murphy/Sherer Mem. 31-25), but he signed the Bond Registration Statement (Compl. ¶ 36), which is a sufficient basis for control liability, and allegedly "prepared and approved" the IPO Registration Statement. (Id.) Moreover, as an Executive Vice President of Refco and President of various Refco subsidiaries, Murphy's role was central enough to make it plausible that the plaintiffs will be able to develop sufficient evidence to show control.

Silverman argues that mere allegations of officer status are insufficient to establish control. (Silverman Mem. 7.) He also argues that he was not, as alleged, the Controller of Refco in 2004 and 2005, and that the extensive alleged involvement of other defendants in the road show and other corporate activities somehow demonstrates that he was not deeply involved in these events. (Id. at 7-11.) Of course, arguments pertaining to the truth of the allegations and the weight of the evidence have no place in a motion to dismiss. The complaint alleges that Silverman signed the Bond Registration Statement (Compl. ¶ 37), and that he prepared and

approved it, and that he was deeply involved with Refco's day-to-day activities.  (Id. ¶ 388.)

This is enough to support the allegations of control.

     The Audit Committee Defendants argue that the allegations of control against them are

inadequate.  (THL/Audit Comm. Mem. 36-38.)  The complaint, however, alleges that these

defendants were responsible for overseeing Refco's financial reporting, accounting, and internal

controls, and coordinating outside audits.  (Compl. ¶¶ 322, 268.)  As another court in this district

found in a similar case,

> the audit committee was clearly the body charged with the specific
> responsibility of overseeing [the company's accounting and
> financial reporting and, therefore, with keeping [the company] on
> the straight and narrow.  A reasonable jury could find that the audit
> committee's recommendations would carry sufficient weight . . .
> that the audit committee had the practical ability to direct [the
> company's] accounting policies.  The audit committee defendants
> need not, of course, have actually exercised that authority to be
> held liable as control persons.

In re JWP Inc. Secs. Litig., 928 F. Supp. 1239, 1260 (S.D.N.Y. 1996).

     The THL Individual Defendants also challenge the allegations in Count Four, arguing

that those allegations are based merely on their status, rather than actual control.  (THL/Audit

Comm. Mem. 38-40.)  The complaint alleges that THL Partners acquired a 57% stake in Refco

prior to the issuance of the Bond Registration Statement, and that each of the THL Individual

Defendants was a control person of THL Partners.  (Compl. ¶¶ 48-52.)  "Control over a primary

violator may be established by showing that the defendant possessed 'the power to direct or

cause the direction of the management and policies of a person, whether through the ownership

of voting securities, by contract, or otherwise.'"  First Jersey, 101 F.3d at 1472-73, quoting 17

C.F.R. § 240.12b-2.  Moreover, the complaint alleges that the THL Individual Defendants were

at all relevant times directors of Refco, and that they "prepared and approved" the Bond

Registration Statement.  Thus, it is not implausible that plaintiffs could develop a record that could support a finding of control as to the THL Individual Defendants.

In short, the movants have failed to offer any convincing arguments for the dismissal of the Section 15 claims under the Securities Act, with the exception of the claims in Count Two. Accordingly, their motions to dismiss Counts Four, Six and Eight will be denied.

## IV.   Exchange Act § 10(b) and Rule 10b-5 Allegations Against the Officer and Audit Committee Defendants

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides that it shall be unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  Pursuant to this authority, the SEC issued Rule 10b-5, 17 C.F.R. § 240.10b-5, which makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

The defendants subject to § 10(b) claims make a variety of challenges, which fall into two basic groups.  First, some defendants argue that the plaintiffs have failed to sufficiently allege that they made material false statements.  Second, various defendants argue that the plaintiffs have failed to sufficiently allege that any false statements were made with scienter. Accordingly, this section discusses first the issue of material false statements, and then the question of scienter.  The Exchange Act allegations against Grant Thornton, Refco's auditor, are discussed separately in a subsequent section.

41

### A.    Material False Statements

To state a claim under Section 10(b), "a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir. 2003), quoting Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).  A statement or omission is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Industries Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

The PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure impose particularity requirements on Section 10(b) complaints, mandating that they "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (citations and internal quotation marks omitted); see 15 U.S.C.A. § 78u-4(b)(1) (PSLRA requirements for pleading misrepresentation).

The movants in this case do not dispute that the complaint adequately identifies the fraudulent statements, where and when they were made, and why they were fraudulent.  Instead, their challenges all pertain to the identity of the speaker, and fall into two basic groups.  First, some defendants argue that the complaint inappropriately groups them together, failing to tie them individually to the allegedly fraudulent statements.  Second, some defendants argue that

they cannot be implicated in the making of the allegedly fraudulent statements because of the timing of those statements.[26]

### 1. *Challenges Pertaining to Group Pleading (The Officer Defendants)*

"[A] defendant must actually make a false or misleading statement in order to be held liable under Section 10(b).  Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)."  Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998) (internal quotation marks and alterations omitted).  "[W]hen fraud is alleged against multiple defendants, a plaintiff must set forth separately the acts complained of by each defendant.  A complaint may not simply clump defendants together in vague allegations to meet the pleading requirements of Rule 9(b)."  Rich v. Maidstone Fin., Inc., 98 Civ. 2569, 2001 WL 286757, at *6 (S.D.N.Y. Mar. 23, 2001).  Under the doctrine of group pleading, however, plaintiffs can "circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent" by "rely[ing] on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company."  In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005), quoting In re NTL Secs. Litig., 347 F. Supp. 2d 15, 22 n.26 (S.D.N.Y. 2004).

Alleging direct involvement in the company's everyday business is critical to support the presumption.  Thus, allegations that a defendant was simply "an affiliate and contracted to perform work" or even that it "own[ed] and control[led]" the identified speaker will be

---

[26] Grant Thornton, the outside auditor, also challenges the specificity of the allegations tying it to the allegedly fraudulent statements.  These arguments are addressed in Section V of this opinion.

insufficient.  In re Parmalat Secs. Litig., No. 05 Civ. 4015, --- F. Supp. 2d ----, 2007 WL 869012, at *4 (S.D.N.Y. Mar. 23, 2007).

As defendants point out, some courts have held that the PSLRA implicitly abrogated or abolished the group pleading doctrine.  In Southland Secs. Corp. v. INSpire Ins. Solutions Inc., 365 F.3d 353 (5th Cir. 2004), the Fifth Circuit concluded that the group pleading doctrine "cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind."  Id. at 364-65, quoting 15 U.S.C. § 78u-4(b).

As the Fifth Circuit acknowledged, however, the PSLRA "does not explicitly abolish the doctrine."  Id. at 365.  Nor is there any apparent contradiction between the idea that each defendant's role must be pled with particularity and the fact that corporate officers may work as a group to produce particular document.  Therefore, this Court joins the majority of district courts in this district and others in holding that the group pleading doctrine is "alive and well."  In re BISYS Secs. Litig., 397 F. Supp. 2d 430, 439 (S.D.N.Y. 2005); see id. at 439 n.42 (collecting cases).

Defendants Murphy, Klejna and Silverman argue that the complaint fails to tie them to the alleged fradulent statements with enough specificity.  (Sherer/Murphy Mem. 13-14; Klejna Mem. 8-13; Silverman Mem. 15-16.)  The Complaint alleges, however, that each of these three officers "prepared and approved" the allegedly fraudulent documents.  (Compl. ¶¶ 36, 37, 38). Moreoever, the Complaint alleges that each of these three defendants "was a corporate insider or affiliate with direct involvement in the daily affairs of the company."  BISYS, 397 F. Supp. 2d at

44

440-441.  (See Compl. ¶¶ 36, 37, 38).  These allegations of their involvement in the creation of

the alleged misstatements is sufficient to survive the motions to dismiss.

Similarly, the Audit Committee Defendants contend that the plaintiffs have alleged "no

special relationship with the corporation" or "access to information more akin to a corporate

insider."  (THL/Audit Comm. Mem. 24 n.15.)  "Allegations of membership on an Audit

Committee may, in certain circumstances, provide a basis for liability under the group pleading

doctrine."  In re Alstom SA, 406 F. Supp. 2d 433, 449 (S.D.N.Y. 2005) ("Alstom I").  Plaintiffs

allege that the Audit Committee Defendants served on the Audit Committee from at least

October 12, 2004, when they approved the Bond Registration Statement, through the time of

Refco's bankruptcy (Compl. ¶¶ 42-45), and that they had extensive access to Refco's internal

information, were responsible for overseeing the integrity of Refco's financial statements, and

approved those financial statements for all relevant periods.  (Compl. ¶¶ 42-45, 268; see P. Mem.

93-94.)  These allegations are sufficient under the group pleading doctrine.  See In re Adelphia

Commc'ns Corp. Secs. and Deriv. Litig., 398 F. Supp. 2d 244, 250 (S.D.N.Y. 2005) (applying

group pleading doctrine to members of the board with equity interest and "access to information

concerning the company's day-to-day business").

### 2. *Challenges Based on the Timing of the False Statements (Trosten and Sherer)*

Trosten, Refco's former CFO, argues that plaintiffs have failed to identify any material

misrepresentations made by Trosten within the class period, defined by the complaint as August

5, 2004, to October 17, 2005.  (Compl. at 1.)  (Trosten Mem. 16-17; see P. Mem. 94-95).  He

makes two arguments: first, that he resigned on October 4, 2004, eight days before the filing of

the Bond Registration Statement, and that he is therefore not liable for any misrepresentations in

45

that document; and second, that any misstatements in the Offering Memorandum or road show are irrelevant because they happened in July 2004 (Compl. ¶¶ 105, 144), prior to the start of the Class Period on August 5.

Plaintiffs contend that Trosten "is subject to liability for his false statements at the Road Shows at in the Offering Memorandum." (P. Mem. 95.) These transactions are not, however, asserted as a basis for liability in the complaint. The section of the complaint that deals with the "False and Misleading Statements" on which Exchange Act liability is based describes in detail three sets of statements (the May 2005 press release and Form 8-K, the 2005 year-end press release and 2005 Form 10-K, and the First Quarter 2006 press release and associated filings) (Compl. ¶¶ 526-551), and references the Bond Registration Statement and the IPO Registration Statement (Compl. ¶ 525), but makes no mention of misstatements in the Bond Offering Memorandum or at the Road Show. Moreover, Count Nine of the complaint alleges that misstatements were made "throughout the Class Period." (Compl. ¶ 639.) Thus, plaintiffs cannot now argue that the earlier statements should be the basis of liability.

