UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                             :

                             :           05 Civ. 8626 (GEL)

In re REFCO, INC. SECURITIES LITIGATION  :

                             :         **OPINION AND ORDER**

                             :
----------------------------------------------------------------x

James J. Sabella, Grant & Eisenhoffer P.A., New
York, New York, for Lead Plaintiff Pacific
Investment Management Company LLC and Co-
Lead Counsel for the Putative Class.

John P. Coffey, Bernstein Litowitz Berger &
Grossman LLP, New York, New York, for Lead
Plaintiff RH Capital Associates LLC and Co-Lead
Counsel for the Putative Class.

John K. Villa, George A. Borden, Thomas G. Ward,
Williams & Connolly LLP, Washington, D.C., for
Defendant Mayer Brown.

William J. Schwartz, Cooley Godward Kronish
LLP, New York, New York, for Defendant Joseph
P. Collins.



GERARD E. LYNCH, District Judge:

      In yet another chapter of this putative class action for securities fraud arising from the

collapse of Refco Inc. and its affiliated companies ("Refco"), Joseph P. Collins ("Collins") and

Mayer Brown LLP ("Mayer Brown") (the "Mayer Brown Defendants") – move for dismissal of

the Second Amended Consolidated Class Action Complaint ("the Complaint") as to them.[1] The

---

    [1] The Complaint added Mayer Brown and Collins as defendants and incorporated the
allegations made in a separate complaint filed in this Court on October 1, 2007, under the
caption RH Capital Associates LLC, et al. v. Mayer Brown LLP, et al.

core issue before the Court is whether the plaintiff-investors[2] can hold Refco's outside counsel

liable for their injury pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. 15

U.S.C. §§ 78j(b), 78t(a). Although the Complaint alleges facts that, if true, would make the

Mayer Brown Defendants guilty of aiding and abetting the securities fraud that harmed the

plaintiffs, the Supreme Court and Congress have declined to provide a private right of action for

victims of securities fraud against those who merely – if otherwise substantially and culpably –

aid a fraud that is executed by others. Accordingly, the motions to dismiss must be granted.

## BACKGROUND

The factual background of the fraudulent scheme to deceive investors and others about

the true financial circumstances of the international brokerage firm Refco Inc. and its affiliated

companies is set forth in detail in the Court's prior opinion in In re Refco, Inc. Sec. Litig., 503 F.

Supp. 2d 611, 618-20 (S.D.N.Y. 2007), and in any number of additional opinions,[3] but the details

will be repeated here to the extent that they are relevant. In reviewing a dismissal pursuant to

Fed. R .Civ. P. 12(b)(6), plaintiffs' allegations are assumed to be true for purposes of deciding

the motion. Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 151 (2d Cir. 2007).

I.     The Alleged Fraudulent Scheme

Prior to Refco's spectacular collapse, it was among the world's largest providers of

---

[2] In an order dated February 8, 2006 (Doc. # 63), the Court appointed RH Capital Associates LLC ("RH Capital") and Pacific Investment Management Company LLC ("PIMCO") as lead plaintiffs pursuant to 15 U.S.C. § 78u-4(a)(3)(B) and 15 U.S.C. § 77z-1(a)(3).

[3] See, e.g., Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP, No. 07 Civ. 8663, 2008 WL 3166536, at *1-2 (S.D.N.Y. Aug. 6, 2008); In re Refco Capital Markets, Ltd. Brokerage Customers Sec. Litig., No. 06 Civ. 643, 2007 WL 2694469, at *4 (S.D.N.Y. Sept. 13, 2007); American Financial Int'l Group-Asia, L.L.C. v. Bennett, No. 05 Civ. 8988, 2007 WL 1732427, at *1 (S.D.N.Y. June 14, 2007).

brokerage and clearing services in the international derivatives, currency, and futures markets. Refco's business model involved extending credit to its customers so that they could trade on margin and leverage their capital into larger trades, for which Refco could again extend credit. (Compl. ¶ 2.) These trades generated substantial commissions, revenues, and profits for Refco, but over time Refco began making loans without adequately assessing customers' credit-worthiness or the risks associated with their trading activities. (Compl. ¶¶ 428-30.) These lapses began to have consequences in the late nineties, when several global financial crises caused a number of customers to suffer massive trading losses. (Compl. ¶¶ 3, 431-35.) The loans now became "uncollectible receivables" that Refco's customers were unwilling or unable to repay.

Rather than write off or disclose these uncollectible receivables – the revelation of which would have had dire financial consequences for the company (Compl. ¶¶ 426, 579-80) – Refco's management allegedly devised a scheme to conceal them from the public and Refco's investors. (Compl. ¶ 3.) First, they transferred the loans onto the books of Refco Group Holdings, Inc. ("RGHI"), an entity owned and controlled by Phillip R. Bennett ("Bennett"), Refco's President, CEO, and Chairman. (Compl. ¶¶ 3, 33.) As a result of these transfers, RGHI owed hundreds of millions of dollars to Refco, but RGHI had no liquid assets and no operational functions (Compl. ¶¶ 31, 638), and thus it had no conceivable means of repaying the "loans." (Compl. ¶ 3.)

Next, to avoid the disclosure of large "related-party" receivables – the sum of which dwarfed Refco's net income – a series of fraudulent transactions were arranged by which the RGHI receivables were periodically made to disappear from Refco's books through so-called "round-trip loans" in which the receivables owed to Refco from RGHI were replaced with

3

receivables purportedly owed by a third-party customer.  (Compl. ¶¶ 3, 450-51, 627.)

