UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -x
:
In re REFCO, INC. SECURITIES          :          MASTER FILE NO.
LITIGATION                            :          05 Civ. 8626 (GEL)
:
:          **ORAL ARGUMENT REQUESTED**
:
- - - - - - - - - - - - - - - - - - - - - - - - -x


### THE UNDERWRITERS' MEMORANDUM OF LAW
### IN OPPOSITION TO PLAINTIFFS' MOTION
### FOR PARTIAL SUMMARY JUDGMENT


**WILMER CUTLER PICKERING
HALE AND DORR LLP**

Robert B. McCaw
Lori A. Martin
John V.H. Pierce
Dawn M. Wilson
Michael L. Feinberg
Ross E. Firsenbaum

399 Park Avenue
New York, New York 10022
Tel.: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for Credit Suisse Securities
(USA) LLC, Banc of America Securities
LLC, Deutsche Bank Securities Inc.,
Goldman, Sachs & Co., Merrill Lynch,
Pierce, Fenner & Smith Incorporated, J.P.
Morgan Securities Inc., HSBC Securities
(USA) Inc., William Blair & Company,
L.L.C., BMO Capital Markets Corp., CMG
Institutional Trading LLC, Samuel A.
Ramirez & Company, Inc., Muriel Siebert
& Co., Inc., The Williams Capital Group,
L.P., and Utendahl Capital Partners, L.P.*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 4

I.    The Junior Underwriters Joined The IPO Underwriting Syndicate
      Shortly Before The Effective Date Of The Offering ........................................... 4

II.   The Lead And Co-Managers Conducted A Thorough Investigation
      Of Refco On Behalf Of The Entire IPO Underwriting Syndicate ......................... 8

III.  Cravath Assisted The Lead And Co-Managers' Due Diligence Investigation
      On Behalf Of All Of The Underwriters, Including The Junior Underwriters ........ 12

ARGUMENT ........................................................................................................ 14

I.    Junior Underwriters May Rely On The Exhaustive Due Diligence Investigation
      By The Lead Managers And Syndicate Counsel .............................................. 14

      A.    The Junior Underwriters' Reliance on the Due Diligence Investigation
            Conducted by the Lead Managers, with the Assistance of Syndicate
            Counsel, Satisfies Section 11 ............................................................... 15

      B.    The Reasonableness of the Junior Underwriters' Delegation of the Due
            Diligence Investigation to the Lead Managers is Confirmed by Industry
            Practice and Public Policy ..................................................................... 21

            1.    The Industry Practice in which Junior Underwriters Rely on Lead
                  Managers Promotes Efficient Underwritings ..................................... 22

            2.    Current Industry Practice Promotes Section 11's Goal of Protecting
                  Investors ...................................................................................... 23

            3.    Acceptance of Plaintiffs' Position Would Discourage Inclusion of
                  Junior Underwriters in Syndicates or Burden the Offering Process ...... 26

II.   Plaintiffs Have Not Carried Their Burden Of Establishing That There Are
      No Material Issues Of Fact With Respect To The Due Diligence Conducted
      By The Junior Underwriters ......................................................................... 28

III.  Plaintiffs Have Not Carried Their Burden Of Showing That There Is No Material
      Issue Of Fact With Respect To The Underwriters' Reliance On The Expertised
      Financial Statements In The IPO Registration Statement ................................. 33

IV.   Plaintiffs' Motion For Partial Summary Judgment Should Be Denied As
      Premature Or Decision Should Be Postponed ................................................ 35

CONCLUSION .................................................................................................... 39

## TABLE OF AUTHORITIES

**Page**

Federal Cases

*Alibrandi v. Financial Outsourcing Services, Inc.,*
   333 F.3d 82 (2d Cir. 2003)............................................................................. 14

*Bank of India v. Subramanian,*
   No. 06 Civ. 2026, 2007 WL 1424668 (S.D.N.Y. May 15, 2007)............................ 28

*Cary Oil Co. v. MG Refining & Marketing, Inc.,*
   No. 99 Civ. 1725, 2003 WL 1878246 (S.D.N.Y. April 11, 2003)........................... 37

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)..................................................................................... 15

*Century Colorado Springs P'ship v. Falcon Broadband, Inc.,*
   No. 05 Civ. 02295, 2006 WL 521791 (D. Colo. March 2, 2006)......................... 36

*Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,*
   480 F.2d 341 (2d Cir. 1973)........................................................................... 15

*Commisioner of Internal Revenue v. Banks,*
   543 U.S. 426 (2005)..................................................................................... 28

*Competitive Associates., Inc. v. Int'l Health Sciences, Inc.,*
   No. 72 Civ. 1848, 1975 WL 349 (S.D.N.Y. January 22, 1975)....................... 16, 17

*Endo v. Albertine,*
   147 F.R.D. 164 (N.D. Ill. 1993)....................................................................... 18

*Epstein v. Kemper Insurance Cos.,*
   210 F. Supp. 2d 308 (S.D.N.Y. 2002)............................................................. 36

*Ernst & Ernst v. Hochfelder,*
   425 U.S. 185 (1976)..................................................................................... 15

*Escott v. BarChris Constr. Corp.,*
   283 F. Supp. 643 (S.D.N.Y. 1968) ................................................................. 17

*Feit v. Leasco Data Processing Equip. Corp.,*
   332 F. Supp. 544 (E.D.N.Y. 1971) ................................................................. 28

*Fiataruolo v. United States,*
   8 F.3d 930 (2d Cir. 1993)............................................................................... 37

*G-I Holdings, Inc. v. Baron & Budd,*
  No. 01 Civ. 216, 2002 WL 31251702 (S.D.N.Y. October 8, 2002) ........................................ 36

*Giannullo v. City of New York,*
  322 F.3d 139 (2d Cir. 2003) .................................................................................................. 36

*Gunther v. Airtran Holdings, Inc.,*
  No. 05 Civ. 2134, 2007 WL 193592 (S.D.N.Y. January 24, 2007) ....................................... 27

*Hammond v. Hendrickson,*
  No. 85 C 9829, 1986 WL 8437 (N.D. Ill. July 30, 1986) ................................................. 18, 19

*Holtz v. Rockefeller & Co., Inc.,*
  258 F.3d 62 (2d Cir. 2001) .................................................................................................... 37

*In re Activision Sec. Litig.,*
  621 F. Supp. 415 (N.D. Cal. 1985) ........................................................................... 16, 18, 19

*In re Computer Memories Sec. Litig.,*
  111 F.R.D. 675 (N.D. Cal. 1986) ........................................................................................... 18

*In re Consumers Power Co. Sec. Litig.,*
  105 F.R.D. 583 (E.D. Mich. 1985) ........................................................................... 16, 18, 19

*In re Gap Stores Sec. Litig.,*
  79 F.R.D. 283 (N.D. Cal. 1978) ....................................................................................... passim

*In re Homestore.com, Inc. Sec. Litig.,*
  347 F. Supp. 2d 769 (C.D. Cal. 2004) .................................................................................. 36

*In re International Rectifier Sec. Litig.,*
  No. CV91-3357, 1997 WL 529600 (C.D. Cal. March 31, 1997) ........................................... 29

*In re Itel Sec. Litig.,*
  89 F.R.D. 104 (N.D. Cal. 1981) ...................................................................................... 18, 19

*In re Locust Building Co.,*
  299 F. 756 (2d Cir. 1924) ..................................................................................................... 29

*In re Philip Morris Inc. v. Nat'l Asbestos Workers Medical Fund,*
  214 F.3d 132 (2d Cir. 2000) .................................................................................................. 38

*In re Software Toolworks Inc. Sec. Litig.,*
  50 F.3d 615 (9th Cir. 1994) ............................................................................................ 34, 35

*In re Software Toolworks, Inc. Sec. Litig.,*
  789 F. Supp. 1489 (N.D. Cal. 1992) ..................................................................................... 28

*In re WorldCom, Inc. Sec. Litig.,*
    346 F. Supp. 2d 628 (S.D.N.Y. 2004)...................................................................... 15, 28

*In re WorldCom, Inc. Sec. Litig.,*
    No. 02 Civ. 3288, 2005 WL 591189 (S.D.N.Y. March 14, 2005).......................... 16

*In re Worlds of Wonder Sec. Litig.,*
    814 F. Supp. 850 (N.D. Cal. 1993) ...................................................................... 34, 35

*Johnson v. Arista Holding, Inc.,*
    No. 05 Civ. 9645, 2006 WL 3511894 (S.D.N.Y. December 5, 2006)..................... 36

*Owens v. Hellmuth & Johnson, PLLC,*
    550 F. Supp. 2d 1060 (D. Minn. 2008)..................................................................... 38

*Paxton v. Union Nat'l Bank,*
    688 F.2d 552 (8th Cir. 1982) .................................................................................... 38

*Phillips v. Kidder, Peabody & Co.,*
    933 F. Supp. 303 (S.D.N.Y. 1996) ...................................................................... 29, 34

*Pryor v. United States Steel Corp.,*
    591 F. Supp. 942 (S.D.N.Y. 1984) ........................................................................... 27

*Quinn v. Syracuse Model Neighborhood Corp.,*
    613 F.2d 438 (2d Cir. 1980)...................................................................................... 36

*Robinson v. Transworld Airlines, Inc.,*
    947 F.2d 40 (2d Cir. 1991)........................................................................................ 36

*Rodriguez v. City of New York,*
    72 F.3d 1051 (2d Cir. 1995)...................................................................................... 15

*Rosen v. Trans World Airlines, Inc.,*
    No. 94 Civ. 682, 1997 WL 107640 (S.D.N.Y. March 11, 1997)............................. 36

*Scholastic, Inc. v. Harris,*
    259 F.3d 73 (2d Cir. 2001)........................................................................................ 14

*Schwan-Stabilo Cosmetics GmbH & Co. v. Pacificlink Int'l Corp.,*
    401 F.3d 28 (2d Cir. 2005)........................................................................................ 14

*SEC v. Lyon,*
    No. 06 Civ. 14338, 2009 WL 755356 (S.D.N.Y. March 23, 2009)......................... 33

*SEC v. U.S. Funding Corp.,*
    No. 02 Civ. 2089, 2006 WL 995499 (D.N.J. April 11, 2006) ................................. 33

*Trans-Tec Asia v. M/V Harmony Container,*
    435 F. Supp. 2d 1015 (C.D. Cal. 2005) ................................................................ 36

*Travelers Casualty & Surety Co. v. Ace American Reinsurance Co.,*
    392 F. Supp. 2d 659 (S.D.N.Y. 2005)................................................................... 33

*Vermont Teddy Bear Co. v 1-800 Beargram Co.,*
    373 F.3d 241 (2d Cir. 2004)................................................................................. 36

State Cases

*Cruz v. New York City Transit Authority,*
    526 N.Y.S.2d 827 (App. Div. 1988)..................................................................... 27

Federal Statutes

15 U.S.C. § 77k(b)(3)(A) (2007) ................................................................................ 15

15 U.S.C. § 77k(b)(3)(C) (2007) ................................................................... 15, 34, 35

Federal Regulations

17 C.F.R. § 230.430 (2009) ......................................................................................... 7

Other Authorities

Alan R. Bromberg & Lewis D. Lowenfels, 6 *Bromberg and Lowenfels on Securities*
    *Fraud and Commodities Fraud* § 13 (2d ed. 2008) ............................................ 23

Charles J. Johnson, Jr. & Joseph McLaughlin, *Corporate Finance and*
    *the Securities Laws* (4th ed. 2008 supp.) ............................................................ 21

Dana B. Klinges, Note, *Expanding the Liability of Managing Underwriters*
    *Under the Securities Act of 1933*, 53 Fordham L. Rev. 1063 (1985) .................. 21