Even if pre-class-period statements were alleged as a basis for liability in the complaint, they would not survive the motion to dismiss. The Second Circuit has held that "[a] defendant . . . is liable only for those statements made during the class period." In re IBM Secs. Litig., 163 F.3d 102, 107 (2d Cir. 1998). Although pre-class-period statements can be relevant for showing whether defendants had knowledge that their later statements were false, In re Scholastic Corp. Secs. Litig., 252 F.3d 63, 72 (2d Cir. 2001), those statements cannot themselves give rise to liability.[27]

_____

[27] Plaintiffs' arguments against this rule are not unpersuasive. A class period is delimited in order to identify the individuals who claim membership in the class, not to identify the conduct that injured them, as is clear in context when the Complaint identifies the plaintiffs as

As to whether Trosten may be held liable for misstatements in the Bond Registration Statement, which was filed after his departure from Refco, the general rule is of course that "a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b).  Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)."  Wright, 152 F.3d at 175 (internal quotation marks and alterations omitted).  Trosten did not himself make the misstatements in the Bond Registration Statement, and he can therefore be held liable only if he falls within the group pleading doctrine, which is an exception to this general requirement.

"Alleging direct involvement in the company's everyday business is critical to support the presumption."  Parmalat, 2007 WL 869012 at *4.  The Complaint does not allege that Trosten remained involved in Refco's everyday business after his departure (Compl. ¶ 40), and therefore fails to satisfy the requirements of the doctrine.  Nor does the complaint allege that Trosten prepared or approved the Bond Registration Statement; the only factual predicate offered for Trosten's liability for misstatements in the Bond Registration Statement is that he knew that the statements in the Offering Memorandum would be repeated in the Bond Registration Statement.  (P. Mem. 95.)  This argument, however, would give rise to liability far beyond the scope allowed by the group pleading doctrine, because it would give rise to liability in any case where a misstatement is regularly or predictably repeated for anyone involved in prior iterations of the statement.

---

those "who purchased or acquired [relevant securities] between August 5, 2004 and October 17, 2005 (the "Class Period")."  (Id.)  Indeed, this is why it is called the "*Class* Period," not the "Liability Period."  Thus, it might logically be concluded that "[t]he fact that the proposed class period begins after the first of the alleged misstatements does not make those earlier statements irrelevant or not actionable."  Zelman v. JDS Uniphase Corp., 376 F. Supp. 2d 956, 966 (N.D. Cal. 2005).  However, as noted above, the Second Circuit has spoken clearly on this question, and this Court is bound by its conclusion.

The group pleading doctrine is a presumption that certain statements are "the collective work of those individuals with direct involvement in the everyday business of the company." BISYS, 397 F. Supp. 2d at 438.  It is a doctrine of attribution, not of complicity, and therefore does not give rise to liability for later statements by a defendant's former associates.  See Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007) (as to an accountant, plaintiff must allege a misstatement that is attributed to the defendant "at the time of its dissemination," and cannot rely on alleged assistance in the drafting or compilation of a filing). Accordingly, the Exchange Act claims against Trosten must be dismissed.

Sherer also makes an argument based on the timing of the relevant statements.  He contends that he is not responsible for statements Refco made before January 2005, when Sherer began working at Refco.  (Sherer/Murphy Mem. 13-14.)  Plaintiffs' memo clarifies that they do not seek to hold him responsible for statements made prior to that time.  (P. Mem. 94.)  Although the substantive counts of the complaint do not specifically indicate that Sherer is not subject to claims for misstatements before this point (see Compl. ¶¶ 638-645), the Court accepts that any claims against Sherer arising from misstatements before January 2005 have now been abandoned.  Accordingly, Sherer's motion to dismiss such claims against him will be denied as moot.

### B.      Scienter

The Officer Defendants and the Audit Committee Defendants argue that the Exchange Act counts against them must be dismissed for failure to satisfy the scienter element of an

Exchange Act claim.  (See Sexton Mem. 9-17; Silverman Mem. 16-22; Klejna Mem. 13-24; Sherer/Murphy Mem. 16-31; see P. Mem. 105-112).[28]

The state of mind that must be alleged in an action under section 10(b) and Rule 10b-5 is "'an intent to deceive, manipulate or defraud.'"  Ganino, 228 F.3d at 168, quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).  To state a claim for securities fraud, the PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  See Novak v. Kasaks, 216 F.3d 300, 310 (2d Cir. 2000) (noting that the PSLRA "did not change the basic pleading standard for scienter in this circuit.").

To satisfy this requirement, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud."  Rothman, 220 F.3d at 90.  Conscious misbehavior or recklessness may be inferred where the complaint sufficiently alleges that the defendants: (1) "benefitted in a concrete and personal way from the purported fraud"; (2) "engaged in deliberately illegal behavior"; (3) "knew facts or had access to information suggesting that their public statements were not accurate"; or (4) "failed to check information they had a duty to monitor."  Novak, 216 F.3d at 311 (internal citations omitted).  As to motive and opportunity, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."  Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001).

_____

[28] Although Trosten is among these defendants (see Trosten Mem. 17-22), his arguments need not be addressed in light of the conclusion that plaintiffs have failed to identify him with relevant misstatements.

The group pleading doctrine "has no effect on the PSLRA's scienter requirement.  It merely gives plaintiffs the benefit of a presumption that certain kinds of statements were made by certain kinds of defendants.  It does not permit plaintiffs to presume the state of mind of those defendants at the time the alleged misstatements were made."  BISYS, 397 F. Supp. 2d at 440.

### 1.     *The Officer Defendants' Motive and Opportunity to Commit Fraud*

Silverman, Sexton, Klejna, Sherer, and Murphy contend that plaintiffs have failed to adequately allege their motive and opportunity to commit fraud.

To establish an adequate motive to commit securities fraud, plaintiffs must allege a motive that is concrete and personal to the defendant charged with making the misstatement or omission.  Kalnit, 264 F.3d at 139.  This must be more than "a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor."  Chill v. Gen. Elec. Co., 101 F.3d 268 (2d Cir. 1996).  "Motives that are generally possessed by most corporate directors and officers do not suffice."  Kalnit, 264 F.3d at 139.  The desire for the corporation to appear profitable, the desire to keep stock prices high, and even the desire to keep stock prices high in order to increase officer compensation, are insufficient because they are "common to all corporate executives and, thus, too generalized to demonstrate scienter."  Id.  Similarly, "[t]o allege a motive sufficient to support the inference [of scienter], a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold."  Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994).

Of course, the desire to keep stock prices high or to increase one's own compensation are often the actual motive for corporate fraud, but "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."  Acito v. IMCERA Group, Inc., 47 F.3d 47,

50

54 (2d Cir.1995). "[T]he 'not commonly shared' limitation on motive inhibits some plaintiffs who have been genuinely defrauded from obtaining a remedy," JP Morgan Chase, 363 F. Supp. 2d at 619, but the mere desire to increase officer compensation or stock prices does not give rise to a "strong inference" of fraudulent intent because such desires are omnipresent, and can as easily be a sign of simple ambition or run-of-the-mill greed as of fraud.  Cf. id. at 618 n.14 (discussing whether plaintiffs must plead facts that exclude other inferences that are equally plausible to scienter).

    To show motive in this case, plaintiffs allege that the officers of Refco in the year leading up to the IPO "stripped close to $1 billion from the Company" in a variety of ways. (Compl. ¶ 582.)  The first wave of the "frenzy," according to plaintiffs, began in June 2004 with the THL Partner Defendants' purchase of a 57% stake in Refco from RGHI.  Plaintiffs allege that Murphy, Sexton, and Klejna received large sums of money — from $6.5 million to $13.7 million — from this buyout pursuant to a "Company-endorsed profit-sharing agreement liquidated by [RGHI]."  Plaintiffs also allege that the defendants received certain "unusually large" grants of common stock, without indicating when these grants took place, other than saying they were "[i]n the lead-up to the IPO."  (Compl. ¶ 585.)  Motive, however, entails "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," Shields, 25 F.3d at 1130, and plaintiffs do not explain how these first floods of money relate to the alleged fraud.

    Plaintiffs also rely on a number of more general benefits that would accrue from the IPO. For example, the IPO would allow the defendants to create a public trading market that would allow the defendants to sell their stock for huge profit or use it as collateral for personal loans (Compl. ¶ 588), and would create a capital infusion that would increase the book value of all

Refco shares, including the shares the defendants retained.[29]  (Id.)  Moreover, plaintiffs allege

that the officer defendants received — again, at an unspecified time — "huge" grants of

restricted stock units ("RSUs").  Fifty percent of these grants would vest in four years, while

fifty percent were conditional on the company's performance.  (Compl. ¶ 591.)  The officers also

were entitled to bonuses conditioned on company performance.  (Compl. ¶ 593.)  It is not

necessary to decide whether these incentives, in the aggregate, would have given the defendants

a sufficient motive to commit fraud, because another allegation relating to the defendants'

motive is enough to suffice.

The IPO underwriting agreement provided for a so-called "green shoe" option providing

that in the event the IPO was oversubscribed, the underwriters would be authorized to sell more

shares than originally provided for at the offering price.  (Compl. ¶ 168.)  The proceeds of any

such sale would be distributed directly to the shareholders of record before the IPO — including

the officer defendants and the THL Partner Defendants.  (Id. ¶ 587.)  Thus, "by creating

sufficient demand for Refco stock at the time of the IPO, these Defendants received an extra

cash payment from the sale of shares dedicated to cover the oversubscription."  (Id.)  The IPO

was indeed oversubscribed, and the defendants received payments ranging from Sherer's

$349,800 to Klejna's $201,135.  (Id. ¶ 587.)