These loans, which straddled the end of each fiscal year from 2000 through 2005 and at the end of several fiscal quarters as well, all worked in essentially the same way.  (Compl. ¶ 451.)  First, several days before Refco closed its books for each financial period, Refco Capital Markets Ltd. ("RCM"), a Refco subsidiary, would loan hundreds of millions of dollars to a third-party customer who then, through its account at Refco, simultaneously loaned the same amount to RGHI.  (Id.)  The loan agreements between the third party and RCM – which were done on a book basis (the principal never changed hands) – were meticulously structured so that they were essentially risk-free to the third-party customers; the customers' loans to RGHI were guaranteed by Refco and the customers profited for their participation in the "loans" through interest earned on their loans to RGHI, which by design exceeded the interest they were charged by RCM.[4] (Compl. ¶¶ 451, 633.)  RGHI, in turn, used the loans from the customers to pay down the money it owed to Refco for its uncollectible receivables.  (Id.)  The net effect of these transactions was that at the close of each reporting period, Refco's books would show "loans" to third-party customers and the RGHI receivables would be gone.  Then, just days after the financial period closed, the transactions were unwound – the "loans" repaid, and the uncollectible receivables from RGHI were returned to Refco's books.  Thus, these transactions enabled Refco to lend money to itself, through third parties, to conceal its grim, multi-hundred million dollar losses from the public and from its investors.  (Compl. ¶¶ 579-80.)

---

[4] Although the third parties purportedly earned interest from RGHI, the payment of the difference in interest was made by RCM.  (Compl. ¶ 451, 632.)  In effect, RCM paid the interest on a loan extended by a customer to a purportedly separate entity, RGHI.  (Compl. ¶ 632.)  This payment to the third-party customer was the only occasion on which funds actually changed hands in these "round-trip" transactions.

4

II.     The Mayer Brown Defendants' Participation in the Alleged Scheme

From 1994 until Refco's collapse, Mayer Brown was Refco's outside counsel and was Collins's largest client.[5]  (Compl. ¶¶ 76-78.)  Mayer Brown and Collins – the partner-in-charge of the Refco account – had a close working relationship with Refco, in which the firm provided the company with a broad range of legal services and through which Mayer Brown collected approximately $5 million per annum in legal fees.  (Id.)  Accordingly, Mayer Brown was familiar with Refco's operations and finances and participated in seventeen rounds of the round-trip loan transactions between 2000 and 2005 by which Refco's uncollectible receivable were concealed.  (Compl. ¶¶ 79, 451-52.)  Specifically, the role of the Mayer Brown Defendants was to explain the structure and terms of the transactions to potential third-party participants, negotiate the loans, draft and revise the documentation for the transactions including the relevant loan agreements, promissory notes, guarantees and indemnification letters, transmit documents to the participants, distribute executed copies of the documents, and mark the third-party customers' promissory notes to RCM as "paid in full" when the transaction was unwound.  (Compl. ¶¶ 451-52, 457-60, 471, 476, 482, 488, 494, 500, 506, 512, 514, 550-58, 564-65, 567, 569-72, 574.)  Collins supervised all of these activities, approved bills for the work, personally negotiated and revised some of the loan documents, sent drafts of loan documents to Refco, and discussed the enforceability of the loans with Refco management.  (Compl. ¶¶ 550, 556, 560, 567, 571-72, 574.)[6]

---

[5] Mayer Brown began representing Refco in 1994 when Collins moved to Mayer Brown from Schiff Hardin & Waite and brought Refco with him as a client.  (Compl. ¶ 77.)

[6] Plaintiffs' opposition papers incorporate the criminal indictment of Collins (Sabella Decl. Ex. 1) into their allegations, arguing that it "confirms in detail Collins' and Mayer Brown's

III.   The Mayer Brown Defendants' Participation in Statements that Refco Used to Issue
       Securities to Investors

While the round-trip loans concealed the trouble at Refco, certain Refco insiders began to

consider cashing out of the company.  Their plans began to unfold in 2004 when Refco issued

$600 million in bonds (the "Bonds") to public investors in connection with a leveraged buy-out

("LBO"), and came to fruition approximately one year later when Refco conducted a $670

million initial public offering ("IPO"), during which Refco sold approximately one-fifth of its

shares to the plaintiff class.[7]  (Compl. ¶¶ 6-7, 195.)  Both the LBO and the IPO yielded tens of

millions of dollars in cash payouts to Bennett and other executives.  (Id.)

The Mayer Brown Defendants participated in drafting the documents that were filed with

the Securities and Exchange Commission ("SEC") in order to induce investors to purchase

Refco's Bonds and, later, to effectuate the IPO.  (Compl. ¶¶ 116, 127-28, 133, 135, 149-50, 152-

53.)  Specifically, with respect to the LBO, the Mayer Brown Defendants were involved, as were

others,[8] in drafting and disseminating the Offering Memorandum to investors.  (Compl. ¶¶ 115,

117.)  The Offering Memorandum, which stated that Mayer Brown represented Refco in

---

indispensable role in conceiving and effectuating [Refco's] fraudulent scheme."  (Pl. Opp. Mem.
at 4, n.3.)  Whatever its substance, the Court can take judicial notice of the indictment, "not for
the truth of the matters asserted in the other litigation, but rather to establish the fact of such
litigation and related filings."  Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc., 969 F.2d
1384, 1388 (2d Cir. 1992).

[7] Two months later, on October 10, 2005, Refco announced that it had discovered the
RGHI receivable and that, accordingly, investors could no longer rely on its financial statements
for the preceding four years.  (Compl. ¶¶ 233-34.)  On October 17, 2005, Refco filed for Chapter
11 bankruptcy protection.  (Compl. ¶ 244.)