David A. Lipton, 15 *Broker Dealer Regulation* (2008)............................................. 18

Edward Brodsky & M. Patricia Adamski, *Law of Corporate Officers and*
    *Directors: Rights, Duties and Liabilities* (2009) ................................................ 23

*Enhancing Investor Protection and the Regulation of the Securities Markets:*
    *Hearing Before the S. Comm. on Banking, Housing and Urban Affairs,*
    111th Cong. (2009) (statement of Professor John C. Coffee, Jr.)......................... 21

Ernest L. Folk, III, *Civil Liabilities Under the Federal Securities Acts:*
    *The* BarChris *Case*, 55 Va. L. Rev. 1 (1969)......................................... 22, 23, 24, 26

H.R. Rep. No. 73-152, 1933 WL 984 (1933) (Conf. Rep.) ........................................ 24

National Association of Securities Dealers, Inc., *Special Report:*
  *Due Diligence Seminars* (1981) ................................................................. 22

New High Risk Ventures, Securities Act Release No. 5275, 1972 WL 125474
  (July 27, 1927) ......................................................................................... 20

Restatement (Third) of Agency § 5 (2006) ..................................................... 19

Robert J. Haft & Michele H. Hudson, *Due Diligence:*
  *Periodic Reports & Securities Offerings*(2008-09) .................................... 17

*Securities Act of 1933: Hearings on S. 875 Before the Senate Committee on Banking*
  *and Currency*, 73d Cong. (1933) (statement of Penn Harvey, Vice President,
  Chase Harris Forbes & Co.) ....................................................................... 25

William K. Sjostrom, Jr., *The Due Diligence Defense Under Section*
  *11 of the Securities Act of 1933*, 44 Brandeis L.J. 549 (2006) ................. 17

William O. Douglas & George E. Bates, *Some Effects of the*
  *Securities Act Upon Investment Banking*, 1 U. Chi. L. Rev. 283 (1933)................. 25

William O. Douglas & George E. Bates, *The Federal Securities Act of*
  *1933*, 43 Yale L.J. 171 (1933) ......................................................... 23, 25, 27

Defendants William Blair & Company, L.L.C., BMO Capital Markets Corp., CMG Institutional Trading LLC, Samuel A. Ramirez & Company, Inc., Muriel Siebert & Co., Inc., The Williams Capital Group, L.P., and Utendahl Capital Partners, L.P. (the "Junior Underwriters"), members of the August 10, 2005 Refco Inc. initial public offering ("Refco IPO") underwriting syndicate ("IPO Underwriting Syndicate"), respectfully submit this memorandum of law in opposition to Plaintiffs' Motion for Partial Summary Judgment ("Motion"). The Lead Managers and Co-Managers join this opposition because the Motion implicates the nature and scope of the underwriting arrangements, the underwriters' due diligence, and the offering materials.[1]

## PRELIMINARY STATEMENT

Plaintiffs seek partial summary judgment (before the completion of fact and expert discovery and before class certification) against the Junior Underwriters of the Refco IPO because they allegedly "did nothing" in the way of independent due diligence other than relying on the Lead Managers of the IPO and Syndicate counsel, Cravath, Swaine, & Moore LLP ("Cravath").[2] (Pl. Br. at 1.) This motion should be denied for at least four independent reasons:

*First*, even if the record supported Plaintiffs' portrayal, the Securities Act of 1933 ("1933 Act") permits Junior Underwriters to delegate entirely the due diligence investigation to the Lead Managers. The industry-standard Agreement Among Underwriters was drafted in accordance with this framework and appoints the Lead Managers as agents for the Syndicate for all matters

---

[1]    The Underwriters against whom Plaintiffs have not moved are Credit Suisse Securities (USA) LLC ("Credit Suisse"), Goldman, Sachs & Co. ("Goldman Sachs"), and Banc of America Securities LLC ("Banc of America") (the "Lead Managers") and Deutsche Bank Securities Inc. ("Deutsche Bank"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), J.P. Morgan Securities Inc. ("J.P. Morgan"), Sandler O'Neill & Partners, L.P. ("Sandler"), and HSBC Securities (USA) Inc. ("HSBC") (the "Co-Managers"). Sandler entered into a preliminarily approved settlement with Lead Plaintiffs.

[2]    Cravath served as counsel for the Syndicate, including the Junior Underwriters, and assisted the Lead Managers in documenting the due diligence investigation.

relating to the Refco IPO, including in respect of the Syndicate's due diligence. With that appointment and delegation, the Lead Managers conducted due diligence, with the assistance of Syndicate counsel, for the benefit of the entire Syndicate as ultimately constituted. The overwhelming weight of judicial precedent, legislative history, scholarly commentary, industry practice, and common sense support the Junior Underwriters' reliance on the due diligence investigation performed by the Lead Managers and counsel – here, leading investment banks and a prominent national law firm with established reputations and track records in public offerings. Delegation of due diligence by junior underwriters to lead managers was anticipated at the adoption of the 1933 Act, and heralded by the Act's supporters as a requirement for efficiency and broadly distributed securities offerings. Every court to have passed on the issue has permitted junior underwriters to rely on the due diligence investigation conducted by lead managers. The adoption of Plaintiffs' position would subvert this framework, build massive inefficiencies into the capital raising process, and lead to the absurd result that the Junior Underwriters could be liable under Section 11 in circumstances in which the Lead Managers, working with Syndicate counsel, conducted exemplary due diligence, and establish their due diligence defense.

*Second*, even assuming Plaintiffs were correct that complete delegation of the due diligence investigation to the Lead Managers is inconsistent with the assertion of a due diligence defense under the 1933 Act, Plaintiffs have not carried their burden of establishing on this record that the Junior Underwriters conducted no due diligence. Through selective quotation, Plaintiffs attempt to demonstrate that the Junior Underwriters did literally nothing. The record is otherwise. All of the Junior Underwriters at a minimum reviewed portions of the preliminary prospectus, relied upon the expertised financial statements, relied upon the opinions of counsel,

relied upon Syndicate counsel's bring down due diligence, and relied upon their knowledge of, and experience with, the Lead Managers developed over years of initial public offerings. Certain of the Junior Underwriters had prior or on-going business relationships with Refco, which provided independent corroboration of certain due diligence matters investigated by the Lead Managers. Thus, at this stage of the litigation, and in the absence of a fully developed factual or expert record, Plaintiffs have not carried their burden of establishing that no material issues of fact remain regarding the extent to which the Junior Underwriters conducted their own diligence, even assuming that every Syndicate member was required to conduct an individualized diligence investigation.

*Third*, the Refco litigation overwhelmingly involves issues regarding the integrity and accuracy of the Company's financial statements. The financial statements certified by Grant Thornton LLP (including the notes) contained representations covering all of the alleged misstatements or omissions of which Plaintiffs complain. All of the Underwriters, including the Junior Underwriters, were entitled to rely on those expertised portions of the registration statement pursuant to which Refco conducted its IPO ("IPO Registration Statement"), absent a reasonable basis for believing that such expertised statements were false or incomplete. Plaintiffs have not even attempted to show that there was any basis – reasonable or otherwise – for doubting the expertised statements.[3]

*Finally*, the Motion should be denied, or decision postponed, because the Motion is premature and prejudicial. Fact discovery is still on-going. The Underwriters have had no opportunity to depose individuals that the United States Attorney's Office has designated as witnesses or potential witnesses in the criminal prosecution of Joseph Collins, a former partner at

---

[3]    As shown in Argument II below, Plaintiffs do not adequately show how the "expertised" financial statements are different and distinguishable from the purported non-expertised statements on which they purport to base their claims.

Refco's law firm Mayer Brown Rowe & Maw LLP ("Mayer Brown"), including such key observers as Thomas H. Lee Partners L.P. ("THL") witnesses or Collins. Expert discovery has not commenced. No class certification motion has been filed. Before deciding this Motion, the Court should first determine class certification to ensure that the Court and the parties know who is bound by any decision. The Court also should have before it a full record of the due diligence investigation conducted by the Lead Managers, with the aid of Syndicate counsel. And any predicate findings as to the falsity of the prospectus – which would have far reaching import in this litigation beyond this Motion – should be on a full record and in a context providing all parties with an opportunity to be heard. It would be unfair and prejudicial to the Underwriters (and countless other parties) to do otherwise.

## STATEMENT OF FACTS

**I.    THE JUNIOR UNDERWRITERS JOINED THE IPO UNDERWRITING SYNDICATE SHORTLY BEFORE THE EFFECTIVE DATE OF THE OFFERING**

The Junior Underwriters are small to mid-size investment firms, each offering investment banking and underwriting services through their capital markets divisions.[4] (ASF ¶¶ 65-71.) Five of the seven Junior Underwriters qualify as minority-and women-owned business enterprises. (ASF ¶¶ 65-68; Declaration of Douglas Rudley (May 5, 2009) ("Rudley Decl.") at ¶ 56.) Each has extensive experience in underwriting initial public offerings, including as a participating underwriter (or "junior underwriter"). (ASF ¶¶ 65-70; Declaration of Robert M. Daines (May 5, 2009) ("Daines Decl.") at ¶ 91; Declaration of Guy Erb (May 5, 2009) ("Erb Decl.") at ¶¶ 62-63; Rudley Decl. at ¶ 59.)

---

[4]    The facts discussed above are drawn from the record included in the Underwriters' Additional Statements of Undisputed Facts section ("ASF") of the concurrently filed Underwriters' Response to Lead Plaintiffs' Statement Made Pursuant to Rule 56.1.

Junior underwriters are one of several tiers in a typical IPO underwriting syndicate. (ASF ¶ 111.) IPO underwriting syndicates usually consist of lead managers, co-managers, and junior underwriters, each of which serve different roles and have different responsibilities. (ASF ¶ 112.) A junior underwriter serves the important purpose of expanding the channels of distribution available in the marketplace, thus increasing the likelihood of a successful offering and marketing the securities to a larger, more diverse pool of investors. (ASF ¶ 113.) Junior underwriters are typically not invited into an IPO underwriting syndicate until the final days before the shares are priced and distributed, after the preliminary prospectus has been distributed, and the marketing of the IPO has begun. (ASF ¶ 82.) At the time of their invitations, the lead and co-managers, aided by underwriters' counsel, have substantially completed a thorough due diligence investigation of the issuer for the purpose of establishing a reasonable belief that the statements in the issuer's registration statement are true and that there is no omission to state a material fact required to be stated or necessary to make the statements not misleading. (ASF ¶ 114.)

The Refco IPO Underwriting Syndicate conformed to this industry standard. (ASF ¶¶ 62-64, 72-79; Daines Decl. at ¶¶ 101-12; Erb Decl. at ¶¶ 48-79; Rudley Decl. at ¶¶ 67-79.) The Junior Underwriters received invitation wires to join the IPO Underwriting Syndicate on July 29, 2005.[5] (ASF ¶ 72.) By that time, Refco and the Lead Managers had filed the Fourth Amendment to the Form S-1/A registration statement with the Securities and Exchange Commission ("SEC"), and were marketing actively the securities to potential investors on the IPO roadshow. (ASF ¶¶ 62-63.) The Invitation Wires allocated to the Junior Underwriters totaled less than 6% of the shares offered for distribution. (ASF ¶ 75.) The Junior Underwriters

---

[5]     Some of the Junior Underwriters received phone calls informally inviting them into the Syndicate days before they received the invitation wire.

accepted their invitations between July 29 and August 5, 2005. (ASF ¶ 87.)  The SEC declared the IPO Registration Statement effective on August 10, 2005 ("IPO Registration Statement"), less than two weeks after the Junior Underwriters were invited to participate in the IPO Underwriting Syndicate.  (Lead Plaintiffs' Statement Pursuant to Rule 56.1 ("PSF") ¶ 1.)