"[M]otive is adequately pleaded where the plaintiffs allege that the defendants sold their

own shares while at the same time misrepresenting corporate performance in order to inflate

stock prices."  Marcus v. Frome, 329 F. Supp. 2d 464, 473 (S.D.N.Y. 2004).  The Second Circuit

---

[29] Plaintiffs also allege that the IPO would result in a "huge one-time 'special dividend' payment that would . . . line the pockets of these corporate insiders."  (Compl. ¶ 588.)  It is not clear what this refers to; presumably, it is a reference to the "green shoe" option, as plaintiffs have not alleged any other special dividend from the IPO.

has held that motive is adequately alleged where the defendants who made false statements inflating the value of shares "sold tens of thousands of shares during the period that the allegedly defrauded customers were purchasing them." Shields, 25 F.3d at 1131. According to the complaint, the officers had a direct financial interest in the IPO. By fraudulently concealing the uncollectible receivables, they could drive up demand for Refco shares, which would result in purchases of shares from which defendants would be directly compensated. This is a concrete benefit directly flowing from the alleged fraud, and is accordingly sufficient to give rise to a strong inference of motive.

Several defendants point out that they purchased stock in the IPO, which, they argue, is inconsistent with the motive to commit fraud. They cite In re Regeneron Pharmaceuticals, Inc. Securities Litigation, No. 03 Civ. 3111, 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005), in which the court stated that "[i]t is well settled that . . . the purchase of additional company shares during the class period-is inconsistent with an intent to commit fraud." Id. at *22. Regeneron, however, dealt with alleged misstatements by corporate officers about the effectiveness of a new drug marketed by their company.[30] Purchasing shares in the company is indeed inconsistent with a belief that the drug's effectiveness has been fraudulently overstated, because that fact will inevitably become known; one does not buy seats on a sinking ship. In this case, however, the

---

[30] The same is true of In re Symbol Techologies Class Action Litigation, 950 F. Supp. 1237, 1245 (E.D.N.Y. 1997) ("Plaintiffs do not allege a motive to commit fraud. This is not surprising, since the company and defendant Amato, as well as two high-ranking financial officers, purchased shares of Symbol stock during the class period"), on which Regeneron relied; Symbol dealt with allegedly false projections of future performance that would have been shortly disproved. Klejna also cites In re Sina Corp. Securities Litigation, No. 05 Civ. 2154, 2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006), in which the court noted that "If the Individual Defendants indeed failed to disclose certain facts in order to personally profit from inside information, one would reasonably expect that they would hold fewer shares of stock before the anticipated plunge in the stock's price than they held the year before." Id. at *12. It is not clear from the allegations in this case that the defendants anticipated a plunge.

facts alleged in the complaint do not make clear that the defendants knew the ship was sinking. The defendants might have believed that the uncollectible receivables held by RGHI could be hidden indefinitely or at some point permanently disposed of (for example, by RGHI actually paying Refco for them), and that Refco's stock would accordingly continue to rise.

Murphy and Sexton make a similar argument, relying on In re Health Management Systems, Inc. Securities Litigation, No. 97 Civ. 1865, 1998 WL 283286 (S.D.N.Y. June 1, 1998), which held that the fact that defendants actually purchased shares "undermines plaintiff's claim that defendants delayed notifying the public so that they could sell their stock at a huge profit." Id. at *6. Again, the case is not analogous; nothing about defendants' purchase of shares in the IPO is inconsistent with their alleged efforts to inflate the demand for Refco stock. The defendants in Health Management allegedly planned to profit by selling shares; the fact that they purchased shares thus directly rebutted plaintiffs' theory. The scheme in this case did not depend upon defendants' selling their shares.

Defendants are free to argue to a finder of fact that their actions were inconsistent with an intent to commit fraud. It might be possible to argue, for example, that plaintiffs' allegations are implausible because Refco would have been seen as too risky an investment by anyone who knew of the scheme. However, despite the demands of Rule 9(b) and the PSLRA, this is, after all, a motion to dismiss, and arguments such as these are inappropriate at this stage. Plaintiffs have adequately alleged that the officer defendants stood to profit in a direct, personal, and concrete way from the alleged fraud.

As to opportunity, the defendants' arguments are easily dispensed with. They argue that plaintiffs' allegation that each defendant prepared and approved the relevant misstatement are insufficient to establish opportunity to commit fraud. (See, e.g., Sexton Mem. 16.) They do not

explain, however, why these allegations do not suffice.  Opportunity entails "the means and likely prospect of achieving concrete benefits by the means alleged."  Shields, 25 F.3d at 1130. The defendants' involvement in the preparation of the statements at issue was of course the "means and likely prospect" of fraudulently inflating demand for Refco shares.  They were corporate officers of Refco with the power to approve those statements, and cannot seriously dispute that "[s]uch senior executives have the opportunity to commit fraud."  Am. Bank Note Holographics, 93 F. Supp. 2d at 444.  Thus, plaintiffs have adequately alleged that Silverman, Sexton, Klejna, Sherer, and Murphy had sufficient motive and opportunity to give rise to a "strong inference," 15 U.S.C. § 78u-4(b)(2), of scienter.

## 2.   *The Officer Defendants' Knowledge or Recklessness*

Although the finding that motive and opportunity have been adequately alleged is sufficient to dispose of the argument that plaintiffs have not adequately alleged scienter as to these defendants, the issue of the officer defendants' knowledge or recklessness will be addressed because it is relevant to the discussion of control-person liability in a later section of this opinion.

To support an inference of recklessness, plaintiffs must allege facts showing that the defendants' conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  Rothman, 220 F.3d at 90.  Recklessness is adequately alleged when, inter alia, a plaintiff "specifically alleges defendants' knowledge of facts or access to information contradicting their public statements."  In re eSpeed, Inc. Secs. Litig., 457 F. Supp. 2d 266, 282 (S.D.N.Y. 2006).

Sexton, Silverman, Klejna, Sherer, and Murphy argue that the plaintiffs have failed to adequately allege facts giving rise to a strong inference that they acted with the requisite state of mind, that is, knowledge or recklessness.  They contend that plaintiffs' allegations fail because they have not pointed to specific pieces of information to which defendants had access that would have alerted them to the wrongdoing in progress, noting that "conclusory allegations that a corporate officer had 'access' to information that contradicted the alleged misstatements are insufficient to raise a strong inference of recklessness." Kinsey v. Cendant Corp., No. 04 Civ.0582, 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005).

Aside from defendants' role in the corporation, the complaint's allegations of recklessness focus primarily on the allegedly fraudulent transactions themselves, in particular their size, their timing and recurrent nature, and their obvious lack of business purpose.  The transactions were certainly large, and their timing, recurrent nature, and obvious lack of business purpose would certainly have been suspicious to anyone who became aware of them.  Plaintiffs also rely on the allegation that Refco had a history of similar violations, which they claim "should have alerted the Inside Defendants and Grant Thornton to the risk of financial manipulation." (Compl. ¶ 576.)  This history allegedly included at least 140 citations from the CFTC for violations including filing false trading reports and inadequate record-keeping — "the worst record in the industry." (Id.)  "Refco's culture of rule-breaking and repeated legal troubles should have, and but for their recklessness would have, alerted Grant Thornton and the Inside Defendants (who, unlike outside investors, had unfettered access to Refco's managers, books, and records) to Refco's fraudulent financial reporting." (Id. ¶ 576.)  Specifically, plaintiffs allege that Refco had earlier been implicated in CFTC and SEC enforcement actions where Refco was accused of improperly shifting client funds between related party accounts and paying

off its own debt, actions similar to the scheme at issue here.  (Id. ¶¶ 577, 578, 579.)  This history, they contend, was essentially a roadmap to discovery of the fraud, had anyone cared to look into it.

The red flags on which plaintiffs rely are glaringly suggestive of fraud, but only to those who were or should have been aware of them.  While a red flag need not "reveal to a defendant all aspects of a given fraud," In re Van der Moolen Holding N.V. Secs. Litig., 405 F. Supp. 2d 388, 406 (S.D.N.Y. 2005), plaintiffs must allege that "facts which come to a defendant's attention would place a reasonable party in defendant's position on notice of wrongdoing."  Id. In this case, there was certainly a monster under the bed; the question is whether anyone had a reason to look there.

"[S]cienter cannot be inferred solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information."  In re Winstar Commc'ns, No. 01 Civ. 3014, 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006).  The inquiry into whether corporate officers should have known of facts indicating the falsity of public statements is a fact-specific one; scienter may be found where there are "specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice" that the public statements were false. Goplen v. 51job, Inc., 453 F. Supp. 2d 759, 774-775 (S.D.N.Y. 2006).

Where the parent corporation is allegedly put on notice of the true underlying facts, scienter can be established, see Alstom, 454 F. Supp. 2d 187, 199 (S.D.N.Y. 2006) ("Alstom II") (finding scienter where the parent corporation "had been directly alerted at its highest corporate levels as to this potentially adverse issue").  But "[f]raud cannot be inferred simply because [a parent company's officers] might have been more curious or concerned about the activity at [its

subsidiary]."  Chill, 101 F.3d at 270.  "[I]ntentional misconduct or recklessness cannot be

presumed from a parent's reliance on its subsidiary's internal controls."  Id. at 271 (internal

citations and quotation marks omitted).

During the relevant time period, each of the moving defendants was an Executive Vice

President of Refco, but none is alleged to have been an officer of Refco Capital or (with the

exception of Silverman) RGHI.  (Compl. ¶¶ 33-38.)  Silverman was Controller and Secretary of

Refco.  Sherer, who joined Refco in January 2005, was CFO from that time through Refco's

collapse; Sexton was COO; Klejna was General Counsel; and Murphy was in charge of global

marketing.  (Id.)  As to these officers, plaintiffs allege essentially that the ongoing fraud was so

large and conspicuous, so poorly hidden, and so consistent with prior violations that the officer

defendants must have been aware of it.  They contend that the defendants' "positions in . . . the

Company, and their concomitant access to inside information, also raise a strong inference that

[they] knew or recklessly disregarded the truth about the transactions discussed above.  The

Officer Defendants were responsible for the Company's operations and played a critical role in

its management."  (Compl. ¶ 565.)  Thus, they contend, the defendants' "access to, and

obligation to monitor, all the underlying facts and circumstances of these transactions raises a

strong inference of scienter."  (Id.)

The allegations against some of the defendants are stronger than others.   Silverman's

alleged role in Refco and related parties raises a strong inference of knowledge or recklessness.