[8] Participants included, inter alia, Credit Suisse Securities (USA), Banc of America
Securities LLC, Deutche Bank, Bennett, Robert C Trosten, Scott L. Jaeckel, and the so-called
THL Partners.  (Compl. ¶ 115.)  All of these parties are defendants in this action.

connection with the offering, concerned the creation of unregistered bonds that, through an underwriting by certain financial institutions, were purchased and immediately resold to certain institutional investors, including some of the plaintiffs. (Compl. ¶¶ 114, 116, 118.)   The portions of the memorandum drafted by the Mayer Brown Defendants included the Management's Discussion & Analysis ("MD&A") and Risk Factors portions, which discussed Refco's business and financial condition in a way that, given Mayer Brown's involvement in the round-trip loan transactions and knowledge of the RGHI receivables, the Mayer Brown Defendants knew to be false. (Compl. ¶¶ 116-17.)

The Offering Memorandum, in turn, was used as the foundation for preparing the Bond Registration Statement whereby the Bonds issued in 2004 were exchanged for registered securities. (Compl. ¶ 165.)  With respect to the Bond Registration Statement, the Mayer Brown Defendants, together with banks underwriting the Bonds received and reviewed SEC comment letters and participated in drafting sessions for amendments to the statement.[9]  (Compl. ¶ 170.) Like the Offering Memorandum, the Bond Registration Statement contained untrue statements and omissions of material fact because it failed to disclose the existence and full extent of the related-party transactions and the related-party indebtedness between Refco and RGHI,. (Compl. ¶¶ 181-94).

Similarly, the Mayer Brown Defendants played a significant role in drafting and

---

[9] Specifically, Refco filed a Form S-4 Registration Statement with the SEC on October 12, 2004, which was subsequently amended through numerous Form S-4/A filings in late 2004 and early 2005 (collectively, the "Bond Registration Statement"). (Compl. ¶ 165.) The Bond Registration Statement became effective, and registered bonds were issued pursuant thereto, on or about April 13, 2005. (Compl. ¶ 166.)

reviewing the IPO Registration Statement, which was prepared at the same time as the Bond Registration Statement. The IPO Registration Statement also specifically identified Mayer Brown as counsel to Refco. (Compl. ¶¶ 116, 201.) In that capacity, the Mayer Brown Defendants received and presumably reviewed the SEC's comments. (Compl. ¶ 204.) Both the IPO and Bond Registration Statements were materially false and misleading for the same reasons as the Offering Memorandum – they misrepresented Refco's financial condition and failed to disclose multi-hundred million dollar receivable that were concealed through the round-trip loans that the Mayer Brown Defendants helped facilitate. (Compl. ¶¶ 181, 186, 203.)

IV.     Plaintiffs' Claims

As a result of Refco's collapse, the value of plaintiff-investors' interests in Refco plummeted, allegedly causing them millions of dollars in losses. (Compl. ¶¶ 17-19.) Plaintiffs allege that the Mayer Brown Defendants knew, or were reckless in not discovering, that Refco's statements made in the Offering Memorandum, the Bond Registration Statement, and the IPO Registration Statement were false or materially misleading and that, accordingly, defendants should be held primarily liable for those statements under Section 10(b), either because they participated in drafting the documents and were identified as counsel for Refco in two of the three offering documents, or because they documented the round-trip loans that enabled Refco to issue false and misleading financial statements. Plaintiffs also contend that control person liability under Section 20(a) is sufficiently alleged. The Mayer Brown Defendants move to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6). The motion will be granted.

**DISCUSSION**

I.      Motions to Dismiss

8

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all of the factual allegations in the Complaint and draw all reasonable inferences in plaintiffs' favor. ATSI Comme'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). Nonetheless, "[f]actual allegations must be enough to raise a right of relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007). Ultimately, the plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." Id. at 1974. This "flexible 'plausibility standard,' . . . obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007), quoting Twombly, 127 S. Ct. at 1968 (emphasis in original). If plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Twombly, 127 S. Ct. at 1974.

While the rules of pleading in federal court usually require only "a short and plain statement" of the plaintiff's claim for relief, Fed. R. Civ. P. 8, averments of fraud must be "stated with particularity," Fed. R. Civ. P. 9(b). To comply with Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks omitted). Accordingly, where the fraud is based on alleged misrepresentations, the complaint must "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Suez Equity Investors, L.P. v.

Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001), quoting Cosmas v. Hassett, 886 F.2d 8,

11 (2d Cir. 1989).  A plaintiff pleading fraud based on deceptive conduct 'must specify what

deceptive or manipulative acts were performed, which defendants performed them, when the acts

were performed, and the effect the scheme had on investors in the securities at issue." In re

Parmalat Secs. Litig., 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2006).

II.     Pleading a Violation of Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "for any person,

directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any

security . . . any manipulative or deceptive device or contrivance" in violation of the rules set

forth by the Securities and Exchange Commission for the protection of investors.  15 U.S.C. §

78j.  Pursuant to SEC Rule 10b-5, promulgated thereunder, it is unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to
> state a material fact necessary in order to make the statements
> made, in the light of the circumstances under which they were
> made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any person, in
> connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Supreme Court recently articulated the elements necessary to sustain a private cause

of action for securities fraud under § 10(b) and Rule 10b-5:

> In a typical § 10(b) private action a plaintiff must prove (1) a
> material misrepresentation or omission by the defendant; (2)
> scienter; (3) a connection between the misrepresentation or
> omission and the purchase or sale of a security; (4) reliance upon
> the misrepresentation or omission; (5) economic loss; and (6) loss

10

causation.

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. ___, 128 S. Ct. 761, 768

(2008), citing Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); see also, e.g.,

Jay Dees Inc. v. Def. Tech. Sys., Inc., No. 05 Civ. 6954, 2008 WL 4501652, at *4 (S.D.N.Y.