The Invitation Wires identified Credit Suisse, Goldman Sachs, and Banc of America as the Lead Managers, and Deutsche Bank, J.P. Morgan, Merrill Lynch, Sandler, and HSBC Securities as Co-Managers.  (ASF ¶ 73.)  The Junior Underwriters had participated in numerous underwriting syndicates led by the Lead Managers.  (ASF ¶ 76.)  Cravath, a nationally renowned law firm with preeminent experience representing underwriters, had been retained to represent the IPO Underwriting Syndicate.  (ASF ¶¶ 25-26, 28.)

The Invitation Wires further informed the Junior Underwriters that by accepting the invitation, each Junior Underwriter would join the IPO Underwriting Syndicate and would be bound by the terms of the Credit Suisse Master Agreement Among Underwriters (the "AAU") (ASF ¶¶ 77-78.)  The AAU authorized Credit Suisse to act as "Manager" of the offering, allocate responsibilities among and between underwriters at its discretion, and take whatever action it deemed advisable in connection with the offering of the securities.  (ASF ¶¶ 22-23.)  The AAU also authorized Credit Suisse to execute an underwriting agreement between Refco and the IPO Underwriting Syndicate (the "Underwriting Agreement") on behalf of the IPO Underwriting Syndicate.  (ASF ¶ 24.)  Consistent with their own practice, industry custom, and the AAU, the Junior Underwriters delegated investigatory functions to the Lead Managers, and such experts as the Lead Managers retained to assist them.  (ASF ¶¶ 23, 82, 88, 115.)

When the Junior Underwriters joined the IPO Underwriting Syndicate, and received the preliminary prospectus (which by that point reflected the work and blessing of the Lead

Managers and multiple counsel), they understood that the Lead Managers and Co-Managers of the Refco IPO, who bore more than 94% of the underwriting risk and were marketing the issue to prospective investors, already had conducted a thorough due diligence investigation into the representations made by Refco and its management. (ASF ¶¶ 88-89, 91.) Indeed, because the IPO Registration Statement had already been filed with the SEC, and because the Lead Managers were already marketing the issue to potential investors through a Rule 430 prospectus (the "Preliminary Prospectus"),[6] the Junior Underwriters reasonably believed that the due diligence process was substantially complete when they received their invitation to join the IPO Underwriting Syndicate. (*Id.*; *see* Daines Decl. at ¶¶ 102-12; Erb Decl. at ¶ 78; Rudley Decl. at ¶¶ 70-72.) They also reasonably believed that the statements in the IPO Registration Statement were true and there was no omission to state a material fact required to be stated or necessary to make the statements not misleading. (*Id.*)

Notwithstanding the Junior Underwriters' confidence in the Lead Managers and their investigation to that point, the Junior Underwriters conducted their own independent analyses regarding Refco. (ASF ¶¶ 79-81, 83-86.) Generally, the Junior Underwriters reviewed portions of the Preliminary Prospectus, which included Refco's audited financial statements. (ASF ¶ 79.) Cravath, working with the Lead Managers and for the benefit of all Underwriters, documented significant additional due diligence. (ASF ¶¶ 25, 54-61, 102.) Some of the Junior Underwriters conducted further independent due diligence. (ASF ¶¶ 79-81, 83-86.) Samuel Ramirez & Company, Inc. and Muriel Siebert & Co., Inc. conferred with each other about the view of the

---

[6]    A Rule 430 Prospectus is a "form of prospectus [that] contains substantially the information required by the Act and the rules and regulations thereunder to be included in a prospectus meeting the requirements of Section 10(a) of the Act for the securities being registered, or contains substantially that information except for the omission of information with respect to the offering price, underwriting discounts or commissions, discounts or commissions to dealers, amount of proceeds, conversion rates, call prices, or other matters dependent upon the offering price." 17 C.F.R. § 230.430 (2009).

transaction in the marketplace as part of their analysis.  (ASF ¶ 80.)  William Blair reviewed a

Renaissance IPO Research Report about Refco.  (ASF ¶ 81.)  Personnel at BMO Capital Markets

("BMO"), which had an on-going relationship with Refco, consulted with each other and

confirmed that Refco was an historical client in good standing.  (ASF ¶¶ 83-86.)[7]

## II.    THE LEAD AND CO-MANAGERS CONDUCTED A THOROUGH INVESTIGATION OF REFCO ON BEHALF OF THE ENTIRE IPO UNDERWRITING SYNDICATE

The due diligence of Refco by the Lead and Co-Managers progressed in three significant

phases.  Beginning in June 2003, Refco retained Credit Suisse as a financial adviser.  (ASF ¶ 1.)

Credit Suisse conducted due diligence, prepared a confidential information memorandum, and

assisted a number of potential institutional investors in conducting due diligence on Refco.  (ASF

¶ 2.)  These efforts led to an Equity Purchase & Merger Agreement for the leveraged buy-out

("LBO") of Refco by THL.  (ASF ¶ 4.)

In April 2004, Banc of America and Deutsche Bank joined Credit Suisse in continuing

due diligence as initial purchasers for the private placement of $600 million high-yield, senior

subordinated notes (the "Notes") and the $800 million senior syndicated term loan facility for the

LBO transaction.  (ASF ¶ 9.)  These efforts led to the completion of THL's acquisition of Refco

in August 2004.  (ASF ¶ 17.)

In October 2004, Goldman Sachs joined Credit Suisse and Banc of America as Lead

Managers for the IPO.  (ASF ¶ 18.)  Between October 2004 and December 2004, Deutsche Bank,

---

[7]    This discussion entailed an overview of BMO's historical relationship with Refco, which included recent meetings with Refco management and internal analysis of Refco.  BMO attended at least two meetings with Refco management regarding the Refco IPO in early-2005.  BMO also conducted an investigation into Refco in connection with the Refco LBO, which entailed reviewing Refco's financial statements, reviewing a lender's presentation presented by Refco, attending a presentation by Refco management, conducting a sensitivity analysis regarding Refco's financials, and preparing a memorandum for BMO's credit committee.  (ASF ¶¶ 83-86.)  These efforts establish BMO's reasonable investigation into Refco based on its role as a junior underwriter in the Refco IPO; at minimum, they preclude summary judgment against BMO.

Merrill Lynch, J.P. Morgan, Sandler, and HSBC became Co-Managers in the IPO Underwriting Syndicate. (ASF ¶¶ 30, 40.) Separately, jointly, and through Syndicate counsel, these underwriters performed comprehensive due diligence on Refco leading up to the IPO in August 2005. (ASF ¶¶ 41-62, 98, 102-110.) The due diligence for each of these transactions built upon the previous due diligence, and, by the time of the IPO, one or more of the underwriters had been conducting due diligence for more than two years. (ASF ¶¶ 1, 2, 9, 10, 27.)

By the time the Junior Underwriters received their invitation wires, the Lead Managers and Co-Managers were nearing the culmination of more than two-years of due diligence investigations into Refco, including more than nine months of due diligence investigations in connection with the Refco IPO. (ASF ¶¶ 1-2, 9, 18, 27, 29-30.) The sources of inquiry were as varied as they were exhaustive, and included probing meetings between the Lead Managers and Co-Managers with management, Refco's professional advisers, accountants and lawyers, Company directors, and THL. (ASF ¶¶ 41-62, 98, 102-110.) We summarize the due diligence investigation below.

*First*, the extensive record of due diligence conducted before the Junior Underwriters joined the Syndicate included obtaining information about Refco directly from Refco's executives, including but not limited to:

- Serving detailed questions on Refco that probed various aspects of Refco's business, including business regulation, relationships and related-party transactions, indebtedness, and shares eligible for future sale (ASF ¶ 41);

- Speaking or meeting with senior and mid-level executives at Refco on more than 40 occasions, including Refco Chief Executive Officer Phillip Bennett, Refco Chief Financial Officers Robert Trosten and Gerald M. Sherer, Refco General Counsel Dennis Klejna, Executive Vice President of Refco Group and President and Chief Executive Officer of Refco Securities Santo C. Maggio, Executive Vice President of Refco Group Joseph Murphy, and President of Refco Group Limited Thomas Hackl, at which Refco management presented information regarding Refco's business, financial performance, risk-management procedures, and other topics, and responded to questions (ASF ¶ 42);

- Requesting, receiving, and reviewing hundreds of categories of Refco documents, including documents related to Refco's incorporation, accounting and auditing, litigation, customers, real property, management contracts, financing, risk management, ownership, and other topics (ASF ¶ 45);

- Obtaining completed directors and officer questionnaires from, among others, Phillip Bennett, Robert Trosten, Santo C. Maggio, Dennis A. Klejna, William M. Sexton, Joseph James Murphy, Gerald M. Sherer, Ronald L. O'Kelley, Scott L. Jaeckel, Leo R. Breitman, Nathan Gantcher, David V. Harkins, Thomas H. Lee, and Scott A. Schoen (ASF ¶ 43); and

- Requesting and receiving certifications from Refco officers in connection with the Refco LBO (ASF ¶¶ 108-10).

*Second*, by the time the Junior Underwriters joined the Syndicate, the Lead Managers and Co-Managers already had conducted numerous meetings with THL and its advisers regarding Refco's business and financial condition, including:

- Speaking or meeting with senior and mid-level executives from THL on more than 15 occasions (ASF ¶ 44);
- Reviewing and analyzing a report prepared by THL adviser KPMG concerning the quality of Refco's earnings, its financial performance, financial position, information technology capabilities, and an overall assessment of the risks and opportunities associated with an investment in Refco (ASF ¶ 48);
- Reviewing and analyzing a report prepared by THL adviser McKinsey & Co. concerning loyalty, retention, and satisfaction of Refco's customers (ASF ¶ 49); and
- Requesting and receiving comfort or opinion from THL's legal counsel Weil Gotshal & Manges LLP in connection with the Refco LBO (ASF ¶ 53).

*Third*, by the time the Junior Underwriters joined the Syndicate, the Lead Managers and Co-Managers already had conducted numerous meetings with Refco's auditors, law firms, and advisers regarding Refco's business and financial condition, including:

- Speaking or meeting with Grant Thornton, Refco's auditors, on more than 5 occasions about topics including, but not limited to, the results of Grant Thornton's audits of Refco, the scope and actual procedures used in the audit of Refco, significant deficiencies observed by Grant Thornton and management's plans to correct them, the auditor's discussions with management, Grant Thornton's historical relationship with Refco and view of management, acquisitions consummated by Refco, joint ventures in which Refco participated,

and the substance of a comfort letter to be provided by Grant Thornton on the date of the IPO (ASF ¶ 46);

- Speaking or meeting with PwC, a Refco adviser on accounting and financial reporting matters, concerning, among other things, Refco's internal reporting and finance functions, the nature and scope of PwC's work at Refco, expectations about the Company's prospects, and general observations about Refco learned during the course of PwC's engagement (ASF ¶ 56);

- Requesting and receiving comfort or opinions from Grant Thornton and Mayer Brown in connection with the Refco LBO (ASF ¶ 53); and

- Participating in more than 25 drafting sessions for the various offering documents, which included contemporaneous discussions of due diligence.  (ASF ¶ 47.)