Whether or not his duties as Secretary and Controller of Refco included monitoring related-party

transactions involving subsidiaries like Refco Capital — a question not addressed in the

complaint —  Silverman was Secretary of RGHI (Compl. ¶ 37), the entity most deeply

implicated in the fraudulent transactions.  Plaintiffs also point out that Silverman was asked by

58

the Board of Refco to resign at the same time as Bennett and Maggio. (Id.)  This fact at least suggests that the Board — which was in a position to know — believed he was in a position to have learned of the fraud.  Moreover, Silverman allegedly signed an agreement by which BAWAG, which allegedly served as one of the third-party intermediaries for the fraudulent loans, obtained in 2004 an undisclosed equity interest in Refco.  (Compl. ¶ 269(a).)  This could be read to suggest that he was not only involved with the day-to-day operations of RGHI, but in particular in dealings with the third party that facilitated the fraud.  While a reasonable fact-finder might certainly conclude that Silverman was not conscious or reckless with respect to the fraud, these allegations at least give rise to a "strong inference" sufficient to allow plaintiffs to go forward with discovery as to Silverman.

The allegations as to Murphy and Sexton, on the other hand, are inadequate.  Plaintiffs never explain, for example, what business Murphy, Refco's vice president for global marketing, would have had reviewing the books of Refco Capital or RGHI.  Sexton, who was Refco's COO (and, briefly, CEO), no doubt had more responsibility for Refco's operations, but plaintiffs make no allegations whatsoever concerning the relationship between Refco Capital, the subsidiary, and Refco, the entity for which Sexton worked.  The complaint states that Refco Capital Markets Ltd. "is a Bermuda-based Refco subsidiary that traded over-the-counter derivatives in a largely unregulated market" (Compl. ¶ 25),[31] but whether the two entities were entirely separate or effectively one, and whether Refco's officers had any involvement whatsoever in the operations

_____

[31] Although it has no effect on the outcome of the present motion, it should be noted that Klejna asserts that there are in fact two separate entities that might be referred to as "Refco Capital": Refco Capital Markets Ltd., and Refco Capital LLC.  (Klejna Mem. 21 n.12.)

of Refco Capital, is left entirely to the imagination.[32]  Thus, the complaint gives no basis on

which to conclude that Sexton or Murphy should have been familiar with any transactions

originating with that company.

Nor do plaintiffs allege any reason to think that Sexton or Murphy should have been

aware of the activities of RGHI.  Plaintiffs more than amply allege that all defendants had a basis

for knowing RGHI "was a related party controlled by Refco's President and CEO."  (¶ 566.)

This can hardly be questioned; as Klejna notes, the relationship between Refco and RGHI was

disclosed in the IPO Registration Statement and the Bond Registration Statement. (Compl. ¶ 99.)

Plaintiffs do not, however, allege that Sexton — or, indeed, any of the corporate officers moving

for dismissal, with the exception of Silverman — was involved in RGHI's day-to-day

operations, much less the relevant transactions.  See In re NYSE Specialists Secs. Litig., 405 F.

Supp. 2d 281, 314 (S.D.N.Y. 2005) (holding that plaintiffs had failed to allege scienter where

there were no allegations that corporate parent "recklessly disregarded" red flags that should

have put it on notice of subsidiary's fraudulent scheme).  It is not clear that Sexton's

responsibilities as COO would have involved oversight of transactions such as the ones at issue,

or monitoring Refco's financial situation.  Nor do plaintiffs allege any reason why Sexton or

Murphy should have known that Bennett had signed for Refco as a guarantor for the relevant

loans.

The only aspect of the fraudulent transactions that would presumably have appeared on

Refco's own books was the last step, in which RGHI used the loan from the third party to pay

down the money it owed to Refco for the uncollectible receivables.  (Compl. ¶ 416.)  A Refco

---

[32] The complaint does make clear that the loan agreements between Refco Capital and the
third party were signed by David Weaver, the Chief Administrative Officer at Refco Capital
(¶ 409), rather than by any of the moving defendants.

officer reviewing Refco's books might have seen RGHI temporarily paying off "at least a portion of the receivable owed."[33]  (Id.)  The complaint does not specify, however, whether this payment against the RGHI receivable appeared in any reports or statements routinely reviewed by officers such as Sexton.  The other stages in the transactions would apparently not have been reflected in Refco's books at all.  As noted above, the complaint does not allege that the fraudulent transactions began at Refco itself; instead, the money came from Refco Capital, a subsidiary with which the Officer Defendants are not alleged to have been involved.[34]  Indeed, in the plaintiffs' chart summarizing the form of these transactions, no arrow representing a loan or a debt originates from Refco itself.  (Id. ¶ 517.)  Nothing in the complaint supports the strong inference that Murphy or Sexton had responsibility for monitoring those books.

Plaintiffs' allegations of a history of similar violations by Refco is relevant insofar as it would have made the red flags brighter, but again, unless this history required a defendant to make further investigations that would have uncovered the fraud, the history would not make visible red flags otherwise outside defendants' range of vision.  Nor does it matter that an employee at Refco allegedly discovered the fraud after working there for only two months

---

[33] It appears that the scheme was designed not to pay off all of Refco's uncollectible receivables, but merely to pay them down.  (See Compl. ¶ 240.)

[34] As discussed above, the complaint in places uses the word "Refco" to refer to Refco Capital.  Thus, as to the transactions for which BAWAG served as intermediary, the complaint frequently states that the money originated with "Refco," a term which the complaint defines to include Refco itself "and all of its predecessors and affiliates," (Compl. Ex. 1. at viii), but does not explain whether this term is used to denote Refco or Refco Capital.  In at least one place, it is clear that where the portions of the complaint dealing with BAWAG loans refer to money originating from "Refco," they mean money originating with "Refco Capital Markets," not Refco itself (Compl. ¶ 500).  The complaint nowhere alleges otherwise with respect to the other BAWAG transactions.  (Id. ¶¶ 472-501.)  Moreover, the complaint elsewhere states broadly that "[t]he funds used in the circular transactions originated with Refco Capital."  (Id. ¶ 569.)  In transactions with other third parties, too, Refco Capital was the source of the money.  (Id. ¶ 505.)

(Compl. ¶ 608), because the complaint never identifies this employee's position, or the responsibilities pursuant to which he or she discovered the fraud.  No doubt there were some employees at Refco whose positions put them into close contact with the massive fraud, but absent an allegation that puts defendants themselves into such contact, that fact cannot defeat a motion to dismiss.  Nor does the suspiciously large severance payment allegedly made to Trosten (¶ 575) raise an inference of scienter as to the individual defendants, because the complaint fails to specify which of them, if any, were or should have been aware of it.  (Id.)

Plaintiffs's allegations as to Sherer and Klejna are more specific.  Sherer, the CFO, was responsibility for Refco's financial well-being, and the regular appearance and disappearance of a large RGHI receivable at the end of Refco's financial period's was a glaring red flag.  Moreover, the fraudulent transactions were allegedly orchestrated by one or more attorneys at an unnamed law firm.  (Compl. ¶¶ 403-05.)  The plaintiffs allege that Sherer, as CFO, and Klejna, as General Counsel, were responsible for receiving and authorizing the payment of bills from this firm that "described the legal work performed . . . in connection with documenting the transactions."  (Compl. ¶ 595.)  It is of course possible that Bennett orchestrated the legal work without the help or knowledge of the corporate officers responsible for supervising the law firm, but the allegation that Sherer and Klejna stood between Bennett and the law firm in the relevant chain of command supports a strong inference that they were aware of the work being done.  The size of the transactions, their recurrent nature, and their obvious lack of business purpose may not themselves be sufficient to support an inference of scienter, but together with the allegations concerning the roles and responsibilities of Silverman, Sherer, and Klejna, they suffice.

Thus, plaintiffs have adequately alleged recklessness as to Silverman, Sherer and Klejna, but not as to Sexton and Murphy.  Because motive and opportunity have been adequately alleged

as to all five of these defendants, however, a strong inference of scienter has been raised as to

each, and their motions to dismiss for failure to allege scienter will be denied.

### 3.    *The Audit Committee Defendants' Recklessness*

The Audit Committee Defendants also argue that plaintiffs have failed to adequately

allege scienter as to them.  (THL/Audit Comm. Mem. 25-34; see P. Mem. 105-113.)  Although

the allegations of recklessness as to the Audit Committee Defendants are insufficient to give rise

to a strong inference of fraud, the allegations of motive and opportunity are enough to survive a

motion to dismiss.

As to recklessness, "courts have been hesitant to find a strong inference of audit

committee members' scienter in cases providing general allegations of circumstantial evidence."

In re Marsh & McLennan Cos., Inc. Secs. Litig., No. 04 Civ. 8144, 2006 WL 2057194, at *29

(S.D.N.Y. July 20, 2006).  Reckless conduct in a § 10(b) claim "represents an extreme departure

from the standards of ordinary care . . . to the extent that the danger was either known to the

defendant or so obvious that the defendant must have been aware of it."  Chill, 101 F.3d at 269.

"[J]ust because a defendant is a director and member of the company's audit committee does not

lead automatically to an inference that the person acted with conscious disregard of a known risk

as opposed to with gross negligence or even negligence."  Jacobs, 1999 WL 101772, at *16.

Plaintiffs allege in detail the responsibilities for internal procedures and oversight that

went with membership in the Audit Committee.  (Compl. ¶¶ 599-601.)  Specifically, the Audit

Committee's duties allegedly included oversight of Refco's accounting and internal control

policies and procedures and of the internal controls themselves; assessment and management of

the company's exposure to risk; management of internal audit projects; and meetings with inside

and outside counsel to review legal and regulatory matters, including any matters that might

have a material impact on Refco's financial statements; and reviewing and discussing with management "material financial arrangements of the Company which do not appear on the financial statements of the Company."  (Id. ¶ 601.)  The complaint also alleges that Audit Committee Defendant O'Kelley, the chairman of the Committee, was qualified as an independent "audit committee financial expert" as defined by the SEC, which required extensive experience and expertise on his part.  (Id. ¶ 602.)

Mere membership in a committee with oversight responsibilities, however, is not enough to give rise to an inference of recklessness.  "[C]ourts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook."  Health Mgmt. Sys., No. 97 Civ. 1865, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998).  It is not enough to allege "that the Audit Committee had a duty to monitor regulatory and legal compliance"; rather, plaintiff must identify "information that reached the Audit Committee and that they either knew about or were reckless in ignoring." Marsh & McLennan, 2006 WL 2057194, at *29.  "Simply stating that a defendant had a duty to monitor is insufficient to raise a strong inference of scienter without allegations of what information was reasonably available to them or how they were reckless in their duties."  Id.