Sept. 30, 2008) (reciting this articulation of the elements from Stoneridge) [10]

In the context of securities fraud complaints, the Private Securities Litigation Reform Act

of 1995 ("PSLRA") has expanded on Rule 9(b)'s pleading requirements. See 15 U.S.C. §

78u-4(b). The PSLRA provides that, where misleading statements or omissions under Section

10(b) are alleged, a plaintiff must "specify each statement alleged to have been misleading, the

reason or reasons why the statement is misleading, and, if an allegation regarding the statement

or omission is made on information and belief, the complaint shall state with particularity all

facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); see also Tellabs, Inc. v. Makor

Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 2509-10 (2007). In cases where it is not a

statement or omission that is alleged, but rather, a fraudulent scheme to affect the price of stocks,

it is sufficient to specify "what manipulative acts were performed, which defendants performed

them, when the manipulative acts were performed, and what effect the scheme had on the market

for the securities at issue." In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319 , 329

(S.D.N.Y. 2004), quoting In re Blech Sec. Litig., 961 F. Supp. 569, 580 (S.D.N.Y. 1997). Thus,

---

[10] The Second Circuit has recognized a largely indistinguishable set of elements
necessary to state a claim for relief under § 10(b) and Rule 10b-5, which requires that a plaintiff
prove that defendants "'(1) made misstatements or omissions of material fact; (2) with scienter;
(3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5)
that plaintiffs' reliance was the proximate cause of their injury.'" Lattanzio v. Deloitte &
Touche LLP, 476 F.3d 147 (2d Cir. 2007), quoting In re IBM Sec. Litig., 163 F.3d 102, 106 (2d
Cir. 1998).

in order for a defendant to be held liable for a claim brought under Rule 10b-5, a plaintiff must allege that the defendant made a false or misleading statement or omission that investors attributed to him or her, or that the defendant "participated in [a] fraudulent scheme or other activity proscribed by the securities laws." SEC v. U.S. Envtl., Inc., 155 F.3d 107, 111 (2d Cir. 1998) (citations omitted).

III.     Sufficiency of the Rule 10b-5(b) Claim

In Count Nine of their Complaint, plaintiffs allege that the Mayer Brown Defendants violated § 10(b) and Rule 10b-5(b) when they drafted, reviewed, and revised portions of the Offering Memorandum and the IPO Registration Statement, which contained false and misleading statements and in which – at the conclusion of each document -- Mayer Brown was identified as counsel for Refco. The Mayer Brown Defendants argue that Count Nine should be dismissed because none of the alleged misstatements were actually made by, or otherwise attributed to, Mayer Brown.

The starting point for this analysis is Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994), which held that § 10(b) imposes liability only on a person who makes a material misstatement or omission, and that there is no liability for aiding and abetting fraudulent conduct. Id. at 177. In Shapiro v. Cantor, 123 F.3d 717 (2d Cir 1997), the Second Circuit, observed that "[i]f Central Bank is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting . . . *no matter how substantial that aid may be* . . . ." Id. at 720 (emphasis added). This requirement draws a "bright line" between the conduct of a secondary actor and that of a primary violator. Wright v. Ernst & Young LLP, 152

12

F.3d 169, 175 (2d Cir. 1998).  To rise to the level of a primary violation, the secondary actor

must not only make a material misstatement or omission, but "the misrepresentation must be

attributed to the specific actor at the time of public dissemination," such as in advance of the

investment decision, so as not to undermine the element of reliance required for § 10(b) liability.

Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007), quoting Wright, 152

F.3d at 175.  "Allegations of 'assisting,' 'participating in,' 'complicity in' and similar synonyms

. . . all fall within the prohibitive bar of Central Bank."  Shapiro, 123 F.3d at 720.

Nor can silence or mere association be construed as nonetheless conveying an actor's

"imprimatur."  Lattanzio, 476 F.3d at 155.

> Public understanding that [a secondary actor] is at work behind the
> scenes does not create an exception to the requirement that an
> actionable misstatement be made by the [secondary actor]. Unless
> the public's understanding is based on [that actor's] articulated
> statement, the source for that understanding – whether it be a
> regulation, an accounting practice, or something else – does not
> matter.

Id. (holding that a securities regulation requiring that the company's accountant review the

quarterly unaudited financial statements did not "associate" the accountant with those statements

to such a degree that, without more, those statements became the accountant's statements).

Here, the decisive question is whether the allegations against the Mayer Brown Defendants are

sufficient to show that they "made" the alleged material misstatements and omissions such that

plaintiffs relied on the *defendants'* misrepresentation.  Plaintiffs have not made such a showing.

Lattanzio explains that only an "articulated statement" of attribution to a secondary actor

is sufficient.  Id.; accord, United States v. Finnerty, 533 F.3d 143 (2d Cir. 2008); see also In re

Alstom SA, 454 F. Supp. 2d 187, 204 (S.D.N.Y. 2006) (noting that the attribution requirement is

"of particular concern" when plaintiffs seek to hold outside secondary actors like accountants

and auditors liable for a corporation's misleading statements).  The Offering Memorandum and

the IPO Registration Statement each mention Mayer Brown only once in their nearly two-

hundred pages – at the coda, and under the subheading "legal matters," in which counsel for

Refco and counsel for the purchasers are identified.  (Borden Decl. Ex. A "Offering

Memorandum" at 172; id. Ex. C "IPO Registration Statement" at 125.)  Throughout these

documents, where outside entities did supply content, the source of that content is identified.  At

no point, however, do these documents attribute any of their contents to Mayer Brown, including

with respect to the portions of the documents that the Mayer Brown defendants participated in

drafting, such as the "Management's Discussion and Analysis" portion of the Offering

Memorandum which attributes its analysis solely to Refco's *management* (Borden Decl. Ex. A

"Offering Memorandum" at 50), and the Risk Factors section of the IPO Registration Statement

which clearly states that, "[p]resented below are all the risks that *management* deems material . .

. ." (id. Ex. C "IPO Registration Statement" at 11) (emphasis added).  This, without more, is not

an "articulated statement" by the Mayer Brown Defendants.