*Fourth*, the Lead Managers and Co-Managers utilized information collected from these various sources and conducted their own internal analyses regarding Refco, including:

- Testing and verifying information through internal and external sources (ASF ¶ 45);

- Conferring with internal and external colleagues regarding Refco's reputation and business prospects (ASF ¶ 50);

- Conducting a detailed credit analysis of Refco in connection with the LBO, including preparing and analyzing a consolidating balance sheet (ASF ¶ 51);

- Preparing memoranda for, and discussing the firms' participation in Refco offerings with the firms' various commitment committees, including additional diligence requested by these committees (ASF ¶ 12-14, 52);

- Documentation by Syndicate counsel of facts and representations made by Refco in the Refco Confidential Offering Circular prepared in connection with the Refco LBO, the Preliminary Prospectus, and the IPO Registration Statement through fact circle-ups (ASF ¶ 59); and

- Negotiating an underwriting agreement with Refco that contained representations and warranties, including that the financial statements in the registration statement were accurate and prepared in accordance with generally accepted accounting principles.  (ASF ¶ 60.)

III.  **CRAVATH ASSISTED THE LEAD AND CO-MANAGERS' DUE DILIGENCE
INVESTIGATION ON BEHALF OF ALL OF THE UNDERWRITERS,
INCLUDING THE JUNIOR UNDERWRITERS**

Following their selection as Lead Managers of the Refco IPO in October 2004, the Lead

Managers retained Cravath to serve as legal counsel for the IPO Underwriting Syndicate.  (ASF ¶

25.)  Cravath is one of the nation's pre-eminent law firms with extensive experience acting as

underwriters' counsel in connection with equity offerings.  (ASF ¶¶ 11, 26.)  At the time the

Lead Managers retained Cravath, the firm already was familiar with Refco because it had served

as counsel to the initial purchasers of the Refco LBO Notes.  (ASF ¶ 10.)  In that capacity,

Cravath had, among other things, assisted the Initial Purchasers in investigating Refco's

business, financial and legal affairs, and participated in the drafting and verification of the

Confidential Offering Circular.  (ASF ¶¶ 10, 59.)  The non-privileged documentation of the

diligence meetings by Cravath, as well as fact circle-ups documenting the Underwriters' due

diligence investigation, were produced to Plaintiffs more than eighteen months ago.  (Declaration

of Dawn M. Wilson, dated May 5, 2009 ("Wilson Decl."), at Ex. 189.)

Under the terms of its IPO engagement, Cravath represented the interest of the entire IPO

Underwriting Syndicate, including any Junior Underwriters eventually invited to participate in

the offering.  (ASF ¶ 25.)  Acting for the benefit of the entire IPO Underwriting Syndicate,

Cravath supported the Lead Managers' and Co-Managers' efforts to test and document the IPO

Registration Statement.  (ASF ¶¶ 15, 25, 54-61.)  Cravath submitted lengthy document requests

to Refco and reviewed the documents that it received.  (ASF ¶ 61.)  Cravath participated in

numerous meetings with Refco's executives, auditors, and lawyers related to Refco's business,

financial, accounting, and legal affairs.  (ASF ¶¶ 54-55, 60.)  Cravath requested and obtained

questionnaires from Refco's officers and directors, including Phillip Bennett, who represented

that Refco had no undisclosed related-party transactions.  (ASF ¶ 43.)  Cravath also represented

- 12 -

the IPO Underwriting Syndicate in discussions with Refco regarding the drafting of various

provisions of the prospectus, participated in numerous drafting sessions, worked with Refco's

counsel to formulate appropriate responses to SEC comments, and assured that the IPO

Registration Statement complied with the requirements of the 1933 Act.  (ASF ¶ 55, 57.)

Cravath continued to perform work on the Underwriters' behalf after the Junior

Underwriters accepted their invitations to join the IPO Underwriting Syndicate.  In the time

between the Junior Underwriters' acceptance of their invitations and the deal's closing on

August 16, 2005, Cravath:

- had at least three discussions with Grant Thornton regarding Refco's interim financial statements and issues related to the minutes of Refco's board of directors' meetings (ASF ¶ 54);

- held conference calls with Refco's counsel to discuss pending civil litigation, disclosure schedules, and to verify that an anticipated, partial redemption of outstanding Refco bonds was permissible under existing Refco agreements (ASF ¶ 55);

- participated in a teleconference with representatives from Goldman Sachs and PwC regarding PwC's efforts to augment Refco's accounting staffing and internal reporting functions (ASF ¶ 56);

- participated in at least one drafting session (ASF ¶ 57);

- represented the IPO Underwriting Syndicate in "bring down" due diligence calls both on the date of the deal's pricing and on the date of its closing (ASF ¶ 58);

- negotiated the provision of a comfort letter from Grant Thornton (ASF ¶ 54);

- negotiated the provision of 10b-5 opinion letters from Refco's counsel Mayer Brown (ASF ¶¶ 106-07);

- negotiated the provision of a 10b-5 opinion letter and negative assurance letter from Refco's counsel Weil (ASF ¶¶ 103-05); and

- promised to provide its own opinion and negative assurance letter to the IPO Underwriting Syndicate, including the Junior Underwriters.  (ASF ¶ 102.)

Cravath also assisted in negotiating the Underwriting Agreement, which was executed on

August 10, 2005, and to which the Junior Underwriters were a party.  (ASF ¶¶ 60.)  The

- 13 -

Underwriting Agreement contained various provisions designed to assure and further the efficacy of the Syndicate's due diligence, including receipt of the comfort and 10b-5 opinion letters referenced above, as well as Cravath's own opinion and negative assurance letters.  (ASF ¶ 97.)  The Underwriting Agreement further called for a Certificate from Refco's President and Chief Financial Officer stating that the representations and warranties under the Underwriting Agreement were true and correct.  (ASF ¶¶ 97, 108-10.)  Thus, Cravath, on behalf of the entire Syndicate, including the Junior Underwriters, obtained written and other assurances that the IPO Registration Statement, including its financial statements, were complete and accurate as of the effective date of the IPO.  (ASF ¶¶ 60, 95, 103-10.)

On August 10, 2005, the Refco IPO priced, and the IPO Underwriting Syndicate collectively placed 26,500,000 shares at $22.00 per share.  (ASF ¶¶ 99-100.)  The Underwriters sold 3.975 million additional shares to accommodate over-subscriptions pursuant to a green shoe option in the IPO Registration Statement.  (ASF ¶¶ 101.)  The transaction closed on August 16, 2005.  (ASF ¶ 116.)

## ARGUMENT

### I.   JUNIOR UNDERWRITERS MAY RELY ON THE EXHAUSTIVE DUE DILIGENCE INVESTIGATION BY THE LEAD MANAGERS AND SYNDICATE COUNSEL

A movant is entitled to summary judgment only when there are no genuine issues of material fact in dispute and "the moving party is entitled to a judgment as a matter of law." *Schwan-Stabilo Cosmetics GmbH & Co. v. Pacificlink Int'l Corp.*, 401 F.3d 28, 32 (2d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).  In making its determination, the trial court must resolve all ambiguities, draw all reasonable inferences, and "constru[e] the evidence in the light most favorable to the non-moving party." *Scholastic, Inc. v. Harris*, 259 F.3d 73, 81 (2d Cir. 2001); *see also Alibrandi v. Fin. Outsourcing Servs., Inc.*, 333 F.3d 82, 85 (2d Cir. 2003) (explaining

- 14 -

that courts should "draw[] all reasonable inferences in . . . favor" of the non-moving party). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) ("The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law").

A.    **The Junior Underwriters' Reliance on the Due Diligence Investigation Conducted by the Lead Managers, with the Assistance of Syndicate Counsel, Satisfies Section 11**

Underwriters are not liable under Section 11 where, with respect to the non-expertised portions of the registration statement, they conducted a reasonable investigation and had reasonable grounds to believe, as well as a belief in fact, that the statements were true and there were no misleading omissions. 15 U.S.C. § 77k(b)(3)(A) (2007).[8] A reasonable investigation is one that would be conducted by "a prudent man in the management of his own property." *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 373 n.26 (2d Cir. 1973); *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 n.26 (1976). It is well-recognized as a negligence standard. *See Ernst & Ernst*, 425 U.S. at 208; *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004).

Plaintiffs maintain that the due diligence defense is available only for those underwriters who personally conducted the due diligence investigation. They cite no judicial authority for this proposition and there is none. Even if the Junior Underwriters had done no more than delegate the entirety of the due diligence investigation to the Lead Managers, as Plaintiffs incorrectly suggest (*see* Pl. Br. at 1), Section 11 permits such delegation and affords the delegating Junior

---

[8]    In addition, and in all events, Underwriters are entitled to rely on the expertised portions of the registration statement if they had no reasonable ground to believe and did not believe that the statements were untrue. 15 U.S.C. § 77k(b)(3)(C) (2007).

Underwriters an affirmative defense of due diligence in circumstances in which the managing underwriters have performed adequate due diligence.  Indeed, every court that has addressed this issue has concluded that junior underwriters, or participating underwriters, may rely on the lead underwriter to satisfy their due diligence investigation.  *See Competitive Assocs., Inc. v. Int'l Health Sci., Inc*, No. 72 Civ. 1848, 1975 WL 349, at *19-20 (S.D.N.Y. Jan. 22, 1975) (holding that lead managers' reasonable due diligence inures to the benefit of participating underwriters); *see also In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 591189, at *8 (S.D.N.Y. Mar. 14, 2005) ("all other Underwriter Defendants acted as junior underwriters and relied on the due diligence performed by the [lead manager]"); *In re Activision Sec. Litig.*, 621 F. Supp. 415, 434 (N.D. Cal. 1985) ("[t]he actions taken by the managing underwriters will work to [the participating underwriters'] benefit or detriment"); *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583, 612, 614 (E.D. Mich. 1985) ("[t]he underwriting syndicate members therefore sink or swim with the lead underwriter in the usual case" and that it is an "unconscionable expense" to conduct "discovery relevant to each participa[ting underwriter's] due diligence, unless and until the manager's liability has been determined").  Accordingly, junior underwriters "sink or swim" with the lead underwriter and the reasonableness of the lead underwriter's due diligence. *See Consumers Power*, 105 F.R.D. at 612.

In *Competitive Associates*, for example, the district court held that participating underwriters that did not conduct their own due diligence investigation were "entitled to prevail upon the affirmative defense of due diligence used." 1975 WL 349, at *20.  In that case, in an action asserting Section 11 and 12(2) claims, the underwriters defended on grounds that the lead manager, underwriters' counsel, and their adviser had conducted a reasonable investigation, which included a complete analysis of the issuer and the relevant industry, as well as a due

- 16 -

diligence meeting immediately prior to the effective date. *Id.* at *18. Some of the participating underwriters did not participate in the meeting, and did not otherwise conduct their own investigation regarding accuracy of the offering document. *Id.* at *19.

The court found that the lead manager, "on its own behalf *and in behalf of the other underwriters*, made a reasonable investigation." *Id.* (emphasis added).[9] The court stated:

> Although each of the underwriters had a responsibility of due diligence, upon this record, I do not find that the other members of the underwriting group conducted their affairs in an unreasonable manner. The activities of [the lead manager], *which inured to the benefit of all of the underwriters*, indicate an exercise of due diligence throughout the offering.

*Id.* (emphasis added). The delegation of the due diligence investigation to the lead manager was sufficient at law to give the participating underwriters the benefit of the lead manager's reasonable due diligence, even though some participating underwriters neither conducted an independent investigation into the accuracy of the offering document nor verified the scope of the lead manager's investigation.[10]

Similarly, *In re Gap Stores Sec. Litig.*, 79 F.R.D. 283 (N.D. Cal. 1978), recognized that requiring independent verification of the diligence performed by lead underwriters could lead to

---

[9] The court concluded that one underwriter could not benefit from the lead underwriter's due diligence because it was involved in a conspiracy with the controlling shareholder of the issuer to maintain artificially the post-issue market price of the registered securities. *Id.* at *16. The PSF includes no analogous facts and this part of the court's holding is inapplicable to resolution of the pending Motion.