As to the specific information revealing fraud that the Audit Committee Defendants Plaintiffs knew or should have known of, plaintiffs can point only to certain "significant deficiencies" in Refco's audit procedures which were brought to the Committee's attention by Refco's auditor in February 25, 2005.  (Compl. ¶¶ 603-07.)  These deficiencies were: (1) a need to increase the resources of Refco's finance department, "to be able to prepare financial statements that are fully compliant with all SEC reporting guidelines on a timely basis" (id.

¶ 603), and (2) a "lack of formalized procedures for closing [the Company's] books" (id. (alterations in original)).  The IPO Registration Statement defined "significant deficiency" as "a deficiency that results in more than a remote likelihood that a misstatement of financial statements that is more than inconsequential will not be prevented or detected."  (Id.)  Plaintiffs allege that these deficiencies "should have alerted [the Audit Committee Defendants] that there was a significant risk of fraudulent activity at the Company."  (Id. ¶ 604.)  They also allege that the deficiencies "created an environment where it was easy for Bennett, Maggio and others to fraudulently manipulate Refco's financial statements."  (Id.)

Plaintiffs do not explain how correction of these deficiencies would have resulted in discovery of the fraud.  Nor is it obvious that it would have; more resources for the finance department or more formalized procedures might have necessitated more care on the part of the perpetrators, but plaintiffs do not explain what aspects of the fraud would have been revealed by a strengthening of procedure or an influx of resources to the finance department.  Alleging that the defendants should have prospectively tightened controls is not the same as alleging that they should have investigated specific red flags that would have led them to the fraud.  Plaintiffs have essentially claimed that the Audit Committee's negligence made it too easy to commit fraud at Refco, but even if true, this is not the same as alleging that they knew or should have known of the fraud.

Allegations that an audit committee failed to take steps to prevent fraud may suffice where plaintiffs identify specific actions that the committee-members should have taken that would have prevented the fraud.  Livent, 78 F. Supp. 2d at 221 ("[I]f the Outside Directors were aware that the Company's management information systems were capable of manipulating the accounts without leaving a paper trail, and failed, despite this awareness, to take steps to insure

that such manipulations were not being performed, including a review of the work of D & T, this might constitute recklessness sufficient to infer scienter."); JWP, 928 F. Supp. at 1257 (denying summary judgment where a reasonable factfinder could conclude that "the audit committee defendants were aware of a laundry list of dubious accounting practices that should have caused them to investigate and to uncover the massive fraud at JWP.").  However, where plaintiffs fail to describe the chain of events by which defendants should have discovered or averted the fraud, the allegations do not give rise to an inference of scienter.  In re WorldCom, Inc., Secs. Litig., No. 02 Civ. 3288, 2003 WL 23174761, at *5 (S.D.N.Y. Dec. 3, 2003) ("WorldCom II") ("even if the Lead Plaintiff had sufficiently alleged a breach of a well-defined duty to communicate, it has not alleged that Internal Audit would have reported to the Audit Committee in the Fall of 2001 that it had uncovered information indicative of fraud or wrongdoing, or even information requiring further investigation."); Marsh & McLennan, 2006 WL 2057194, at *30 ("There are no facts alleged to show that closer scrutiny of those transactions would have put any of the defendants on notice of the misconduct.").

Here, as in WorldCom II,

> the Amended Complaint describes what the Audit Committee Defendants might have learned if they had done a better job or if they had been more aggressive or diligent.  Section 10(b), however, does not impose liability for negligence or impose obligations ex post facto.  There is simply no adequate basis to infer from the allegations in the Amended Complaint that the Audit Committee Defendants themselves were aware or must have been aware of the accounting fraud.

WorldCom II, 2003 WL 23174761, at *5.  "The Amended Complaint's allegations reveal at most an Audit Committee that . . . was anemic in its oversight function.  The allegation that a defendant generally failed to perform a job well, however, is not a substitute for the

particularized pleading that a defendant knowingly or recklessly engaged in fraud." Id. at *6.

Similarly, plaintiffs' allegation that an unidentified employee caught the fraud after only two months of employment at Refco (Compl. ¶ 608) does nothing to help identify the information from which the Audit Committee knew or should have known of the fraud in progress, because plaintiffs fail to identify the information from which this employee identified the fraud.  If the employee was reviewing the same information as the Audit Committee Defendants, the allegation could be relevant, but plaintiffs do not even suggest that this was the case.[35]  In short, plaintiffs have failed to adequately allege that the Audit Committee Defendants were so reckless as to give rise to an inference of scienter.

### 4.    *The Audit Committee Defendants' Motive and Opportunity*

Some of the alleged motives alleged as to the officer defendants discussed above are also alleged as to the Audit Committee Defendants, in particular the grants of Refco common stock (Compl. ¶ 585), but the Audit Committee Defendants are not alleged to have benefitted from the "green shoe" option that supported the inference of motive as to the corporate officers discussed above.  (Compl. ¶ 587.)  The only other motive allegation against these defendants is that each of the three received 20,000 restricted stock units ("RSUs") in advance of the IPO.  They were the only board members to receive these grants.  (Compl. ¶ 592.)  The RSUs would become worthless were the fraud exposed.  (Id. ¶¶ 591-92.)

In general, an "unparticularized interest in executive compensation tied to stock price performance is not a sufficient motive for fraud."  Geiger, 933 F. Supp. at 1190.  In this case, however, the allegation that no other directors received grants of RSUs makes those grants

---

[35] If plaintiffs can plead that the unidentified employee learned of the fraud by reviewing information known to the Audit Committee, they can of course seek leave to amend their complaint to allege that.

sufficiently unusual to support the required inference of motive.  Cf. WorldCom I, 294 F. Supp.

2d at 412 (to determine whether insider sales were unusual, "the court may consider whether

other directors also sold or held their shares during the relevant period").  It could be inferred

from the fact that grants were made directly to the Audit Committee — and only to the Audit

Committee — that the RSU grants were part of a quid pro quo in exchange for the Committee's

overlooking the fraudulent transactions, or a specifically tailored incentive for them to overlook

the transactions, or both.  Because only these boardmembers received the RSUs, this allegation

is not "common to all," boardmembers, Kalnit, 264 F.3d at 139, and is sufficient to support an

inference of motive.  Thus, the Audit Committee Defendants' motion to dismiss for failure to

allege scienter will be denied.[36]

## V.     Exchange Act Claims Against Grant Thornton

### A.     The Exchange Act Allegations Against Grant Thornton

Plaintiffs allege that Grant Thornton made false statements in its unqualified audit reports

for the fiscal years 2003, 2004 and 2005, which were included in the Company's fiscal year 2005

Annual Report.  (Compl. ¶¶ 54, 532.)  In these reports, plaintiffs allege that Grant Thornton

falsely stated (1) that its audits conformed with Generally Accepted Auditing Standards

("GAAS"),[37] and (2) that it had concluded that Refco's financial statements were presented in

---

[36] The Audit Committee Defendants do not dispute that they had the opportunity to engage in fraud.

[37] The Complaint defines GAAS as the auditing standards issued or adopted by the Public Company Accounting Oversight Board ("PCAOB") established by the Sarbanes-Oxley Act of 2002, together with the auditing standards issued by the American Institute of Certified Public Accountants ("AICPA").  (Compl. ¶ 206 (mis-numbered paragraph on page 94, between ¶¶ 225 and 226); id. ¶ 226.)

accordance with Generally Accepted Accounting Principles ("GAAP").[38]  (Compl. ¶¶ 306, 336,

532.)  Grant Thornton makes several arguments in support of its motion to dismiss these claims.

First, it argues that plaintiffs have failed to identify the material misstatements at issue with

sufficient particularity.  Second, it argues that plaintiffs cannot show loss causation as to certain

losses.  Third, it argues that plaintiffs have failed to allege facts giving rise to a strong inference

of scienter on its part.  Each of these arguments is without merit.

### B.    Material Misstatements by Grant Thornton

Grant Thornton argues that plaintiffs' Exchange Act claims against it should be

dismissed for failure to comply with Rule 9(b)'s particularity requirements, in that the plaintiffs

have failed to allege with specificity the material misstatements on which their claims are based.

(Grant Thornton Mem. 15-17; see P. Mem. 87-89)  There is no question that plaintiffs have

pointed with adequate specificity to the statements alleged to be false; as noted above, plaintiffs

allege that in Grant Thornton's audit reports for the fiscal years 2003, 2004 and 2005, which

were included in the Company's fiscal year 2005 Annual Report, Grant Thornton falsely stated

---

[38] The Complaint defines GAAP as:

> those principles recognized by the accounting profession as the
> conventions, rules, and procedures necessary to define accepted
> accounting practices at a particular time.  GAAP principles are the
> official standards accepted by the SEC and promulgated in part by
> the American Institute of Certified Public Accountants ("AICPA").
> GAAP consists of a hierarchy of authoritative literature.  The
> highest authority is comprised of Financial Accounting Standards
> Board ("FASB") Statements of Financial Accounting Statements
> ("SFAS"), followed by FASB Interpretations ("FIN"), Accounting
> Principles Board Opinions ("APB Opinion"), and AICPA
> Accounting Research Bulletins ("ARB").  GAAP provides other
> authoritative pronouncements including, among others, the FASB
> Concept Statements ("FASCON").

(Compl. ¶ 212.)

(1) that its audits conformed with GAAS and (2) that it had concluded that Refco's financial statements were presented in accordance with GAAP. Rather, Grant Thornton's contention is that plaintiffs have failed to explain why those statements were false.