      Plaintiffs seem to concede as much, arguing – citing this Court's opinion in Global

Crossing – that it is not the mere mention of Mayer Brown as counsel-of-record that imputes the

statements to the defendants, but rather that "investors [were] sufficiently aware of defendant's

participation that they may be found to have relied [on the statement] . . . as if the statement had

been attributed to [Mayer Brown]."  322 F. Supp. 2d at 332-33.  Even if, after Lattanzio, Global

Crossing remains good law,[11] plaintiffs have neither alleged any facts showing that at the time of their investment they or other members of the investing public "almost certainly understood [Mayer Brown] to be the speakers," In re Converium Holding AG Sec. Litig., No. 04 Civ. 7897, 2006 WL 3804619, at *12 (S.D.N.Y. Dec. 28, 2006), nor alleged the rather extraordinary awareness found sufficient in Global Crossing, in which this Court observed that

> it is undisputed, as a matter of public record, that Andersen's audit reports were included in all of GC's registration statements and annual reports from 1998 to 2000, and that they were widely available to shareholders during the class period. Andersen's role as GC's auditor was thus well known to investors, who could easily have relied on the accounting firm's involvement in making any public financial reports, even where a particular statement was not publicly attributed to it. Moreover, Andersen's aggressive marketing of the novel accounting strategies promoted in the White Paper, which allegedly "became a 'must-read' in the telecom industry," raises an inference that sophisticated investors would have known of Andersen's role in creating the reporting practices behind GC's false statements. These allegations are sufficient to raise a reasonable inference not only that Andersen was one of the 'makers' of the statements, but also that investors viewed it as such.

Global Crossing, 322 F. Supp. 2d at 334 (distinguishing these extraordinary allegations from those insufficient to transcend the proscribed category of aiding and abetting liability).

Here, plaintiffs allege that Mayer Brown's involvement in the drafting process "provides more than a sufficient basis for 'attributing' the false statements therein to Mayer Brown." (Pl.

---

[11] Lattanzio does not discuss Global Crossing and the Mayer Brown Defendants question whether Global Crossing and the cases that follow it can be reconciled with Lattanzio's renewed endorsement of Wright and its prohibition against relying on "public understanding" to attribute statements to actors for purposes of Rule 10b-5 liability. It is not necessary, however, to reach that issue, since plaintiffs have not pleaded facts that would meet even this "relax[ed]" version of the Wright standard. Global Crossing, 322 F. Supp. 2d at 331.

Opp. Mem. at 15.)[12]  Even if the Mayer Brown Defendants played a substantial role in drafting

the statements at issue, however, the relevant inquiry is not simply the extent of their

involvement viewed in hindsight, but whether, at the time, plaintiffs reasonably understood

Mayer Brown to be speaking through the release.  Global Crossing, 322 F. Supp. 2d at 332-33;

see also In re Converium, 2006 WL 3804619, at *12.  To that end, plaintiffs' meager allegation –

that the mention in the Offering Memorandum and the IPO Registration Statement that Mayer

Brown was Refco's primary outside counsel, and that accordingly investors expected that

"Mayer Brown was involved in the preparation and review of those documents" (Compl. ¶ 749)

– is plainly insufficient to establish a primary violation by Global Crossing's own terms.  See id.

at 333 (finding no liability where an accountant "merely reviewed and approved" unaudited

statements or was "instrumental in helping" the company prepare the statements at issue).

      Further, unlike in Global Crossing, where the plaintiffs pleaded facts that raised a

reasonable inference that *investors knew* that Andersen had masterminded the misleading

---

      [12] At one point, plaintiffs also argue that the fact that the Mayer Brown Defendants
"devised and perpetrated a fraudulent scheme to falsify the issuer's financial statements"
provides a basis for attributing the misstatements in the financial statements to Mayer Brown.
(Pl. Opp. Mem. at 17.)  This argument improperly conflates the distinct elements of a claim for
false statements under subsection (b) of Rule 10b-5, which requires a misrepresentation or
omission, with those of a claim for engaging in a fraudulent scheme under subsections (a) or (c).
See 17 C.F.R. § 240.10b-5; Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128,
152-53 (1972) (drawing a distinction between the two kinds of claims); cf. Lentell v. Merrill
Lynch & Co., 396 F.3d 161, 177-78 (2d Cir. 2005) (finding that "where the sole basis for such
claims is alleged misrepresentations or omissions, plaintiffs have not made out a [fraudulent
scheme] claim under Rule 10b-5(a) and (c)").  Plaintiffs' allegation that Mayer Brown was
behind the scenes papering the loans that concealed the RGHI receivables is not relevant to the
issue of what investors understood Mayer Brown's role to be at the time plaintiffs made their
investment.  Accordingly, plaintiffs cannot offer their fraudulent scheme claim as proof for their
fraudulent misstatement claim.

accounting behind the issuer's false statements, here plaintiffs have offered no reason why the Mayer Brown Defendants' status as counsel for Refco would be understood by investors as an endorsement of the accuracy of Refco's assertions about its financial condition. Nor is such an inference self-evident. Indeed, it is implausible that the mere fact that the issuer's law firm was identified in the offering documents would, without a great deal more, be perceived as an articulation by that law firm of the accuracy of the statements made in those documents.

Although it is well settled that a lawyer who makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under § 10(b) and Rule 10b-5(b), Central Bank, 511 U.S. at 191, it is equally well settled that "a secondary actor cannot incur primary liability . . . for a statement not attributed to the actor at the time of its dissemination" precisely because "[s]uch a holding would circumvent the reliance requirements of the Act." Wright, 152 F.3d at 175; Lattanzio, 476 F.3d at 154-55. Accordingly, Count Nine of the Complaint as to the Mayer Brown Defendants must be dismissed.