[10] Although *Competitive Associates* is the most recent authority on the responsibilities of syndicate members, Plaintiffs rely on cases that pre-date *Competitive Associates* and do not address the issue presented by this Motion. (Pl. Br. at 16; *see Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643, 697, n.26 (S.D.N.Y. 1968).) As Plaintiffs concede, *BarChris* "held that the lead underwriter's due diligence was inadequate." (Pl. Br. at 16.) Thus, the court never assessed whether junior underwriters could avail themselves of a due diligence defense in circumstances in which a lead underwriter satisfied its due diligence obligations. *See* William K. Sjostrom, Jr., *The Due Diligence Defense Under Section 11 of the Securities Act of 1933*, 44 Brandeis L.J. 549, 593 (2006) (stating that post *BarChris* decisions have established that "participating underwriters can meet the reasonable investigation standard by merely relying on the reasonable investigation of the lead underwriter"); Robert J. Haft & Michele H. Hudson, *Due Diligence: Periodic Reports & Securities Offerings* § 7:6, at 286 (2008-09) ("[Post *BarChris* decisions] have held that all underwriters can obtain the benefits of adequate due diligence by the managing underwriter, thus establishing their own due diligence defense").

the perverse result that the junior underwriter would be liable even where the lead underwriter had conducted a reasonable investigation. *Id.* at 301. Industry experts and commentators agree with this analysis. *See* David A. Lipton, 15 *Broker Dealer Regulation* § 3:70 (2008) (noting there "could be some problems…with the [SEC's] advice [concerning verification of the due diligence performed by the leads]" because such requirement "could produce an absurd result"); Erb Decl. at ¶ 45; Rudley Decl. at ¶ 35.

In the context of plaintiffs' motions to certify defendant classes of underwriters, the courts also have concluded that junior underwriters may rely on the lead manager's investigation for their due diligence defense. The question of whether the lead manager conducted reasonable due diligence is a question common to both the lead manager and the junior underwriters, supporting certification of an underwriter class. *Consumers Power*, 105 F.R.D. at 612 (concluding that the due diligence of the lead underwriter was a defense typical to all underwriter defendants); *Endo v. Albertine*, 147 F.R.D. 164, 171 (N.D. Ill. 1993) (certifying defendant class because lead and junior underwriters have "the same interest in proving . . . the due diligence of the lead underwriters . . . which would tend to exonerate the defendant class").[11]

Delegation of duties is permissible under Section 11. *See Endo*, 147 F.R.D. at 171 (holding that "no inquiry will be made into the due diligence or scienter of the [participating] underwriters" if the lead underwriters have satisfied their due diligence obligation). The "personal" aspect of the due diligence defense is supplementary in nature and triggered only

---

[11]     *See also Activision*, 621 F. Supp. at 434 (concluding that "a finding of due diligence on [the lead underwriter's] part could exonerate the class members as well"); *In re Itel Sec. Litig.*, 89 F.R.D. 104, 112 (N.D. Cal. 1981) (concluding that whether "the lead underwriter acted with due diligence" was a defense typical to all underwriter defendants); *In re Computer Memories Sec. Litig.*, 111 F.R.D. 675, 687-88 (N.D. Cal. 1986) (adopting the reasoning of *Activision* that the due diligence of the lead underwriter would extend to other syndicate members); *Hammond v. Hendrickson*, No. 85 C 9829, 1986 WL 8437, at *9 (N.D. Ill, Jul. 30, 1986) (certifying defendant class because issue of whether managing underwriter exercised due diligence was a question typical to defenses of both managing and participating underwriters); *see also Gap*, 79 F.R.D. at 302 ("proof of the due diligence of the managing underwriter will most likely exonerate the participants as well").

when the lead manager failed to conduct reasonable due diligence. *Activision*, 621 F. Supp. at 434 (concluding that the diligence of the junior underwriters would become relevant "[o]nly if the lead managers are found to have acted without due diligence").[12]  In such cases, the junior underwriter nonetheless may pursue its affirmative defense by demonstrating that it independently conducted a reasonable investigation into the accuracy of the offering documents. *See id.*

The legal principles which underscore the accepted reasonableness of the reliance of junior underwriters upon such contractual agents as lead managers, assisted by syndicate counsel, are long-standing principles of agency law.  "An agent" – here, the Lead Managers pursuant to the terms of the AAU and the Underwriting Agreement (ASF ¶¶ 23-24) – "undertakes to act on behalf of a principal;" that agent's knowledge is imputed to the principal because a "principal's agents link the principal to the external world for purposes of taking action, including the acquisition of facts material to their work for the principal." Restatement (Third) of Agency § 5.03, cmt. b (2006).  The Junior Underwriters authorized Credit Suisse to act as the "Manager" of the offering and to, among other things, "exercise, in the Manager's discretion, all of the authority vested in the Manager in the Underwriting Agreement." (ASF ¶ 23; Wilson Decl. Ex. 1 at 3(a)(iv).)  Section 12 of the Underwriting Agreement between Refco and the Lead Underwriters, as "Representatives" of the several underwriters (including the Junior Underwriters), provided that the Representatives would act for the several underwriters in connection with the IPO, and that any action taken by the Representatives would be binding

---

[12]      *See also Itel Sec. Litig.*, 89 F.R.D. at 112 (a participating underwriter's "personal due diligence defense . . . will not become operative at trial at least until . . . whether the lead underwriter acted with due diligence [is] resolved in favor of the plaintiffs"); *Hammond*, 1986 WL 8437, at *9 ("[w]hile the participating underwriters all benefit from a showing that the managing underwriter has exercised due diligence in preparation of the registration statement, the individual underwriters here need not [but could] rely exclusively on the conduct of the [managing underwriter]").

upon all of the underwriters.[13]  (ASF ¶¶ 24, 96; Wilson Decl. Ex. 141.)

Although no judicial decision supports the outcome that Plaintiffs advance in this Motion – an independent due diligence investigation by the Junior Underwriters – Plaintiffs nonetheless contend that a due diligence defense should be unavailable unless the "junior underwriters . . . conduct some investigation." (Pl. Br. at 15.) Their sole authority for this proposition is a portion of a 1972 SEC Release that was expressly rejected upon careful consideration by the federal district court in *Gap*. 79 F.R.D. at 301-02. The court reasoned that the Commission's interpretation of the due diligence defense with respect to participating underwriters "might penalize the participant who failed to double check the diligent manager's methods." *Id.* at 301. Such a rule, the court observed, "would produce an absurd result . . . since it would hold the participant liable for failure to investigate the manager's methods, which if he had done so would have proven to him that the manager had acted with due diligence." *Id.*

Moreover, Plaintiffs ignore the broader focus of the SEC Release, which endorsed the general proposition that participating underwriters may delegate investigatory duties to the managing underwriter. The SEC Release noted that it would be reasonable for participating underwriters to delegate the investigation in circumstances where the participating underwriter satisfies "himself that the managing underwriter makes the kind of investigation the participant would have performed if he were the manager." New High Risk Ventures, Securities Act Release No. 5275, 1972 WL 125474, at *6 (July 27, 1927). The Junior Underwriters more than satisfy this standard, through both their independent experience with the Lead Managers, and review of and reliance on other materials, as discussed in detail in Argument II, below.

---

[13]     In return, the Junior Underwriters paid a management fee to the Lead Managers. (Wilson Decl. Ex. 1) ("You authorize the Manager to charge your account as compensation for the Manager's and Co-Managers' services in connection with the Offering.")

**B.**    **The Reasonableness of the Junior Underwriters' Delegation of The Due Diligence Investigation to the Lead Managers is Confirmed by Industry Practice and Public Policy**

The reasonableness of the Junior Underwriters' delegation of the due diligence investigation is confirmed by industry practice and good public policy. *Gap*, 79 F.R.D. at 300. "[I]t is 'standard operating procedure in the investment banking industry' for all the underwriters in a syndicate to rely on the lead underwriter's investigation." Dana B. Klinges, Note, *Expanding the Liability of Managing Underwriters Under the Securities Act of 1933*, 53 Fordham L. Rev. 1063, 1067 (1985) (citation omitted); ASF ¶ 117. Leading academics have defended this practice. Most recently, Professor John C. Coffee, Jr., testifying before the United States Senate Committee on Banking, Housing and Urban Affairs, confirmed: "Each underwriter need not *personally perform this investigation. It can be delegated to the managing underwriters and to counsel . . . .*" *Enhancing Investor Protection and the Regulation of the Securities Markets: Hearing Before the S. Comm. on Banking, Housing and Urban Affairs*, 111th Cong. 57 (2009) (statement of Professor John C. Coffee, Jr.) (emphasis supplied); *accord* Charles J. Johnson Jr. & Joseph McLaughlin, *Corporate Finance and the Securities Laws* 5-3 (4th ed. 2008 supp.) ("Traditionally, a managing underwriter of an SEC-registered securities offering was thought of as a 'gatekeeper' or 'reputational intermediary' on whom investors relied to reduce their information costs. Members of the underwriting syndicate, who could not as a practical matter conduct their own due diligence, also relied on the managing underwriter for similar purposes"); *id.* 2-12 ("Whether or not specified in the AAU, the manager has the formal responsibility for conducting due diligence").

Even the National Association of Securities Dealers, then one of the Underwriters' principal regulators, recognized the efficiency of this industry practice:

> Broker/dealers participating in an underwriting syndicate generally
> do not perform extensive due diligence directly with the issuer, but
> rely upon the managing underwriter to perform such investigations
> on behalf of syndicate members. The crucial thing for
> participating underwriters, therefore, is a determination of the
> reliability of the managing underwriters and its counsel . . . The
> participating underwriter should therefore have confidence in the
> managing underwriter . . . [The participating underwriter] must be
> able to reliably assume that [the managing underwriter is]
> performing a proper due diligence investigation. Many
> participating underwriters rely heavily upon the reputation of the
> attorneys and accountants involved in the registration statements.

National Association of Securities Dealers, Inc., *Special Report: Due Diligence Seminars* 25

(1981).

Each of the Junior Underwriters has based its internal policies on this industry custom,

practice, and standard, and the Junior Underwriters' conduct in connection with the Refco IPO

was consistent with their policies, procedures, and practice in all other IPOs in which they served

as junior underwriters. (ASF ¶¶ 82, 115.) Industry and academic experts agree that this practice

has always been the industry standard. (ASF ¶¶ 82, 117.)

1.    ***The Industry Practice in which Junior Underwriters Rely on Lead
       Managers Promotes Efficient Underwritings***

The case law and secondary authority approve current industry practice because allowing

junior underwriters to rely on the lead managers' due diligence efforts is both efficient and

practical. *See* Ernest L. Folk, III, *Civil Liabilities Under the Federal Securities Acts: The

BarChris Case*, 55 Va. L. Rev. 1, 56-58 (1969); Daines Decl. at ¶¶ 9-74. As the court in *Gap*

recognized, requiring junior underwriters to conduct independent due diligence would be

inefficient:

> In accordance with industry practice, participating underwriters
> count on the lead underwriter to immunize them from section 11
> liabilities by satisfying the requirements of the 1933 Act. This is
> not unreasonable, since chaos would prevail if each underwriter
> participated in the investigation and tried to verify the accuracy of

the registration statements. The underwriters would spend all of their time writing inquiries, posing questions, holding diligence meetings and generally doing everything but trying to market the securities. Even if the participating underwriters specially designated one of their number to do this job, it would be a costly and usually pointless duplication of the efforts which the lead underwriter should undertake.