As to the failure of Grant Thornton's audits to conform with GAAS, plaintiffs allege that over the years that Grant Thornton served as Refco's auditor, it made only one attempt to confirm that one of the massive loan transactions that took place at the end of each reporting period was an actual loan, and that Grant Thornton made no effort to determine whether this was in fact an arm's-length transaction. (Compl. ¶¶ 232, 239, 554-67.) Plaintiffs also allege that Grant Thornton failed to detect the massive fraud (id. ¶¶ 227; 237-238) and to remain properly independent (¶ 228). As to the failure of Refco's financial statements to conform with GAAP, plaintiffs allege that the statements failed to disclose significant related-party transactions (Id. ¶¶ 215-19) and that Refco was a guarantor of those transactions (id. ¶ 221), and that the statements violated general principles of GAAP requiring that financial statements contain a thorough and complete report of relevant information. (Id. ¶¶ 224-25.)[39]

These allegations are sufficiently particular to survive the motion to dismiss, because they give Grant Thornton more than ample notice of the ways in which its unqualified audit reports allegedly misrepresented the propriety of its auditing practices and Refco's accounting practices. Grant Thornton argues that these alleged problems with its audits would not constitute a violation of the relevant standards, but "[a]lthough the question of whether GAAP has been violated might appear to be a legal determination, the element of what is 'generally accepted'

---

[39] Allegations that an auditor "prepared, directed or controlled," "helped create" or "materially assisted in" preparing false statements are sufficient to give rise to liability. Global Crossing I, 322 F. Supp. 2d at 334. In this case, however, the false statements for which Grant Thornton is allegedly liable are not Refco's statements, but Grant Thornton's audits themselves.

makes this difficult to decide as a matter of law." In re Global Crossing, Ltd. Secs. Litig., 322 F.

Supp. 2d 319, 339 (S.D.N.Y. 2004) ("Global Crossing I").  At the motion to dismiss stage, the

plaintiffs' assertion that certain practices were not generally accepted "must be taken as true."

Id. at 339.  Therefore, Grant Thornton's argument that the complaint puts it "in the impossible

position of trying to divine Plaintiffs' allegations" (Grant Thornton Mem. 17) is without merit.

### C.    Loss Causation As To Grant Thornton

Grant Thornton argues that plaintiffs' claims against it — both the § 11 claims and the

§ 10 claims — must be dismissed because plaintiffs have not adequately alleged loss causation

as to losses suffered after October 10, 2005, the date of the initial press release disclosing the

hidden uncollectible receivables and disavowing the financial statements.

Grant Thornton argues that the October 10, 2005, disclosure of the related-party loan to

RGHI and announcement that Refco's prior financial statements could not be relied upon

(Compl. ¶ 620) "removed from the marketplace the only alleged misinformation that could

possibly have been attributed to the audit firm."  (Grant Thornton Reply 8.)  It contends that after

the October 10 disclosure, "the marketplace was on notice that the financial statements could not

be relied upon, so investors necessarily would have known that the audit opinion concerning

those financial statements could not be relied upon either."  (Id. at 8-9.)  Conceding that Refco's

stock continued to decline after this disclosure, Grant Thornton contends that the later decline

was due to the liquidity problems following the "mass exodus" of Refco's customers and

Bennett's arrest.  (Id.)  Therefore, it argues, any misstatements in its audit reports were not the

cause of losses suffered after the October 10 disclosures.

Grant Thornton is free to make such arguments to the factfinder, but it seems more than

plausible to argue, as plaintiffs do, that the exodus of Refco's customers was due, in part, to the

71

allegedly false statements by Grant Thornton and the other defendants.  (Compl. ¶ 621.)

Plaintiffs' allegations could support an inference "that foreseeability links the omitted

information and the ultimate injury in this case, in contrast to cases where external and

unforeseeable factors such as market crashes were the direct cause of a plaintiff's loss."

Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 190 (2d Cir. 2001).  Accordingly, Grant

Thornton's argument regarding loss causation is without merit.[40]

### D.      Grant Thornton's Recklessness

Grant Thornton argues that plaintiffs have failed to adequately allege that any false

statements in its audit reports were made knowingly or recklessly, or that it had motive and

opportunity to commit the fraud.  (Grant Thornton Mem. 5-15; see P. Mem. 97-104).  Because

the plaintiffs have adequately alleged facts giving rise to a strong inference of recklessness, it is

unnecessary to reach the question of motive.

"The standard for pleading auditor scienter is demanding."  Marsh & McLennan, 2006

WL 2057194, at *30.  For an accountant to be found to have acted recklessly during an audit, its

alleged misconduct must "approximate an actual intent to aid in the fraud being perpetrated by

the audited company."  Rothman, 220 F.3d at 98 (citation and internal quotation marks omitted).

This standard requires more than "a failure to follow GAAP."  Vladimir v. Deloitte & Touche

LLP, 95 Civ. 10319, 1997 WL 151330, at *3 (S.D.N.Y. Mar. 31, 1997).  Plaintiffs must prove

that "[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an

egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting

---

[40] Grant Thornton also argues that allegations in the criminal indictment against Bennett,
along with allegations in the complaint in this case, suggest that "a central purpose of the scheme
was to hide the truth from Grant Thornton."  (Grant Thornton Mem. 14.)  This argument, of
course, has no place in a motion to dismiss.

judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts ." S.E.C. v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y.1992) (internal quotation marks and citations omitted).  Because "[i]t is elementary that, on a motion to dismiss, the Complaint must be read as a whole," Yoder v. Orthomolecular Nutrition Inst., Inc., 751 F.2d 555, 562 (2d Cir. 1985), the red flags must be viewed in the aggregate; defendants "cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder."  In re Philip Svcs. Corp. Secs. Litig., 383 F. Supp. 2d 463, 476 (S.D.N.Y. 2004).

As noted above, the claims against Grant Thornton are premised on its alleged false statements about its own auditing practices and Refco's accounting practices.  Plaintiffs' memorandum focuses on the red flags that allegedly should have alerted Grant Thornton to the fraud; apparently, their argument is that from the scale and obviousness of the fraud, it can be inferred either (1) that Grant Thornton actually knew of the fraud, in which case of course its certifications were false; or (2) that Grant Thornton didn't know of the fraud, which could only happen as a result of audit procedures that were (contrary to the claims in their reports) so sub-standard that the auditors would have to have known they were sub-standard.

To demonstrate Grant Thornton's recklessness, plaintiffs rely on many of the same allegations made against the officer defendants.  They note the "suspicious timing, recurrent pattern and unusual nature of the related-party transactions" (P. Mem. 97) and the large size of the sham loans in comparison to Refco's net income.  (Id.)  Some of these red flags are not alleged to have been known by Grant Thornton; for example, plaintiffs do not allege that Grant Thornton knew the transactions were being routed back to Refco-related entities after they were loaned to third parties, or that Grant Thornton knew that Refco Capital was paying interest on

the fraudulent loans.[41]  As discussed above, however, the complaint supports an inference that the appearance and disappearance of large receivables at the end of financial reporting periods was reflected in Refco's books, and large transactions near the end of financial reporting periods can be a significant red flag.  In re Winstar Commc'ns, No. 01 Civ. 3014, 2006 WL 473885, at *11 (S.D.N.Y. Feb. 27, 2006).

As to these large transactions, plaintiffs note that Grant Thornton only arranged for one confirmation request for the related-party transactions.  In Fall 2004, Refco Capital sent a confirmation request to the third party known as "Customer X," asking that they confirm certain information to Grant Thornton.  (Compl. ¶ 554.)  The Statement of Account attached to the confirmation request showed that Refco (by which plaintiffs presumably mean Refco Capital) had loaned $325,000,000 to Customer X on February 25, 2002, three days prior to the end of Refco's fiscal year.  (Compl. ¶ 556.)  Customer X confirmed this information and sent it, along with a Statement of Account, to Grant Thornton.  Grant Thornton did not ask for any further information.  Nor did Grant Thornton send confirmation requests in fiscal years 2003, 2004, or 2005. (Compl. ¶ 559.)

Plaintiffs do not explain what would have been learned if such requests had been sent, and of course Refco was in the business of making loans, some of them presumably falling close to the end of its fiscal year.  Absent an allegation that Grant Thornton knew or discovered that the loan would be routed back to RGHI, the failure to send more confirmation requests is not direct evidence of a refusal to see the obvious.  In the context of the other allegations of scienter as to Grant Thornton, however, the firm's apparent lack of interest in large receivables that

_____

[41] Plaintiffs allege that Grant Thornton "recklessly failed to discover" that Refco Capital was paying the interest.  (Compl. ¶ 563.)

74

briefly disappeared from Refco's books at the moment when they would have been reportable forms an important part of the broader picture.

Plaintiffs also contend that the fraud was "documented in plain terms in numerous documents maintained at the Company." (P. Mem. 100.) The complaint does allege that numerous such documents existed. (Compl. ¶ 400) For example, plaintiffs claim that the unnamed law firm facilitating the transaction drew up agreements and other transaction documents with the third parties through which the money passed, including a guarantee letter from Refco Group. (Id. ¶ 405.) "The documentation for each of these transactions was created by the Law Firm." (Id. ¶ 406.) Many of the documents, such as the loan agreement pursuant to which Refco Capital loaned money to Customer X, were between Refco Capital or RGHI and the third party. (Id. ¶¶ 409, 412.) Bennett signed guarantee agreements for some of these loans on behalf of Refco. (Id. ¶ 425.)[42]

---

[42] Plaintiffs also rely on internal statements of RGHI's accounts at Refco, which allegedly contained line-items reflecting the circular flow of funds between RGHI and BAWAG. (Compl. ¶ 567.) In at least one case, a transfer from BAWAG to RGHI was followed a short time later by a transfer of slightly more money from RGHI back to BAWAG. In other words, it would have been apparent to a reviewer of these records that BAWAG had loaned RGHI a large sum of money. There is nothing obviously suspicious about this, however; the relevant parties were in the business of making loans and investments, and the circular transactions were suspicious because they involved money being loaned from one Refco-related party through BAWAG *to another Refco-related party* — something that plaintiffs do not allege that RGHI's account statements reflected.

As to one circular transaction involving BAWAG,, the complaint alleges that after RGHI received the loan from BAWAG, RGHI unwound the transaction by sending the money back to "Refco" (again, this seems to refer to Refco Capital) — without using BAWAG as an intermediary. The complaint specifically notes that in this case, the line-item representing the return of money to Refco is *not* identified in RGHI's records; the relevant line-item is marked only "transfer." (¶ 567(b).) In other words, the relevant records contain a transfer from BAWAG to RGHI, followed by an unspecified "transfer." For this transaction, then, it would not even have been apparent to a reviewer of records that the transfer was a loan from BAWAG to RGHI.