IV.     Sufficiency of the Rule 10b-5(a) and (c) Claim

In addition to liability for its statements in the offering documents, plaintiffs posit an alternative theory of liability, commonly known as "scheme liability," for Mayer Brown's role in the fraud alleged: subsections (a) and (c) of Rule 10b-5, which prohibit "employ[ing] any device, scheme or artifice to defraud," or "engag[ing] in any act, practice or course of business which operates . . . as a fraud or deceit upon any person" in connection with the sale of securities. 17 C.F.R. § 240.10b-5(a), (c). Plaintiffs allege that the Mayer Brown Defendants "design[ed] and implement[ed] sham transactions used by Refco to fraudulently transfer uncollectible debt and design[ed] and participat[ed] in blatantly fraudulent sham loan transactions." (Compl. ¶ 766.)

17

The Mayer Brown Defendants seek dismissal of this claim, inter alia, on the ground that the

Supreme Court's decision in Stoneridge forecloses this theory of liability.  They are correct.

In Stoneridge, the Court examined the issue of "when, if ever, an injured investor may

rely upon § 10(b) to recover from a party that neither makes a public misstatement nor violates a

duty to disclose but does participate in a scheme to violate § 10(b)."  128 S. Ct. at 767.

Specifically, the Court considered whether two vendors of a cable operator that entered into

various sham transactions with the cable operator to artificially increase the cable operator's

publically reported revenues could be held liable for violating § 10(b).  The vendors were not

alleged to have made any misstatements directly to the public, but instead were alleged to have

knowingly participated in the scheme with the purpose of creating a false appearance about the

cable operator's revenues.  While finding that "[c]onduct itself can be deceptive," the Court

ultimately concluded that the vendors could not be held liable because the vendors' "deceptive

acts, which were not disclosed to the investing public [were] too remote to satisfy the

requirement of reliance . . . except in an indirect chain . . . too remote for liability."  Id. at 769-

70.  Precisely because "[t]he conduct of the secondary actor must satisfy each of the elements or

preconditions for liability," a mere allegation of "'scheme liability' . . . does not answer the

objection that petitioner did not in fact rely upon [the defendants'] own deceptive conduct."  Id.

at 770.  Accordingly, allegations that a defendant committed a deceptive act, even one in

furtherance of a scheme to defraud investors, are insufficient.  Id. at 771; see id. at 770 (rejecting

this interpretation of reliance because the implied cause of action would then "reach the whole

marketplace in which the issuing company does business; and there is no authority for this

rule").

18

Here, there is no dispute that plaintiffs had no knowledge of the Mayer Brown Defendants' conduct that facilitated the fraudulent transactions.  Plaintiffs' Complaint specifically alleges that "[p]laintiffs . . . purchased Refco securities" "[i]n ignorance of the fraudulent conduct of Collins, Mayer Brown" and others.  (Compl. ¶ 771.)  Accordingly, the Mayer Brown Defendants contend that no liability can attach because plaintiffs could not have relied on their conduct, just as the plaintiffs in Stoneridge did not know of, and thus could not have relied on, the transactions in that case.  See Stoneridge, 128 S. Ct. at 769.

Plaintiffs nevertheless attempt to distinguish Stoneridge, arguing that the Mayer Brown Defendants were not unrelated suppliers or customers such that they were "remote" from the issuer and that Mayer Brown's conduct "made it necessary or inevitable for [the issuer] to record the transactions as it did."  Id. at 769-70.  This line of argument is unavailing.  The nub of plaintiffs' contention is that as Refco's primary counsel, the Mayer Brown defendants could not be "remote" within the meaning of Stoneridge, because they were directly involved in creating and executing the fraudulent scheme, including the drafting of misleading communications to Refco investors.  (Pl. Opp. Mem. at 23-24.)  Plaintiffs' reading of "remote" is myopic.  The issue is not the distance between the issuer and the defendant, but rather the distance between the defendant's conduct and the investor.

As in Stoneridge, plaintiffs admittedly did not know of, and thus did not rely on, any of Mayer Brown's work on the fraudulent loan transactions.  Nor can plaintiffs salvage their claim by arguing that the "inevitable consequence" of the transactions on which Mayer Brown worked were the misstatements on which investors relied.  In Stoneridge as well, the transaction at issue – participation by outside vendors in an issuer's patently fraudulent scheme to create fictitious

documents and backdate contracts – had no other plausible purpose than to misstate the issuer's financial condition, but this fact was insufficient to establish liability, because irrespective of the obviousness of the fraudulent scheme to the participating defendants, or the importance of their participation to the execution of the scheme, the defendants' conduct was too remote from the investing public to satisfy the reliance element of § 10(b). Id. at 770-71 (finding that liability "does not reach all commercial transactions that are fraudulent and affect the price of a security in some attenuated way"). Here, the Mayer Brown Defendants were not even the counter-party to the fraudulent transactions; they merely participated in drafting the documents to effect those transactions.

As alleged in the Complaint, the Mayer Brown Defendants explained the structure and terms of the transactions to potential third-party participants; negotiated the loans; drafted and revised the documentation for the transactions including the relevant loan agreements, promissory notes, guarantees and indemnification letters; transmitted documents to the participants; distributed executed copies of the documents; and marked the third-party customers' promissory notes to RCM as "paid in full" when the transaction was unwound. (Compl. ¶¶ 451-52, 457-60, 471, 476, 482, 488, 494, 500, 506, 512, 514, 550-58, 564-65, 567, 569-72, 574.)