*Gap*, 79 F.R.D. at 300, quoting Folk, 55 Va. L. Rev. at 56-58.[14]  Professor Folk remains the

leading authority on the legal obligations of syndicate members, and other commentators support

his view. *See* Alan R. Bromberg & Lewis D. Lowenfels, 6 *Bromberg and Lowenfels on*

*Securities Fraud and Commodities Fraud* § 13:13 (2d ed. 2008) ("The better view would appear

to be that the participating underwriters may delegate their duties of 'reasonable investigation' to

the managing underwriter and will be bound by the adequacy or inadequacy of the latter's

investigation").[15]

## 2.    *Current Industry Practice Promotes Section 11's Goal of Protecting Investors*

Despite well-established industry practice, Plaintiffs argue that the Junior Underwriters

were required to conduct independent due diligence because "the purpose of Section 11 is to

protect investors" and that "[b]y eschewing their gatekeeper role and choosing to bring Refco's

securities to market without making any attempt to confirm that Refco's IPO Registration

Statement was truthful and complete, the Junior Underwriters have subverted the protections

Congress intended for the Securities Act to provide to investors." (Pl. Br. at 18, 20.)  Plaintiffs

---

[14]    *See also* William O. Douglas & George E. Bates, *The Federal Securities Act of 1933*, 43 Yale L.J. 171, 202 n.169 (1933).

[15]    *See also* Edward Brodsky & M. Patricia Adamski, *Law of Corporate Officers and Directors: Rights, Duties and Liabilities* § 11:23 (2009) (opining that "it seems reasonable . . . to permit syndicate members to rely on the managing underwriter's investigation, rather than to require numerous separate (and duplicative investigations), so long as the syndicate members have no reason to doubt the competence of the managing underwriter, and have no other grounds for suspicion as to the accuracy of the registration statement").

correctly note that Section 11 is intended to protect investors, but fail to explain how or why such an independent investigation would further investor protection.

To the contrary, Junior Underwriters' reliance on the Lead Managers' due diligence is consistent with Section 11's purpose. Section 11's legislative history allows parties to delegate responsibilities to the lead managers:

> [T]he Conference Report recognizes that the "fiduciaries" subject to civil liabilities need not personally perform each of their statutory duties, "especially…where the character of the acts involves professional skill or facilities not possessed by the fiduciary himself." Since this language is not confined to directors, *it can and should be read to allow participating underwriters to delegate investigatory functions to a lead underwriter who coordinates all dealings with the issuer.*

Folk, 55 Va. L. Rev. at 57-58 (emphasis added), citing H.R. Rep. No. 73-152, at 26, 1933 WL 984 (1933) (Conf. Rep.).

Moreover, commentators at the time Congress enacted the 1933 Act understood that junior underwriters relied on the lead managers' due diligence investigation and opined that Section 11 did not set a new investigation standard for junior underwriters. The concept was expressed by William O. Douglas shortly before he became the Chairman of the SEC:

> [A participating underwriter] cannot duplicate the study which the originating house made. Nor can it even go so far as to examine all the data which the originating house has collected. Not only would time and expense be prohibitive but frequently it would have no facilities for making the investigation. It has arrived at a point where it must take a chance. That chance would be that the originating house had a made a thorough check and that it and the issuer had prepared a registration statement that would stand up under the critical eyes of [Section] 11 and juries throughout the land.

William O. Douglas & George E. Bates, *Some Effects of the Securities Act Upon Investment Banking*, 1 U. Chi. L. Rev. 283, 291 (1933).[16]

Indeed, the legislative history of the 1933 Act reveals that Congress was well aware that such reliance was standard industry practice. *See Securities Act of 1933: Hearings on S. 875 Before the S. Comm. on Banking and Currency*, 73d Cong. 290-93, 296-97 (1933) (statement of Penn Harvey, Vice President, Chase Harris Forbes & Co.) ("[O]f course the smaller [underwriting] houses depend a great deal on the larger houses for accuracy of information, and for careful consideration of issues, and for good faith in the purchase of them . . . [B]ecause of the fact that they cannot have trained experts . . . and all that kind of thing, they are not equipped to go into these matters").

Congress appreciated that investors would be protected if lead managers, assisted by syndicate counsel, performed a satisfactory investigation into the issuer. After all, the lead manager typically has had extensive access to the issuer's management, documents, and auditor before junior underwriters arrive on the scene. *Id.* at 290. Professor Folk aptly explains why additional investigation by the Junior Underwriters would not further legislative intent:

> [I]t seems reasonable to allow all to benefit from [the lead underwriter's adequate investigation]. The congressional purpose of protecting investors is largely accomplished if the lead underwriter makes a satisfactory investigation. Although supplementary, independent inquires by the participating underwriters might occasionally dredge up an additional misstatement, the margin of improvement probably would not warrant the expense and confusion of proliferating inquiries. Such a quest of the perfect prospectus would not be worth the effort. If it is thought that investors deserve better safeguards than the law now affords them, the problem should be handled by a statutory amendment that either requires governmental investigation and

---

[16]    *See also* Douglas & Bates, 43 Yale L.J. at 202 ("Economy is achieved by delegating to the originating house the function of investigation, not of the exercise of judgment upon the facts investigated. If it was the design of Congress to assure accuracy and completeness in the registration statement by multiplying the number of investigations, it lost sight not only of this but of other costs entailed").

approval of proposed new issues or exacts a strict guarantor's liability of all underwriters.

*Gap*, 79 F.R.D. at 300-01, *quoting* Folk, 55 Va. L. Rev. at 56-58.

The facts and circumstances surrounding the Refco IPO demonstrate Professor Folk's point. At the time the Junior Underwriters joined the Syndicate, Credit Suisse had been conducting due diligence on Refco for more than two years; Banc of America and Deutsche Bank for more than one year; Goldman Sachs and four additional co-managers for more than nine months. (*See* Statement of Facts ("SOF") Section II, *supra*.) Syndicate counsel from one of the world's preeminent law firms had assisted with these efforts. (*See* SOF Section III, *supra*.) Plaintiffs cannot seriously contend that an additional investigation by the Juniors Underwriters into Refco would have uncovered any material information that was previously unknown to the Lead Managers or Co-Managers or otherwise promoted the Congressional intent behind Section 11.

3.    ***Acceptance of Plaintiffs' Position Would Discourage Inclusion of Junior Underwriters in Syndicates or Burden the Offering Process***

In stark contrast to the efficiencies gained by the current industry standard, a requirement that junior underwriters conduct independent due diligence would affect negatively underwriting practices. Imposing an independent due diligence requirement on junior underwriters would result in smaller syndicates, more thinly distributed offerings, and potentially higher fees. (Daines Decl. at ¶¶ 47-58; Erb Decl. at ¶ 44, 46; Rudley Decl. at ¶ 41.) It potentially would burden the efficient capital raising process by requiring dozens of underwriters to join the investigation of the issuer's management. (Daines Decl. at ¶¶ 47-58; Erb Decl. at ¶ 46; Rudley Decl. at ¶¶ 34-35, 41.)

While all of the Junior Underwriters were competent to conduct diligence of the issuer, they were not compensated in the Refco IPO for the conduct of a full, independent investigation.

- 26 -

*See* Douglas & Bates, 43 Yale L.J. at 202 n.169 (reasoning that it would be uneconomical for junior underwriters to participate in deals if they were charged with their own due diligence responsibilities). To create a legal rule requiring full participation of the junior underwriters in the diligence of the issuer would lead to the restriction of syndicates, with fewer or no junior underwriters. (Daines Decl. at ¶ 56-58; Erb Decl. at ¶ 46; Rudley Decl. at ¶ 41.) Likewise, issuers would be unlikely to submit to multiple due diligence investigations by a dozen or more investment banking firms. (Daines Decl. at ¶ 56-57; Erb Decl. at ¶ 46; Rudley Decl. at ¶¶ 34, 36.) The burden of responding to due diligence inquiries is already significant in any IPO; increasing the number of entities conducting an investigation would increase that burden. (*Id.*) Rather than assume this additional burden, issuers would limit the size of underwriting syndicates and, concomitantly, reduce available distribution avenues. (Daines Decl. at ¶ 56-57; Erb Decl. at ¶¶ 36, 46; Rudley Decl. at ¶¶ 34, 36.)

Smaller underwriting syndicates would create greater risk for the remaining underwriters and potentially greater costs to issuers and shareholders in accessing the capital markets. (Daines Decl. at ¶ 61; Erb Decl. at ¶ 46.) Smaller syndicates would also reduce the available distribution avenues, potentially impacting the success of an offering, leading to a less diversified shareholder base following the offering, and reducing the number of potential market makers and, potentially, the breadth of research coverage. [17] (Daines Decl. at ¶¶ 22, 57; Erb Decl. at ¶ 36; Rudley Decl. at ¶ 20.)

---

[17]     Although Plaintiffs posit that the Junior Underwriters believe that industry practice "trump[s] the rule of law" (Pl. Br. at 19), evidence of an industry standard is relevant to the inquiry of a reasonable investigation under Section 11, and more broadly, whether actions meet a standard of reasonableness. *Gunther v. Airtran Holdings, Inc.,* No. 05 Civ. 2134, 2007 WL 193592, at *10 (S.D.N.Y. Jan. 24, 2007) (*quoting Cruz v. NYC Transit Auth.*, 526 N.Y.S.2d 827, 829 (App. Div. 1988) ("Proof of a generally accepted practice, custom, or usage within a particular trade or industry is admissible as tending to establish a standard of care")); *Pryor v. United States Steel Corp.*, 591 F. Supp. 942, 962 (S.D.N.Y. 1984) (finding "the customary practices of the financial community" relevant to a "question of reasonableness" under the securities laws), *rev'd on other grounds*, 794 F.2d 52 (2d Cir. 1996). Plaintiffs incorrectly reference *WorldCom* for the proposition that "industry custom will . . . .not suffice to

## II. PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN OF ESTABLISHING THAT THERE ARE NO MATERIAL ISSUES OF FACT WITH RESPECT TO THE DUE DILIGENCE CONDUCTED BY THE JUNIOR UNDERWRITERS

Even if the law did not support the complete delegation of due diligence by junior underwriters, summary judgment against the Junior Underwriters would be improper at this time because Plaintiffs have failed to demonstrate that there are no material issues of fact with respect to the due diligence in fact performed by them. *See Bank of India v. Subramanian*, No. 06 Civ. 2026, 2007 WL 1424668, at *6 (S.D.N.Y. May 15, 2007) (denying plaintiff's motion for summary judgment because triable issues of fact remained).[18] Plaintiffs declare that "[e]ach Junior Underwriter made a deliberate choice not to conduct any due diligence investigation." (Pl. Br. at 17.) To the contrary, even at this point in the on-going fact discovery, the record plainly shows that after the Junior Underwriters joined the Syndicate, they understood that the Lead Managers and Syndicate counsel were conducting a proper due diligence investigation.

*First*, Cravath's efforts as Syndicate counsel for the Refco IPO contributed to the Junior Underwriters' own due diligence.[19] *See Comm'r of Internal Revenue v. Banks*, 543 U.S. 426, 436 (2005) ("The relationship between client and attorney . . . is a quintessential principal-agent relationship. The client may rely on the attorney's expertise and special skills to achieve a result the client could not achieve alone") (citation omitted); *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 562, 582-83 (E.D.N.Y. 1971) (granting underwriters' motion for

---

diminish" an underwriters' diligence obligation. (Pl. Br. at 19 n.9 (citing *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 669 (S.D.N.Y. 2004)). The relevance of industry standards to the determination of the reasonableness of an investigation was not the subject of the court's decision. *See id.*

[18]     *See also In re Software Toolworks, Inc. Sec. Litig.*, 789 F. Supp. 1489, 1512 (N.D. Cal. 1992) (holding genuine issues of material fact precluded summary judgment in favor of plaintiff on its section 11 claims), *overruled on other grounds by* 50 F.3d 615 (9th Cir. 1994).