Of course, it could turn out that the documents relating to these loans, guarantees, and other transactions were kept carefully hidden in the files of third parties to which Grant Thornton had no access.  Given the size of the transactions, the fact that at least some of Refco's officers were allegedly involved in orchestrating it, and the volume of documentation allegedly created, however, this allegation — together with the others — contributes to a strong inference of scienter on Grant Thornton's part.  Accordingly, Grant Thornton's argument that the plaintiffs have failed to allege scienter is without merit, as are its other challenges to the Exchange Act claims.

## VI.   Control-Person Liability Under Exchange Act § 20(a)

Most of the moving defendants argue that the control-person liability claims against them under § 20(a) of the Exchange Act must be dismissed.  Under § 20(a):

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

To make out a prima facie case under § 20(a) of the Exchange Act, a plaintiff "must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person."  First Jersey, 101 F.3d at 1472.  Defendants do not argue that plaintiffs have failed to allege a primary violation.

Section 20(a) and Section 15 are parallel provisions, and their "terms are interpreted in the same manner."  Global Crossing I, 322 F. Supp. 2d at 349.  Accordingly, the challenges to

76

the allegations of control by defendants Bennett, RGHI, the Bennett Trust, Sexton, Murphy, Silverman, the Audit Committee Defendants, and the THL Individual Defendants are without merit, for the reasons discussed above in the context of liability under § 15 of the Securities Act. The only remaining issue for these defendants is therefore whether plaintiffs have adequately alleged culpable participation in the fraud.

Unlike § 15, § 20(a) requires that the plaintiff must also "allege culpable participation 'in some meaningful sense' by the controlling person in the fraud."[43] Id., quoting Burstyn v. Worldwide Xceed Group, Inc., No. 01 Civ. 1125, 2002 WL 31191741, at *7 (S.D.N.Y. Sept. 30, 2002). Although "control" may be pleaded in accordance with Rule 8(a)'s notice-pleading standard, see In re Parmalat Secs. Litig., 383 F. Supp. 2d 616, 627 & n. 53 (S.D.N.Y. 2005), a heightened pleading requirement applies to the "culpable participation" element; the plaintiff "must plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was

---

[43] The holding that § 20(a) requires culpable participation, while § 15 does not, may seem to contradict the observation that the terms of the two provisions are substantially identical and "are interpreted in the same manner." Global Crossing I, 322 F. Supp. 2d at 349. There is, however, one respect in which the terms of the control-person provisions differ. Section 15 provides that there shall be no liability where "the controlling person had no *knowledge of or reasonable ground to believe* in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C.A. § 77o (emphasis added). Section 20(a), on the other hand, gives rise to no liability where "the controlling person acted in *good faith* and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C.A. § 78t (a) (emphasis added). Thus, an allegation of negligence does not state a violation of § 20(a) if the negligence was in good faith; the same is not true of § 15. It is in part from this language requiring a lack of "good faith" that the Second Circuit inferred that § 20(a) was "obviously [intended] to impose liability only on those directors . . . who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." Lanza v. Drexel & Co., 479 F.2d 1277, 1299 (2d Cir. 1973).

engaging in fraudulent conduct." Id. (internal quotation marks omitted); see Global Crossing III,

2005 WL 2990646, at *7.

### A.      Bennett and the Bennett Entities

Bennett argues that certain counts should be dismissed because he cannot be both

primarily liable as a direct violator of the Acts and secondarily liable as a "controlling person."

(Bennett Mem. 12-14.)  It is true that dicta in Kalnit v. Eichler, 85 F. Supp. 2d 232 (S.D.N.Y.

1999), suggest that where a "plaintiff alleges that [defendants] had knowledge of the

misrepresentations and omissions . . . the [defendants] could not be control persons." Id. at 246.

Other courts, however, have consistently held that "[a]lhough a defendant ultimately may not be

held liable as both a primary violator and a controlling person, [pleading] such alternative

theories of liability [is] permissible." Parmalat, 375 F. Supp. 2d at 310.  Bennett's argument is

with Rule 8(e)(2) of the Federal Rules of Civil Procedure, which allows alternate pleading and

provides that "[a] party may also state as many separate claims or defenses as the party has

regardless of consistency."

RGHI and the Bennett Trust also move for dismissal of the § 20(a) counts against them.

They argue that the complaint fails to allege that they controlled Refco — an argument rejected

in the context of the Securities Act § 15 discussion above — and that the plaintiffs have failed to

allege culpable participation.  Inexplicably, they contend that "[p]laintiffs do not allege that

RGHI and the Trust played any role in the alleged fraudulent scheme."  (Bennett Mem. 18.)  On

the contrary, plaintiffs' theory of the fraud centers around the claim that RGHI was the hiding

place for Refco's uncollectible receivables.  Moreover, the complaint alleges that Bennett, the

primary actor in the fraud, controlled RGHI and the Trust, which in turn controlled Refco.

(Compl. ¶ 261.)  Thus, Bennett's control of Refco was exercised through the shell entities, and

those entities were the means by which he exercised his power to orchestrate the fraudulent

scheme.  In essence, the complaint alleges that the shell entities that controlled Refco *were*

Bennett.  This is enough to give rise to a strong inference of culpable participation.

### B.      Sexton, Klejna, Murphy, Sherer, Silverman, and the Audit Committee Defendants

Section 20(a)'s culpable participation requirement is similar to the scienter requirement

of Section 10(b); plaintiffs must "plead with particularity facts giving rise to a strong inference

that the controlling person knew or should have known that the primary violator, over whom that

person had control, was engaging in fraudulent conduct."  In re Global Crossing, Ltd. Secs.

Litig., 471 F. Supp. 2d 338, 351 (S.D.N.Y. 2006) ("Global Crossing IV") (internal citations,

alterations and quotation marks omitted); but see Alstom I, 406 F. Supp. 2d at 490 (noting that

"[d]isagreement exists within the Second Circuit . . . as to precisely what conduct, beyond

negligence, [culpable participation] entails.").  Thus, the conclusion above that plaintiffs have

sufficiently plead scienter as to defendants Silverman, Sexton, Klejna, Sherer[44] and Murphy, thus

requires the conclusion that plaintiffs have shown culpable participation as to those defendants.

As discussed above, plaintiffs' scienter allegations give rise to a sufficiently strong

inference that defendants Sexton and Murphy had motive and opportunity to commit fraud, but

not that they acted with knowledge or recklessness.  The same is true of the Audit Committee

Defendants.  Courts in this district have reached different conclusions as to whether allegations

of motive to commit fraud suffice to support an allegation of culpable participation where there

are insufficient allegations to support an inference of knowledge or recklessness.  Compare In re

Flag Telecom Holdings, Ltd. Secs. Litig., 308 F. Supp. 2d 249, 273 (S.D.N.Y. 2004) ("[I]f a

---

[44] Sherer does not challenge plaintiffs' allegations that he controlled Refco, only whether
plaintiffs have sufficiently pled that he was a culpable participant.  (Sherer Mem. 36.)

plaintiff pleads facts establishing that the control person had motive and opportunity to commit fraud, plaintiff has pled 'culpable participation.'") with In re Independent Energy Holdings PLC Secs. Litig., 154 F. Supp. 2d 741, 771-72 & n.23 (S.D.N.Y. 2001) ("Plaintiffs have failed to cite a single case where the culpable participation prong has been satisfied solely based on allegations of the controlling person's financial motive.").

It makes little sense, however, to hold that the same facts are sufficient to support a claim for primary liability but insufficient to support a claim for control liability. If alleged facts raise a strong inference that a defendant acted with scienter as to a particular misstatement, those facts must necessarily raise a strong inference that the defendant's participation as a control person was culpable. Accordingly, culpable participation has been adequately alleged even as to those defendants as to whom motive and opportunity, but not recklessness, have been adequately alleged. The motions to dismiss the § 20(a) claims against Silverman, Sexton, Klejna, Sherer, Murphy, and the Audit Committee Defendants will be denied.

C.     Tone Grant

Defendant Tone Grant's challenge to the allegations of control-person liability against him (Tone Grant Mem. 17-22) is meritless. Grant was allegedly the co-owner of RGHI with Bennett, and RGHI was the central mechanism in the alleged fraud. Bennett and Grant were the only two owners of RGHI, the corporate entity through which all of the allegedly fraudulent transactions passed. (Compl. ¶¶ 41, 517-18.) Aside from serving as a holding company for Bennett's and Grant's interests in Refco, RGHI had no other business, so plaintiffs' allegation that almost four billion dollars in fraudulent loans passed through RGHI is more than sufficient to raise an inference of recklessness as to Grant. (Id. ¶ 515.)

D.    **Trosten**

Trosten, like the other officer defendants, challenges the allegations of control-person liability against him.  (Trosten Mem. 22-24.)  Plaintiffs' § 20(a) claims against Trosten rely on their scienter allegations, as do their claims against the other officer defendants.  Because of the conclusion above that the § 10(b) claims against Trosten must be dismissed because none of the relevant misstatements can be attributed to him, this opinion has yet to consider the scienter allegations against Trosten, and so he must be treated separately from the other officer defendants.

Plaintiffs rely on their allegations of scienter against Trosten (P. Mem. 104, 120) for their allegations of culpable participation against him.  Plaintiffs have clearly alleged not only that Trosten was reckless in failing to discovery the fraud, but that he actually knew about it.  For example, plaintiffs allege that Trosten and Bennett agreed with RGHI and BAWAG to unwind specific fraudulent transactions (Compl. ¶¶ 489, 494) and that Trosten was the person BAWAG contacted to confirm the terms of the loans.  (Id.)  There can be no question that plaintiffs have raised a strong inference that Trosten had the requisite scienter.  However, a claim under § 20(a) requires culpable *participation* — that is, actual involvement in the making of the fraudulent statements by the putatively controlled entity.  Put another way, a claim under § 20(a) requires that the defendant have "actual control over the transaction in question."  Ross v. Bolton, No. 83 Civ. 8244, 1989 WL 80428 (S.D.N.Y. Apr. 4, 1989) (internal citation and quotation marks omitted).  Thus, for the same reasons that Trosten escapes primary liability for the alleged misstatements, plaintiffs' § 20(a) claims against him must also be dismissed.