Plaintiffs have clearly alleged facts, including the suspicious timing and the "risk-free" quality of the loans, that give rise to a strong inference of scienter, that is, that the Mayer Brown Defendants knew or acted in reckless disregard of Refco's intention to use the transactions to inflate its revenues, and knew or should have known that the resulting financial statements issued would be relied upon by research analysts and investors. Plaintiffs allege, moreover, that

20

acting with such knowledge, the Mayer Brown Defendants engaged in conduct that materially aided Refco's fraud.  Such allegations if proven true, are adequate to establish liability for aiding and abetting securities fraud, but are not enough to establish civil liability as a *primary* actor.  As was the case in <u>Stoneridge</u>, it was Refco, not the Mayer Brown Defendants, "that . . . filed fraudulent financial statements; nothing [the Mayer Brown Defendants] did made it necessary or inevitable for [Refco] to record the transactions as it did."  128 S. Ct. at 770.

The critical holding of <u>Central Bank</u> – that liability to investors under Rule 10b-5 does not extend to those who merely aid and abet violations by primary actors – is not limited to violations of Rule 10b-5(b).  To establish liability under the other subsections of the Rule as well, a plaintiff must show that it was the defendant itself that "employ[ed]" the scheme to defraud or "engage[d] in the deceitful practice, and not merely that the defendants assisted another party in its fraudulent practices.  Here the scheme to defraud was Refco's effort to hide from its investors the true state of its finances by concealing the uncollectible receivables and it was Refco that engaged in the deceitful practice of making the round-trip loans and reporting them in its financial statements as if they were bona fide loan transactions.  However significant a role the Mayer Brown Defendants played in assisting Refco's management to engage in these transactions, and however culpable they may have been to do so with the knowledge that the transactions were ultimately designed as part of a scheme to defraud and practice a deceit upon Refco's shareholders – indeed even if the acts of Collins were, as the Government has charged, criminal – the liability that attaches to those acts is liability for aiding and abetting Refco's schemes and manipulation, not principal liability for executing schemes of the Mayer Brown Defendants' own.

21

Plaintiffs' attempts to argue to the contrary are unpersuasive because it was Refco's decision how to account for the transactions at issue; plaintiffs have pleaded no facts that would support – nor could they – that the Mayer Brown Defendants were, in fact, "control[ing]" Recfo's misleading communications to investors.  (See Pl. Opp. Mem. at 23-24.)  Indeed, plaintiffs' allegations are substantially similar to those found insufficient by the Court in Stoneridge because the defendants ultimately merely facilitated the preparation of the fraudulent scheme rather than – as required – engaged in the fraudulent sale of securities pursuant to that scheme.

A thoughtful and highly-respected judge in this district has, following Stoneridge, and under similar circumstances, come to precisely this conclusion.  See In re Parmalat Sec. Litig., 570 F. Supp. 2d 521 (S.D.N.Y. 2008) (Kaplan, J.).  In that case plaintiffs argued that the issuer's offering documents made the public aware of the underlying, allegedly deceptive transactions in which the defendant law firm was involved.  Id. at 525.  The court, having previously upheld on a motion to dismiss some but not all of plaintiffs scheme liability claims against the firm,[13] found this argument "unconvincing" and granted summary judgment in favor of the firm on the basis that "nothing about [the issuer's] disclosures describes any of [the law firm's] own conduct, much less conduct that was deceptive."  Id. at 525-26; see also In re DVI, Inc. Sec. Litig., 249

---

[13] Plaintiffs contend that this decision, see In re Parmalat Sec. Litig., 383 F. Supp. 2d 616 (S.D.N.Y. 2005), which pre-dates Stoneridge, lends support to their position.  (Pl. Opp. Mem. at 29-30.)  This reliance is wholly undermined, however, both by Judge Kaplan's recent decision following Stoneridge and by the fact that in his earlier decision Judge Kaplan had summarily dismissed a number of plaintiffs' allegations quite similar to those at bar and determined that the law firm could only be held liable when it became an active counterparty – by itself "creat[ing] and controll[ing] shell companies – in the transactions that effectuated the fraud.  See, 383 F. Supp. 2d at 624-26 & nn.39 & 43.

22

F.R.D. 196, 216-18 (E.D. Pa. 2008) (refusing to certify a class against an issuer's law firm notwithstanding allegations of the law firm's "unique role in initiating and masterminding certain aspects of the overall scheme" because "the fact remains that none of this alleged conduct was publically disclosed such that it affected the market for [the issuer's] securities"). As in In re Parmalat Sec. Litig., "even assuming the truth of plaintiffs' factual allegations and granting every reasonable inference therefrom, plaintiffs' evidence would establish only that investors relied on [Refco's] deceptive disclosures concerning transactions [in] which [the Mayer Brown Defendnats] were [involved]." 570 F. Supp. 2d at 526.

Finally, plaintiffs argue that they are nevertheless entitled to a presumption of reliance under three distinct theories. None of the presumptions applies here. First, plaintiffs invoke Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), for the presumption that "if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance." Stoneridge, 128 S. Ct. at 769, citing Affiliated Ute, 406 U.S. at 153-154. The Mayer Brown Defendants owed no duty of disclosure to Refco's investors. See In re Parmalat Sec. Litig., 570 F. Supp. 2d at 526 ("even assuming *arguendo* the applicability [of professional rules and a violation thereof] it would not follow that [the law firm] breached a legal duty *to the plaintiffs*") (emphasis in original); see also Finnerty, 533 F.3d at 149-50 (citing Lattanzio and rejecting criminal liability based on investors' "background assumption" of compliance with NYSE rules). Second, plaintiffs invoke the fraud-on-the-market doctrine as announced in Basic Inc. v. Levinson, 485 U.S. 224, 243 (1988), in which reliance is presumed when the statements at issue become public. Here, it is undisputed the Mayer Brown's deceptive acts were not communicated to the public; as in Stoneridge, "no

23

member of the investing public had knowledge, either actual or presumed, of respondents'

deceptive acts during the relevant times."  128 S. Ct. at 769.  Accordingly plaintiffs "cannot

show reliance upon any of respondents' actions except in an indirect chain . . . too remote for

liability."  Id.