[19]     The record demonstrates that Cravath's efforts in support of the Lead Managers were comprehensive, of the highest quality, and more than reasonable. Cravath's work in fulfilling its responsibilities in connection with the Refco LBO and Refco IPO spanned more than 13 months, involved approximately eleven attorneys. In total, Cravath attorneys spent more than four thousand hours working on the two transactions. (ASF ¶ 28.)

summary judgment and treating underwriters' counsel's investigation as part of underwriters' due diligence).[20]

Although Cravath performed substantial work before the Junior Underwriters accepted their invitations into the IPO Underwriting Syndicate, the firm continued to support the Syndicate, including the Junior Underwriters, through the closing of the offering. *See In re Locust Bldg. Co.*, 299 F. 756, 769 (2d Cir. 1924) ("The attorney is conclusively presumed to have informed his client of all material facts which the attorney acquires knowledge of, and which affect the client's rights, while the attorney is acting in the course of his employment and within the scope of his authority"); *see supra*, at 13-14. Cravath's activities after the Junior Underwriters accepted their invitation into the IPO Underwriting Syndicate independently support the Junior Underwriters' due diligence defense. *See id.*

After the Junior Underwriters joined the Syndicate, Cravath, among other things, obtained comfort letters from Refco's accountants (ASF ¶ 98), negative assurance letters from its lawyers (ASF ¶ 103), and documented representations from the President and CFO of Refco that the representations and warranties of the Underwriting Agreement had been satisfied and that the financial statements included in the Registration Statement and Prospectus fairly presented the financial position of Refco. (ASF ¶¶ 108-10.)[21] Cravath also provided Syndicate members with an opinion letter, as well as a negative assurance letter stating that the Registration Statement and Prospectus (except for financial statements and other information of an accounting or financial

---

[20]     *See also In re Int'l Rectifier Sec. Litig.*, No. CV91-3357, 1997 WL 529600, at *4, *8 (C.D. Cal. Mar. 31, 1997) (same); *Phillips v. Kidder, Peabody & Co.*, 933 F. Supp. 303, 318 (S.D.N.Y. 1996), *aff'd*, 108 F.3d 1370 (2d Cir. 1997) (same).

[21]     The Refco Inc. Officers' Certificate, executed by Refco CEO Phillip Bennett and CFO Gerald Sherer, certified that, among other things, "the representations and warranties of the Company in the Underwriting Agreement are true and correct on the date hereof." Among the statements being certified by Bennett and Sherer in the Underwriting Agreement were that "the financial statements included in each Registration Statement and the Prospectus present fairly the financial position of Refco Group Ltd., LLC . . . ." (ASF ¶¶ 109-110.)

nature) "appeared or appears on its face to be appropriately responsive in all material respects to the requirements of the Securities Act."[22] (ASF ¶ 102.) In addition, Cravath engaged in discussions with Refco's auditors, accountants, and outside counsel, and participated in the bring down due diligence call on behalf of the Syndicate, including the Junior Underwriters. (ASF ¶¶ 54-56, 58.)

The Grant Thornton letter presented to the IPO Underwriting Syndicate at closing ("Comfort Letter"), in particular, goes right to the heart of the Motion, which is largely based on Refco's unaudited financial statements. In the Grant Thornton Comfort Letter, which was addressed to each member of the IPO Underwriting Syndicate, including the Junior Underwriters, Grant Thornton detailed the procedures it had performed on the unaudited financial statements and concluded "the consolidated financial statements and financial statement schedules audited by us and included in the Registration Statement comply as to form in all material respects with the applicable accounting requirements of the [1933] Act and the related published rules and regulations adopted by the SEC." (ASF ¶ 98.) Similarly, Cravath obtained an opinion letter from Weil, counsel for THL, and Mayer Brown, counsel for Refco. (ASF ¶ 53, 103.) The Weil opinion letter stated that the IPO Registration Statement and Prospectus "compl[ied] as to form in all material respects with the requirements of the [Securities Act of] 1933 and the rules and regulations thereunder" and the "statements in the Prospectus under the captions 'Business Regulation,' 'Certain Relationships and Related Transactions,' 'Description of Capital Stock,' 'Description of Indebtedness' and 'Shares Eligible for Future Sale' . . . fairly summarize the matters referred to therein in all material respects." (ASF ¶ 104.) Weil also

---

[22]     Cravath's negative assurance letter further stated that Cravath's work did not disclose any information that gave it reason to believe that the IPO Registration Statement or Prospectus contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading (except for financial statements and other information of an accounting or financial nature, on which topics Cravath did not offer a view). (ASF ¶ 102.)

provided a negative assurance letter in which it stated that no facts had come to its attention, during the course of performing its services to Refco, which caused it "to believe that the Registration Statement, as of its effective date, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements contained therein not misleading." (ASF ¶ 103, 105.)

*Second,* Plaintiffs incorrectly assert that "the undisputed record shows that [the Junior Underwriters] did *nothing* to ensure that the investigation supposedly being conducted by the leads was adequate – or even taking place." (Pl. Br. at 17) (emphasis in original). To the contrary, their review of portions of the Preliminary Prospectus (which reflected the input and blessing of the Lead Managers and the work that Cravath performed on their behalf), as well as the reputations of, and their past experiences with the Lead Managers, all confirmed that the Lead Managers had performed a proper due diligence investigation. (ASF ¶¶ 74, 76, 79, 118.) Each Junior Underwriter confidently and reasonably relied on the Lead Managers to conduct due diligence on its behalf. (ASF ¶¶ 88-89.) In the alternative, whether such reliance was reasonable is a question of disputed fact precluding the entry of summary judgment against the Junior Underwriters.

The Junior Underwriters recognized from the invitation wires and the Preliminary Prospectus that the Lead Managers of the offering were global investment banks with substantial IPO underwriting experience. (ASF ¶ 74.) The Junior Underwriters had worked on previous IPOs with the Lead Managers and believed the Lead Managers to be highly competent to perform adequate due diligence. (ASF ¶¶ 74, 76, 88.) Based on their previous work with Credit Suisse, the Junior Underwriters were familiar with the AAU – thus, they knew that they had authorized Credit Suisse to act as the "Manager" of the offering and were paying Credit Suisse to

perform functions commonly expected of a lead underwriter, including due diligence. (ASF ¶¶ 23, 24, 77, 78, 94.)

The Junior Underwriters understood that the Underwriting Agreement provided that the "Representatives," or Lead Managers, would "act for the several underwriters in connection with the IPO, and that any action taken by the Representatives [would] be binding upon all of the underwriters." (ASF ¶ 96). The Junior Underwriters also knew that the Lead Managers had retained expert underwriters' counsel to perform various functions on their behalf, including verifying that, at the time that the IPO Registration Statement became effective, the underwriters had a reasonable basis to believe that the IPO Registration Statement was truthful and there was no omission to state a material fact required to be stated or necessary to make the statements not misleading. (ASF ¶¶ 59, 89.)

Contrary to Plaintiffs' argument, the reasonableness of the Junior Underwriters' reliance on the Lead Managers cannot be viewed in isolation from what the Lead Managers and Co-Managers actually did. Indeed, the facts and circumstances of the Refco IPO highlight the reasonableness of the Junior Underwriters' reliance on the Lead Managers in this transaction. Credit Suisse began conducting extensive due diligence on Refco in or about June 2003. (*See* SOF Section II, *supra*.) In April 2004, Banc of America and Deutsche Bank embarked on five months of additional due diligence as initial purchasers and lenders in the Refco LBO. (*Id.*) The Lead Managers and Co-Managers conducted an additional nine months of due diligence in connection with the Refco IPO. (*Id.*) It would be an absurd result to hold the Junior Underwriters liable for not sufficiently verifying the Lead Managers' due diligence where, as here, the Junior Underwriters understood that the Lead Managers had already conducted an extended, comprehensive investigation into Refco, and Syndicate Counsel obtained

representations from Refco principals, auditors, and counsel substantiating the accuracy and completeness of the registration statement, prospectus, and financial statements. *See Gap*, 79 F.R.D. at 301; Erb Decl. at ¶ 79; Rudley Decl. at ¶ 35.

*Finally*, Plaintiffs ignore the factual record of the Junior Underwriters' process for becoming comfortable with the Refco IPO. Prior to accepting the invitation, the Junior Underwriters reviewed portions of the Preliminary Prospectus and determined who the lead managers were. (ASF ¶¶ 73-74, 79.) The Junior Underwriters also relied on the certified financial statements and comfort letters provided by the auditors. (ASF ¶¶ 93, 98.) At least two of the Junior Underwriters conferred with one another as part of their analysis. (ASF ¶ 80.) BMO, which had a thirty-year commercial banking relationship with Refco, recently had conducted due diligence on Refco in connection with its decision to participate in the loan component of the Refco LBO and met with Refco management regarding the Refco IPO. (ASF ¶¶ 83-86.)

In sum, Plaintiffs have failed to establish that there are no material issues of fact with respect to the due diligence conduct by and on behalf of the Junior Underwriters.[23]

## III. PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN OF SHOWING THAT THERE IS NO MATERIAL ISSUE OF FACT WITH RESPECT TO THE UNDERWRITERS' RELIANCE ON THE EXPERTISED FINANCIAL STATEMENTS IN THE IPO REGISTRATION STATEMENT

Plaintiffs' motion also disregards the unique nature of the claims in this action, which are focused on the accuracy of Refco's financial statements rather than the more general disclosures

---

[23]    To the extent that Plaintiffs' contest the industry practice set forth in section I.B, above, that dispute would also preclude summary judgment. *See SEC v. Lyon*, No. 06 Civ. 14338, 2009 WL 755356, at *9-10 (S.D.N.Y. Mar. 23, 2009) (relying on testimony regarding routine business practice to deny motion for summary judgment). Plaintiffs' cases are inapposite. *See Travelers Cas. & Sur. Co. v. Ace Am. Reins. Co.*, 392 F. Supp. 2d 659, 666 (S.D.N.Y. 2005) (rejecting defendants' reliance on industry practice where defendant "pointed to no caselaw or legal basis . . . [to] support its position."), *aff'd*, 201 F. App'x 40 (2d Cir. 2006); *SEC v. U.S. Funding Corp.*, No. 02 Civ. 2089, 2006 WL 995499, at *9 (D.N.J. Apr. 11, 2006) (rejecting defendant's reliance on industry practice as an independent affirmative defense in its pleading).

about Refco's business or prospects.  The nature and scope of due diligence must be considered

against that backdrop.  Section 11 of the Securities Act exempts the Underwriters from liability

for those portions of the IPO Registration Statement that are made on the authority of an expert

where the Underwriters "had no reasonable ground to believe and did not believe, at the time

such part of the registration statement became effective, that the statements therein were untrue."

15 U.S.C. § 77k(b)(3)(C); *see also In re Software Toolworks Inc. Sec. Litig.,* 50 F.3d 615, 623

(9th Cir. 1994) ("An underwriter need not conduct due diligence into the 'expertised' parts of a

prospectus, such as certified financial statements"); *Kidder, Peabody & Co.,* 933 F. Supp. at 323.

Thus, the Junior Underwriters are entitled to rely on Refco's audited financial statements

(including in the case of Refco, the extensive notes to the financial statements) and the

accounting judgments of Grant Thornton (as Refco's independent auditor) reflected in the

financial statements.  *See In re Worlds of Wonder Sec. Litig.*, 814 F. Supp. 850, 864 (N.D. Cal.