### E.      The THL Partner and Individual Defendants

The THL Partner and Individual Defendants move for dismissal of the § 20(a) claims against them, arguing that both the allegations of control and the allegations of culpable participation against them are insufficient as a matter of law.  (THL/Audit Comm. Memo 40-46.) The arguments as to control are rejected for the reasons discussed above in the context of these defendants' challenges to the allegations of control under § 15 of the Securities Act.

As to the allegations of culpable participation by the THL Defendants, plaintiffs' allegations of recklessness are too thin to survive the motion to dismiss, but their allegations of motive and opportunity will suffice for reasons previously discussed.  Plaintiffs allege that the THL Individual Defendants were members of Refco's Board of Directors, and that they were "deeply involved in the day-to-day management of Refco."  (Compl. ¶ 264.)  They allege that the THL Partner Defendants "dominated Refco's Board of Directors," controlling half of its Board, and that after the LBO these defendants had the ability to control all aspects of Refco's business.  (Id. ¶ 263.)  They also allege that defendant THL Managers V, LLC ("THL Managers"), of which defendant Thomas H. Lee Partners is the managing member, entered an agreement with Refco under which THL Managers was retained to advise Refco in connection with virtually all aspects of Refco's affairs.  (Id.)  Plaintiffs argue that the "unfettered access" afforded by this role, combined with the red flags discussed above in the context of the recklessness allegations against the other defendants, supports an inference of culpable participation as to the THL Defendants.  However, plaintiffs have made no allegations whatsoever as to how the THL Defendants' "unfettered access" would have led them across particular documents in which the red flags would have been apparent, and these allegations must therefore fail for the same reason the allegations against some of the officer defendants

failed: there is no allegation supporting a "strong inference" that the defendants were actually aware of the red flags in question.

Plaintiffs also allege that the THL Defendants had "unusual and significant motives" for committing fraud.  The THL Defendants, like the officer defendants discussed above, were shareholders of record before the IPO, and therefore stood to profit personally and directly from any oversubscription of shares pursuant to the so-called "green shoe" option.  For the reasons discussed above, this allegation is sufficient to support an inference of motive as to these defendants, and their motion to dismiss the § 20(a) claims against them must accordingly be denied.

**VII.   Insider Trading Claims Under Exchange Act § 20A**

Section 20A of the Exchange Act provides:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C. § 78t-1.

Bennett argues that the complaint's allegations of insider trading under § 20A of the Exchange Act are insufficient because they fail to allege with particularity that Bennett's trading was contemporaneous with the plaintiffs'.  (Bennett Mem. 21-23.)  See Wilson v. Comtech Telecommc'ns Corp., 648 F.2d 88, 94-95 (2d Cir. 1981) ("Any duty of disclosure is owed only to those investors trading contemporaneously with the insider").  Bennett is alleged to have sold at least 5.375 million shares in the IPO, which commenced on August 10, 2005.  (Compl. ¶¶ 166,

710.)  Plaintiffs are alleged to have purchased shares in the same IPO.  (Compl. ¶ 362.)  Bennett

makes no attempt to explain how these events, which took place on the same day, could be any

more contemporaneous.  His argument is without merit.

Defendants THL Funds and Thomas H. Lee Investors Limited Partnership — two of the

THL Defendants — also challenge the § 20A allegations against them.[45]  (THL/Audit Comm.

Mem. 46-47; see P. Mem. 127-129.)  They argue that a § 20A claim for insider trading can only

be based on predicate liability under § 10(b) — not predicate liability under § 20(a)'s control-

person provisions.

Not all violations of the Exchange Act can serve as predicate violations for purposes of

§ 20A; the predicate violation must be an act of insider trading.[46]  Section 20A liability is limited

---

[45] The defendants argue that no predicate violation has been alleged, because the underlying § 20(a) control-person claims fail as a matter of law.  This argument is rejected for the reasons discussed on the context of § 20(a) control-person liability above; plaintiffs have adequately alleged a § 20(a) claim against the THL Defendants.

Defendants also argue that the complaint "fails to contain any specific factual allegations that these defendants knowingly possessed material non-public information when they sold their shares in the IPO."  (THL/Audit Comm. Mem. 47.)  The THL Defendants themselves in a related case have alleged that they conducted an extensive review of Refco's financial information.  Complaint, Thomas H. Lee Equity Fund V., L.P., et al v. Phillip R. Bennett, et al., No. 05 Civ. 9608 (S.D.N.Y. Nov. 14, 2005) (Coffey Decl. Ex. D), at ¶¶ 21-22, referenced at Compl. ¶¶ 119, 572.  A claim for insider trading "does not require . . . that a causal connection exist between the knowing possession of the information and the trade, that is, it does not require that the defendant 'use' the information when trading."  In re Oxford Health Plans, Inc., 187 F.R.D. 133, 143 (S.D.N.Y. 1999).  Defendants object to plaintiffs' reliance on this document, but it is appropriate at the motion to dismiss stage to rely on "any statements or documents incorporated in [the complaint] by reference, as well as . . . documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."  Rothman, 220 F.3d at 88-89 (internal citations omitted).  Thus, plaintiffs have adequately alleged that the THL Defendants knowingly possessed material nonpublic information.

[46] Acts of insider trading fall with § 10(b)'s prohibition of the use of "any manipulative or deceptive device or contrivance" in the purchase or sale of securities, 15 U.S.C. § 78j(b).  See 17 C.F.R. § 240.10b-5.  Insider trading qualifies as a "manipulative or deceptive device or contrivance" giving rise to liability under § 10(b) because insider trading involves the insiders taking unfair advantage of the uninformed stockholders with whom they have "a relationship of

to "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder *by* purchasing or selling a security while in possession of material, nonpublic information." (emphasis added).  "The reference to 'this chapter' [in § 20A] is to the '34 [Exchange] Act, and the language of the statute is thus quite plain that to state a claim under § 20A, a plaintiff must plead a predicate violation of the '34 Act or its rules and regulations."  Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 703 (2d Cir. 1994).

The terms of § 20A do not limit its coverage to violators of § 10(b); rather, the required "predicate violation" may be of any section of the Exchange Act, provided the violation was effected "*by purchasing or selling a security* while in possession of material, nonpublic information" (emphasis added).  That is, there can only be § 20A liability if the predicate violation of the Exchange Act was an act of insider trading.  Section 20A "creates a private right of action to enforce the existing prohibition on insider trading under § 10(b) caselaw, and does not create a new definition of insider trading."  DeMarco v. Robertson Stephens Inc., 318 F. Supp. 2d 110, 126 (S.D.N.Y. 2004).  "The language of § 20A makes clear that . . . Congress sought to alter the remedies available in insider trading cases, and only in insider trading cases." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 362 (1991); see Jackson Nat. Life Ins. Co., 32 F.3d at 703 ("Congress added § 20A . . . to remedy the very specific problems inherent in prosecuting insider trading cases").

The question raised by defendants' motion, then, is whether control-person violations of § 20(a) can constitute insider trading, that is, "violat[ing] any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of

---

trust and confidence."  United States v. O'Hagan, 521 U.S. 642, 652 (1997), quoting Chiarella v. United States, 445 U.S. 222, 228 (1980).

material, nonpublic information" under § 20A.  Put differently, the question is whether § 20A creates a private right of action against those who control acts of insider trading, as well as the primary violators who directly engage in them.  There is little precedent on this issue; the parties have identified no case directly addressing the question of whether § 20A liability may be premised on a § 20(a) violation, and the Court has found none.[47]

Section § 20(a) provides liability for any person who "controls any person liable under any provision of this chapter or of any rule or regulation thereunder," 15 U.S.C. § 78t(a). It further provides that a control person is liable "jointly and severally with and *to the same extent as* such controlled person, unless the controlling person acted in good faith and did not directly or indirectly induce the acts or acts constituting the violation of cause of action."  15 U.S.C. § 78t(a) (emphasis added).  The emphasized language clearly provides that liability against a control person is coterminous with liability against the person controlled.  If so, the private right of action created by § 20A should extend to the controller.

This reading is consistent with the statute's language and purpose.  Section 20A provides liability for insider-trading violations of "any provision of this chapter or the rules or regulations thereunder."  15 U.S.C. § 78t-1.  If § 10(b) were the only provision that could serve as the basis for liability, Congress could have simply identified § 10(b) and the rules enforcing it as the basis for liability.  Moreover, control person liability involves more than mere vicarious responsibility for another's wrongdoing; it extends to those who culpably participate in the primary violation,

---

[47] See Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 605 (7th Cir. 2006) ("Whether § 20(a) control-person liability standing alone can serve as the "separate underlying violation" required for § 20A insider trading is an open question of law and raises an important issue of statutory interpretation that should not be decided in a vacuum.  No party in this litigation has provided more than cursory briefing of this issue, and therefore we take no position on its resolution, leaving it for further factual and legal development during the course of the litigation.").

and it would be strange to create a private right of action against the primary violator but not those who culpably participate in the primary violation as controlling persons through the vehicle of persons or entities that they control. Defendants have produced no authority or rationale for the proposition that § 20A liability cannot be predicated on a control-person insider trading violation. Accordingly, their argument is rejected, and their motion to dismiss the § 20A claims against them will be denied.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the motions to dismiss by the "144A" or "Bond Underwriter" Defendants (Doc. # 257) and Robert Trosten (Doc. # 282) are granted. The motions to dismiss by Phillip R. Bennett, et al. (Doc. # 260), Grant Thornton LLP (Doc. # 265), William Sexton (Doc. # 266), Phillip Silverman (Docs. ## 268, 294), Dennis Klejna (Doc. # 273), the THL and Audit Committee Defendants (Doc. # 277), Joseph J. Murphy and Gerald M. Sherer (Doc. # 279), and Tone Grant (Doc. # 303), are granted in part and denied in part.

Counts One and Two of the First Amended Complaint are dismissed in their entirety, and Count Three is dismissed as against the Bond Underwriter Defendants. Counts Three and Four are dismissed as to those plaintiffs who traded their unregistered Rule 144A bonds for registered bonds in the Exxon Capital exchange. All claims against defendant Robert Trosten are also dismissed. The motions to dismiss are in all other respects denied.

SO ORDERED.

Dated: New York, New York
     April 30, 2007

GERARD E. LYNCH
United States District Judge

87