Third and finally, plaintiffs invoke the so-called "fraud-created-the-market" presumption,

where reliance may be presumed if the defendants' fraudulent activity is "so pervasive that it

goes to the very existence of the [securities] and the validity of their presence on the market."

Ross v. Bank South, N.A., 885 F.2d 723, 729 (11th Cir. 1989).  This Circuit has never adopted

this presumption and it has been criticized by at least two other Courts of Appeals.  See

Ockerman v. May Zima & Co., 27 F.3d 1151, 1159 (6th Cir. 1994); Eckstein v. Balcor Films

Investors, 8 F.3d 1121 (7th Cir. 1993) (rejecting the presumption).  Whatever its merits (and

those merits appear to be in grave doubt after Stoneridge), courts that apply the presumption

appear to agree that the touchstone of this standard is "unmarketability."  Such "unmarketability"

must mean either economic unmarketability, which occurs when a security is patently worthless,

or legal unmarketability, which occurs when a regulatory or municipal agency would have been

required by law to prevent or forbid the issuance of the security.  Joseph v. Wiles, 223 F.3d

1155, 1163-66 (10th Cir. 2000) (citing cases).  Plaintiffs' allegations here fall far short of

alleging that Refco stock could not have been sold at any price or that Refco bonds could not

have been offered at any combination of price and interest rate.  See Ross, 885 F.2d at 729-30.

Nor are there any allegations that the issuer was prohibited from issuing the securities as a matter

of law.  T.J. Raney & Sons, Inc. V. Fort Cobb, Okla. Irrigation Fuel Auth., 717 F.2d 1330, 1333

24

(10th Cir. 1983).[14]

In sum, even if the Mayer Brown Defendants' conduct helped Refco to carry out their scheme to defraud investors, under <u>Stoneridge</u> plaintiff-investors have no claim under the federal securities laws against the Mayer Brown Defendants.[15]  At most, the Mayer Brown Defendants were culpable aiders and abettors.  Accordingly, Count Eleven of the Complaint as to the Mayer Brown Defendants will be dismissed.

---

[14] Although plaintiffs point to a single paragraph in the Complaint, which alleges that had investors known about the Refco fraud "there would have been no market for the Bonds." (Compl. ¶ 733), plaintiffs have pleaded no facts to support that conclusion, and the vast weight of the Complaint establishes only that "had Refco's true financial picture been disclosed to investors at the time of the Bond Offering, investors would have known that the credit risk associated with the Bonds was substantially greater than they otherwise believed," (Compl. ¶ 733). Specifically, in both Counts Nine and Eleven of the Complaint, plaintiffs allege only that as a result of the Mayer Brown Defendants' conduct, they "purchased Refco securities at artificially inflated prices." (Compl. ¶¶ 753, 771.) Under these circumstances, plaintiffs cannot rely on a "fraud-created-the-market" presumption as a stand-in for reliance on defendants' "own deceptive conduct." <u>Stoneridge</u>, 128 S. Ct. at 770.

[15] It is perhaps dismaying that participants in a fraudulent scheme who may even have committed criminal acts are not answerable in damages to the victims of the fraud. However, as the Court noted in <u>Stoneridge</u>, the fact that the plaintiff-investors have no claim is the result of a policy choice by Congress. 128 S. Ct. at 769. In 1995, in reaction to the Supreme Court's decision in <u>Central Bank</u>, Congress authorized the SEC – but not private parties – to bring enforcement actions against those who "knowingly provide [ ] substantial assistance to another person" in violation of the federal securities laws. <u>See</u> PSLRA, Pub. L. No. 104-67, § 104, 109 Stat. 737, 757, codified in 15 U.S.C. § 78t(f). This choice may be ripe for legislative re-examination. While the impulse to protect professionals and other marginal actors who may too easily be drawn into securities litigation may well be sound, a bright line between principals and accomplices may not be appropriate. There are accomplices and there are accomplices: after all, in the criminal context when the Godfather orders a hit, he is only an accomplice to murder – one who "counsels, commands, induces or procures" but he is nonetheless liable as a principal for the commission of the crime. 18 U.S.C. § 2(a). Likewise, some civil accomplices are deeply and indispensably implicated in wrongful conduct. Perhaps a provision authorizing the SEC not only to bring actions in its own right but also to permit private plaintiffs to proceed against accomplices after some form of agency review would provide the necessary flexibility without involving the courts in standardless and difficult-to-administer line-drawing exercises.

25

V.      Section 20(a) – Control Person Liability

As plaintiffs have failed to plead Section 10(b) claims against the Mayer Brown Defendants, plaintiffs' Section 20(a) claims,15 U.S.C. § 78t(a), in which they seek to impose control person liability for alleged Section 10(b) and Rule 10b-5 violations by former Mayer Brown partner Collins, fail as a matter of law because plaintiffs have not made out a prima facie case of any such violations by any of those defendants. See In re Pfizer, Inc. Sec. Litig., 538 F. Supp. 2d 621, 637 (S.D.N.Y. 2008) ("Section 20(a) claims are necessarily predicated on a primary violation of securities law . . . ."), citing Rombach, 355 F.3d at 177-78. Accordingly Count Fifteen of the Complaint as to Mayer Brown is dismissed.

## CONCLUSION

For the reasons stated above, the Second Amended Consolidated Class Action Complaint is dismissed in its entirety as to the Mayer Brown Defendants. As this ruling disposes of all claims against Joseph P. Collins and Mayer Brown LLP and there is no just reason for delay, the Clerk is directed, pursuant to Fed. R. Civ. P. 54(b), to enter final judgment with respect to those defendants.

SO ORDERED:

Dated: New York, New York
      March 17, 2009

                                       GERARD E. LYNCH
                                 United States District Judge

26