1993) ("[E]very defendant except [the accountant] is entitled by statute to rely on [accountant's]

expertise on accounting issues"), *rev'd in part on other grounds*, 35 F.3d 1407 (9th Cir. 1994).

 Plaintiffs concede that Section 11 allows the Underwriters – including the Junior

Underwriters – to rely on the expertised portions of the IPO Registration Statement if they have

no reasonable ground to believe and do not believe that the statements are untrue.  (Pl. Br. at 7

n.4); *see* 15 U.S.C. § 77k(b)(3)(C).  Plaintiffs do not dispute that Refco's audited financial

statements were "made on the authority of an expert," and, therefore, are "expertised" portions of

the IPO Registration Statement.  *See id.*  Nor do Plaintiffs suggest that the Junior Underwriters

believed, or had a reasonable ground to believe, that the expertised portions of the IPO

Registration Statement were untrue.  *See id.*  Instead, Plaintiffs argue that the Motion "focuses

exclusively on untrue and misleading non-expertised statements."  (Pl. Br. at 7 n.4.)  But

Plaintiffs may not separate Refco's audited and unaudited financial statements so neatly.

The financial statements audited by Grant Thornton (including the notes) contained representations covering *all* of the alleged misstatements or omissions of which Plaintiffs complain. Here, no difference exists between the allegedly misstated portions of Refco's February 28, 2005 audited and May 31, 2005 unaudited financial statements. By Plaintiffs' own allegations, both statements present the *same* alleged errors – Refco's total assets, receivables from customers, net income, and related-party transactions were allegedly materially misstated as a result of the undisclosed receivable. (Pl. Br. at 7-8; Second Am. Compl. ¶¶ 205-07, 215, 218.) Grant Thornton's certification of such figures in Refco's February 28, 2005 audited financial statements entitled the Junior Underwriters to rely on the same treatment of the same figures in Refco's unaudited May 31, 2005 financial statements unless Plaintiffs present – which they have not done in support of this Motion – facts suggesting that such treatment was no longer warranted. *See In re Software Toolworks*, 50 F.3d at 624 (accounting determinations "represent precisely the type of 'certified' information on which section 11 permits non-experts to rely") (citation omitted); *Worlds of Wonder*, 814 F. Supp. at 864 (finding it "absurd . . . for Plaintiffs to suggest that . . . other defendants, who are not accountants, possibly could have known of any mistake by [accountant]"). At the very least, the Underwriters' reliance on expertised financial statements as support for the same figures reported in the unaudited, interim financial statements and textual statements consistent with audited financials raises a question of material fact regarding the reasonableness of their due diligence.

## IV.  PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED AS PREMATURE OR DECISION SHOULD BE POSTPONED

Plaintiffs' Motion is premature and a decision on it would be prejudicial to other parties, including the other Underwriters. Plaintiffs' Motion could not be adjudicated without

- 35 -

determining what statements in the IPO Registration Statement, if any, were, in fact, materially false and misleading as a predicate matter.[24] All parties, including the other members of the IPO Underwriting Syndicate, Grant Thornton, and others, have an interest in presenting evidence, including such expert evidence as may be applicable, with respect to those issues. In these circumstances, it would be unfair and prejudicial for the Court to decide those issues – which decision would inevitably prejudice the rights of other parties before fact discovery has been completed and all parties have an opportunity to present evidence and to be heard on those issues. The evidence Plaintiffs posit as uncontested on this Motion would not satisfy the burden of demonstrating no material issue of fact.[25]

---

[24]    Paragraphs 17-42 of Plaintiffs' Rule 56.1 Statement are exemplary of the premature timing on this motion. *See Johnson v. Arista Holding, Inc.*, No. 05 Civ. 9645, 2006 WL 3511894, at \*4 (S.D.N.Y. Dec. 5, 2006). None of the underwriters has had the opportunity to depose Plaintiffs' expert regarding alleged misstatements in the IPO Registration Statement or been able to depose Refco insiders (including THL witnesses) regarding this topic because of the United States Attorney's Office request that the parties not depose relevant Refco and THL witnesses until the conclusion of the criminal trial of Joseph Collins. *See Robinson v. Transworld Airlines, Inc.*, 947 F.2d 40, 43 (2d Cir. 1991) (*per curiam*) (district court erred in granting summary judgment when plaintiff still had discovery requests pending; "summary judgment should not be granted when [the non-moving party] is denied reasonable access to potentially favorable information") (quotation marks and citation omitted); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980) (same); *G-I Holdings, Inc. v. Baron & Budd*, No. 01 Civ. 216, 2002 WL 31251702, at \*5 (S.D.N.Y. Oct. 8, 2002) (denying motion for summary judgment where affiants on whose affidavits moving party relied had not been produced for deposition and subjected to cross-examination, despite having been noticed for deposition); *Rosen v. Trans World Airlines, Inc.*, No. 94 Civ. 682, 1997 WL 107640, at \*1 (S.D.N.Y. Mar. 11, 1997) ("The motion of Port Authority [for summary judgment] is denied because plaintiff has not yet been given the opportunity to depose the Port Authority employee on the basis of whose affidavit summary judgment is sought").

[25]    As one example, Plaintiffs refer to an October 10, 2005 press release. This press release is hearsay, lacks foundation, and has not been properly authenticated. *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 782-83 (C.D. Cal. 2004) (holding that press and earning releases were inadmissible for purposes of summary judgment because they did "not bear the indicia of reliability demanded for other self-authenticating documents under Fed. R. Evid. 902"); *see Century Col. Springs P'ship v. Falcon Broadband, Inc.*, 05 Civ. 02295, 2006 WL 521791, at \*3 (D. Colo. March 2, 2006) (*citing to Good v. Bd. of County Comm'rs of County of Shawnee, Kansas*, 331 F. Supp. 2d 1315, 1327 (D. Kan. 2004)); *Trans-Tec Asia v. M/V Harmony Container*, 435 F. Supp. 2d 1015, 1031 n. 20 (C.D.Cal. 2005) ("While newspaper articles are self-authenticating under Fed. R. Evid. 902(6), press releases are not necessarily so"). It cannot serve as the basis for summary judgment against the Junior Underwriters. *See Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) ("Statements in [a] . . . Rule 56.1 statement are inappropriate if they are not based on personal knowledge, contain inadmissible hearsay, are conclusory or argumentative, or do not cite supporting evidence"); *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion."); *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (stating that a "Rule 56.1 statement is itself not a vehicle for making factual assertions that are otherwise unsupported in the record," and

For similar reasons, it would also be prejudicial to decide the Motion before expert discovery has been completed. At its core, the Motion – like the summary judgment motion that the Underwriter Defendants intend to bring – presents questions about the "reasonableness" of the due diligence conducted or relied upon by the Junior Underwriters. Even if this Court departed from the rule that junior underwriters may *always* delegate the due diligence investigation to the lead managers, Plaintiffs have not met their burden of demonstrating that delegation *in this case*, in light of the nine-month investigation that the Lead Managers had conducted at the time the Junior Underwriters were invited to join the Syndicate, was unreasonable for the Refco IPO. Even rejection of the clear majority rule of complete delegation to the lead underwriters would not lead to entry of judgment in favor of Plaintiffs at this time as the reasonableness determination would be a mixed question of fact and law on which expert testimony would be appropriate. *Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir. 1993) ("Experts may testify on questions of fact as well as mixed questions of fact and law"); *Cary Oil Co. v. MG Refining & Mktg., Inc.*, No. 99 Civ. 1725, 2003 WL 1878246, at *5-6 (S.D.N.Y. Apr. 11, 2003) (general corporate governance principles and the concept of veil-piercing were mixed question of fact and law as to which expert testimony was admissible). Plaintiffs do not dispute that undertaking expert discovery at this time would be premature and unnecessarily duplicative of the expert discovery that will occur at the close of fact discovery.

In addition, proceeding with the Motion in advance of a decision on class certification would unfairly prejudice the Underwriter Defendants. As the Underwriter Defendants have long argued, it is critically important that a decision on class certification be rendered *before* any

---

holding that "the record does not support certain critical assertions in the defendant's Rule 56.1 statement on which the district court relied, with the result that, even though plaintiff's Rule 56.1 counter-statement failed to specifically controvert these assertions, the unsupported assertions must nonetheless be disregarded and the record independently reviewed") (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001)).

decision on summary judgment is made so that, if a decision on summary judgment is rendered in favor of the defendants, the decision is binding as to a defined and predetermined class of plaintiffs.[26]  Recognizing these concerns, courts have noted that "it is 'difficult to imagine cases in which it is appropriate to defer class certification until after decision on the merits.'"  *In re Philip Morris Inc. v. National Asbestos Workers Med. Fund*, 214 F.3d 132, 135 (2d Cir. 2000) (*quoting Bieneman v. Chicago*, 838 F.2d 962, 964 (7th Cir. 1988)); *Owens v. Hellmuth & Johnson, PLLC*, 550 F. Supp. 2d 1060, 1070 (D. Minn. 2008) (noting that "it is 'rarely appropriate' for a district court to certify a class after a decision has been rendered on the merits" and finding that plaintiff had waived its right to prosecute the case as a class action after "jumping directly to a final determination of the merits" by bringing a successful motion for summary judgment) (citing *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 558 (8th Cir. 1982)). This is because "[w]hen a named plaintiff seeks a ruling on the merits and then later seeks class certification, all potential class members are placed in a 'win-win' situation: if the ruling goes against the named plaintiff, then others can 'opt out' of the class and not be bound by that adverse decision, and if the ruling is favorable, then others can 'opt in' to the class knowing that the defendant's liability has already been established." *Owens*, 550 F. Supp. 2d at 1070. "Such 'one-way intervention' is to be avoided because it is inherently unfair to defendants." *Id.* (citation omitted).

Finally, the Underwriter Defendants anticipate moving for summary judgment at the close of fact and expert discovery.  Such a motion will present similar issues relating to the reasonableness of the Underwriters' due diligence efforts, including the extent to which members of the underwriting syndicate may reasonably rely on the due diligence conducted by other

---

[26]    *See* Tr. of Hr'g, at 33:20-23 (Dec. 10, 2007).

members of the syndicate with the assistance of syndicate counsel. These issues raise mixed

questions of fact and law that the Syndicate as a whole will ask the Court to consider at the

summary judgment stage. Coordinated adjudication of these issues, rather than the piecemeal

approach proposed by Plaintiffs, would conserve judicial resources and avoid wasteful,

duplicative pleading.

## CONCLUSION

For the foregoing reasons, the Junior Underwriters respectfully request that Plaintiffs'

Motion for Partial Summary Judgment be denied.

Dated:    New York, New York
          May 6, 2009

WILMER CUTLER PICKERING
HALE AND DORR LLP

By: _Lori A Martin_____

Robert B. McCaw
Lori A. Martin
John V.H. Pierce
Dawn M. Wilson
Michael L. Feinberg
Ross E. Firsenbaum

399 Park Avenue
New York, New York 10022
Tel.: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for Credit Suisse Securities (USA)
LLC, Banc of America Securities LLC, Deutsche
Bank Securities Inc., Goldman, Sachs & Co.,
Merrill Lynch, Pierce, Fenner & Smith
Incorporated, J.P. Morgan Securities Inc.,
HSBC Securities (USA) Inc., William Blair &
Company, L.L.C., BMO Capital Markets Corp.,
CMG Institutional Trading LLC, Samuel A.
Ramirez & Company, Inc., Muriel Siebert &
Co., Inc., The Williams Capital Group, L.P., and
Utendahl Capital Partners, L.P.*