NITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                                             :
                                                             :
In re REFCO, INC. SECURITIES LITIGATION    :        05 Civ. 8626 (GEL)
                                                             :
                                                             :
------------------------------------------------------------ x


### LEAD PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT


**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
Max W. Berger
John P. Coffey
Salvatore J. Graziano
John C. Browne
Jeremy P. Robinson
1285 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 554-1400
Facsimile:   (212) 554-1444

**GRANT & EISENHOFER P.A.**
Stuart M. Grant
James J. Sabella
Brenda F. Szydlo
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone:  (646) 722-8500
Facsimile:   (646) 722-8501

- and -

Megan D. McIntyre
Christine M. Mackintosh
1201 North Market Street
Wilmington, DE 19801
Telephone:  (302) 622-7000
Facsimile:   (302) 622-7100


*Attorneys for Lead Plaintiffs RH Capital Associates LLC and Pacific
Investment Management Company LLC and Co-Lead Counsel for the Putative Class*

## <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT .................................................................................................. 1

ARGUMENT ................................................................................................................................ 5

I.    AS A MATTER OF LAW, THE JUNIOR UNDERWRITERS WHO CHOSE
      NOT TO INVESTIGATE THE ACCURACY OF REFCO'S IPO
      REGISTRATION STATEMENT OR TO VERIFY THAT OTHERS WERE
      DOING SO, ARE NOT ENTITLED TO ASSERT SECTION 11'S
      AFFIRMATIVE DEFENSE .............................................................................................. 5

II.   THE JUNIOR UNDERWRITERS CANNOT USE PURPORTED INDUSTRY
      PRACTICE OR DISTORTED INTERPETATIONS OF THE LEGISLATIVE
      HISTORY TO REWRITE SECTION 11 ........................................................................ 10

      A.    The Supposed "Custom and Practice" of The Underwriting Industry Is
            Irrelevant And Does Not Raise A Material Issue of Fact Sufficient To
            Avoid Summary Judgment ................................................................................... 10

      B.    The Junior Underwriters' Distortions Of The Legislative History And
            "Policy" Arguments Are Erroneous And Do Not Raise A Material Issue of
            Fact Sufficient To Avoid Summary Judgment ..................................................... 13

III.  THE JUNIOR UNDERWRITERS' EFFORT TO MANUFACTURE A
      MATERIAL FACTUAL DISPUTE AS TO WHETHER THEY CONDUCTED A
      "REASONABLE INVESTIGATION" CANNOT FORESTALL SUMMARY
      JUDGMENT ................................................................................................................... 16

      A.    Any Investigation Conducted By The Lead Underwriters Is Irrelevant To
            This Motion And Does Not Create A Material Issue of Fact ............................... 17

      B.    The Junior Underwriters' Efforts To Distort The Factual Record Is Belied
            By Their Own Deposition Testimony And Is Otherwise Unavailing ................... 17

            1.    The Junior Underwriters Cannot Raise A Material Issue of Fact By
                  Submitting Declarations That Contradict Their Sworn Deposition
                  Testimony Confirming That They Took No Steps To Investigate
                  The Accuracy of Refco's IPO Registration Statement ............................. 18

            2.    The Junior Underwriters' Deposition Testimony Belies The Notion
                  That They Reasonably Relied On Due Diligence Performed By
                  Others ....................................................................................................... 22

IV.    REFCO'S QUARTLERLY FINANCIAL STATEMENTS WERE NOT
       EXPERTISED............................................................................................................ 26

V.     NO PURPOSE IS SERVED BY DELAYING DETERMINATION OF THE
       MOTION, WHICH PRESENTS NARROW LEGAL ISSUES AND WILL
       EXPEDITE THE RESOLUTION OF THIS LITIGATION............................................ 27

CONCLUSION................................................................................................................. 30

# TABLE OF AUTHORITIES

<div align="right">

**Page(s)**

</div>

CASES

*In re Activision Sec. Litig.*,
621 F. Supp. 415 (N.D. Cal. 1985) ....................................................................8

*In re Apple Computer Sec. Litig.,*
886 F.2d 1109 (9th Cir. 1988) .........................................................................13

*Brown v. Henderson*,
257 F.3d 246 (2d Cir. 2001)..............................................................................18

*Castles Auto & Truck Serv., Inc. v. Exxon Corp.*,
No. 95-3183, 1997 WL 585748 (4th Cir. Sept. 23, 1997) ......................................11

*Competitive Associates, Inc. v. Int'l Health Sciences, Inc.,*
No. 72 Civ. 1848 (CLB), 1975 WL 349 (S.D.N.Y. Jan. 22, 1975) .........................8

*In re Consumer Power Co. Sec. Litig.*,
105 F.R.D. 583 (E.D. Mich. 1985) ......................................................................8

*Escott v. BarChris Constr. Corp.*,
283 F. Supp. 643 (S.D.N.Y. 1968).......................................................10, 11, 12, 20

*In re Gap Stores Sec. Litig.*,
79 F.R.D. 283 (N.D. Cal. 1978)...........................................................................7

*Hammond v. Hendrickson*,
No. 85 C 9829, 1986 WL 8437 (N.D. Ill, July 30, 1986) .........................................8

*Hayes v. New York City Dep't of Corrs.*,
84 F.3d 614 (2d Cir. 1996)................................................................................18

*Helms v. Consumerinfo.com, Inc.*,
436 F. Supp. 2d 1220 (N.D. Ala. 2005).................................................................29

*In re Initial Pub. Offering Sec. Litig.*,
174 F. Supp. 2d 61 (S.D.N.Y. 2001).....................................................................13

*Int'l Gateway Exch., LLC v. Western Union Fin. Servs., Inc.*,
333 F. Supp. 2d 131 (S.D.N.Y. 2004)...................................................................18

*In re Itel Sec. Litig.*,
89 F.R.D. 104 (N.D. Cal. 1981)............................................................................8

*Margo v. Weiss*,
   No. 96 CIV. 3842 (MBM), 1998 WL 2558 (S.D.N.Y. Jan. 5, 1998) ....................................21

*Marx & Co. v. Diners' Club, Inc.*,
   550 F.2d 505 (2d Cir. 1977).........................................................................................13

*Reynolds v. Sealift, Inc.*,
   No. 07-5519, 2009 WL 424387 (S.D.N.Y. Feb. 20, 2009).......................................18

*SEC v. Stanard*,
   No. 06 Civ. 7736 (GEL), 2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ..................................16

*Travelers Cas. & Sur. Co. v. Ace Am. Reinsurance Co.*,
   392 F. Supp. 2d 659 (S.D.N.Y. 2005)...........................................................................12

*Wilson v. Guardian Angel Nursing, Inc.*,
   No. 3:07-0069, 2008 U.S. Dist. LEXIS 92250 (M.D. Tenn. Nov. 12, 2008).........................29

*In re WorldCom, Inc. Sec. Litig.*,
   346 F. Supp. 2d 628 (S.D.N.Y. 2004)................................................................. passim

*In re WorldCom, Inc. Sec. Litig.*,
   No. 02 Civ. 3288 (DLC), 2005 WL 638268 (S.D.N.Y. Mar. 21, 2005)..................................22

*In re ZZZZ Best Sec. Litig.*,
   No. CV-87-3574-RSWL (BX), 1994 WL 746649 (C.D. Cal. Oct. 26, 1994) ....................9, 12

**STATUTES**

15 U.S.C. § 77k(b)(3)(A).................................................................................................6

15 U.S.C. § 77k(c) .................................................................................................3, 11, 12

**OTHER AUTHORITIES**

Circumstances Affecting the Determination of What Constitutes Reasonable
   Investigation, Securities Act Release No. 6335, 1981 WL 31062 (Aug. 6, 1981). ..................8

Ernest L Folk, III, *Civil Liabilities Under the Federal Securities Acts: The BarChris
   Case*, 55 Va. L. Rev. 1 (1969) ....................................................................................15

H.R. Conf. Rep. 73-1838, 1934 WL 1291 (May 31, 1934).........................................................11

H.R. Rep. 73-85, 1933 WL 983 (May 4, 1933)....................................................................11

William O. Douglas & George E. Bates, *Some Effects of the Securities Act Upon
   Investment Banking*, 1 U. Chi. L. Rev. 283 (1933)..................................................14

Lead Plaintiffs respectfully submit this reply memorandum of law in further support of their motion for partial summary judgment against the Junior Underwriters.[1]

## PRELIMINARY STATEMENT

The discovery record has revealed that each of the Junior Underwriters made two choices prior to selling $39 million of now-worthless Refco stock to investors: each chose <u>not</u> to conduct any independent investigation into the accuracy of Refco's IPO Registration Statement, and each chose <u>not</u> to verify whether anyone else – including the lead underwriters – was conducting a reasonable investigation. These choices have an unavoidable consequence for the Junior Underwriters: Section 11's affirmative defense of "reasonable investigation" is unavailable to them as a matter of law.

Faced with an incontrovertible record of their delinquency, the Junior Underwriters respond by rewriting Section 11 and burying the Court in a mountain of irrelevant (and distorted) "evidence" in an effort to manufacture the appearance of material factual disputes. But none of this alters the record facts that the Junior Underwriters conducted no investigation into Refco, and made no effort to verify that anyone else was doing so in their stead. The Court is therefore presented with a straightforward question of law that is ripe for adjudication: can utterly passive statutory defendants who do nothing <u>affirmative</u> to ensure that a registration statement is accurate prior to selling securities to the public invoke Section 11's affirmative defense of "reasonable investigation"? Lead Plaintiffs respectfully submit that they cannot.

Studiously ignoring the plain language of Section 11, the Junior Underwriters first argue

---

[1] This memorandum also responds to the *amicus curiae* submission by the Securities Industry and Financial Markets Association ("SIFMA") in opposition to the motion for partial summary judgment. All capitalized terms not otherwise defined herein have the meaning ascribed to them in Lead Plaintiffs' opening memorandum ("LP Mem."). All emphasis is added unless otherwise noted.

that they are legally entitled to rely entirely, and blindly, on the supposed investigatory efforts of the lead underwriters and others.  *See* The Underwriters' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("UW Mem.") at 14-28.  Section 11 makes clear, however, that <u>each</u> underwriter seeking to assert the statutory defense must show that <u>it</u> actually conducted a "reasonable investigation."  *See* LP Mem. at 1-2, 12-15.  The Junior Underwriters also ignore the SEC Release interpreting Section 11, which states that "each" junior underwriter, at a minimum, "must take some steps" to verify that the lead underwriters are conducting a reasonable investigation.  *See* LP Mem. at 3-4, 13-14.  Indeed, the SEC has determined that this aspect of a junior underwriter's role is "vital since [it] may provide additional assurance of verification of the statements in the registration statement."  SEC Release No. 9671, 1972 WL 125474 ("SEC Release"), at *6 (July 27, 1972).

The Junior Underwriters contend that the interpretation of Section 11 advanced by Lead Plaintiffs and the SEC would lead to an "absurd result" because junior underwriters could potentially be held liable for registration statement falsehoods while more senior underwriters, who had conducted what a jury found to be a reasonable investigation, would not.  UW Mem. at 2.  That is not absurd; it would be the very result contemplated by Congress and the SEC.  Indeed, it would be an absurd result if the Junior Underwriters were entitled to assert an <u>affirmative</u> defense for doing nothing.  In one of the most authoritative and comprehensive judicial interpretations of Section 11's affirmative defense, Judge Cote squarely rejected the precise argument raised by these defendants:

> An underwriter must conduct a reasonable investigation to prevail on the due diligence defense, <u>even if it appears that such an investigation would have proven futile in uncovering the fraud.  Without a reasonable investigation, of course, it can never be known what would have been uncovered or what additional disclosures would have been demanded</u>.

2

*In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 683-84 (S.D.N.Y. 2004).  In fact, the

corporate representative for Refco's lead underwriter Credit Suisse Securities (USA) LLC

("CSFB") testified to the benefits of having more investment banks involved in the due diligence

process:

> Q:     Are there benefits in your mind to underwriters conducting due diligence together?
>
> A:     I think in general the more parties involved, <u>the more eyes looking at things, the more, you know, brains thinking about things, that's a good thing</u>.  And that could mean more than one person or it could mean more than one investment bank.  It could mean more than one law firm, more than one accounting firm, consultants, et cetera.
>
> Q:     And why is it a good thing in your mind to have more eyes looking at things while you're conducting due diligence?
>
> A:     <u>It's just a good thing to have more than one person thinking about different questions to ask or looking at things in a different way</u>.

Lead Plaintiffs' Reply to the Underwriters' Response to Rule 56. 1 Statement ("RSF") at 75-76.

Next, the Junior Underwriters appeal to "legislative history" and "industry custom and

practice" to excuse their failure to conduct any investigation.  UW Mem. at 21-28.  Neither

argument is convincing.  First, their meager appeal to legislative history amounts to selective

quotations from one investment banker about industry practice <u>before</u> Congress comprehensively

revamped the Nation's securities laws by passing the Securities Act.  Indeed, Congress expressly

provided for underwriters' reasonableness to be judged by the standard of a "prudent man in the

management of his own property," not by any self-serving industry standard.  15 U.S.C. §

77k(c).  Similarly, the Junior Underwriters submit reports from three "experts" – three more than

they managed to consult while supposedly ensuring that Refco's registration statement was

accurate – who assure the Court that it is "custom and practice" in the industry for junior

underwriters to do nothing.  But "custom and practice" in the industry cannot trump the

requirements of a statute passed by Congress, and the plea for deference to how the financial

industry regulates itself is particularly toneless in light of recent market events.

In belated recognition of the legal consequences of their sworn testimony that they conducted no independent due diligence (LP Mem. at 9-12), the Junior Underwriters strive mightily to generate the appearance of a material factual dispute regarding whether they can invoke Section 11's affirmative defense.  UW Mem. at 28-35.  They spend most of their response describing the investigation supposedly conducted by the <u>lead</u> underwriters, which is irrelevant to whether the <u>Junior Underwriters</u>, on this record, can carry their burden of establishing their <u>own</u> "reasonable investigation."  Apparently aware of this, in a striking variance from their deposition testimony, the Junior Underwriters submit declarations where they suddenly "remember" that they <u>did</u> conduct an independent investigation into Refco by reviewing "portions of the preliminary prospectus" and relying on the "reputations" of the lead underwriters.  *Id.* at 28.

A fundamental problem with this argument is that the Junior Underwriters cannot undo what they have already admitted at their depositions.  When asked if they reviewed drafts of the prospectus, many Junior Underwriters said they had not, and the others testified that they did not consider such a review as part of a due diligence investigation.  *See* Part III.B.1 below;  *see also* Exhibit B attached hereto (selections of deposition testimony).  Singing a different tune now will not work.  But even if some Junior Underwriters did glance at <u>portions</u> of Refco's prospectus and rely on the "reputations" of the leads, the Junior Underwriters made no attempt to verify either (i) the accuracy of any aspect of the registration statement, or (ii) that the lead underwriters had conducted a reasonable investigation – necessary prerequisites to asserting Section 11's "reasonable investigation" affirmative defense.  SEC Release, at *6.

The Junior Underwriters also claim to have "relied" on the work supposedly performed

by lawyers and accountants with whom they never communicated and in many instances could not even identify.  *See* UW Mem. at 15-21.  As the SEC has stated, it is not reasonable, as a matter of law, for junior underwriters to rely blindly on the work supposedly performed by others, without stirring to verify that the work was actually performed – let alone whether it was performed adequately.  And the Junior Underwriters' attempt to use their purported reliance on Cravath in order to avoid summary judgment is particularly unavailing here given that they have withheld evidence based on dubious assertions of privilege (and in the failure to produce a privilege log despite over a year of repeated requests), while deliberately ignoring Lead Plaintiffs' requests to state whether they would be citing reliance on counsel as part of their due diligence defense at trial.

In sum, the undisputed facts show that none of the Junior Underwriters did any investigation whatsoever, or took any steps to verify whether those on whom they purportedly relied did so in their stead.  Accordingly, Lead Plaintiffs are entitled to summary judgment on their Section 11 claim (Count V) against the Junior Underwriters.

## **ARGUMENT**

I.    **AS A MATTER OF LAW, THE JUNIOR UNDERWRITERS WHO CHOSE NOT TO INVESTIGATE THE ACCURACY OF REFCO'S IPO REGISTRATION STATEMENT OR TO VERIFY THAT OTHERS WERE DOING SO, ARE NOT ENTITLED TO ASSERT SECTION 11'S AFFIRMATIVE DEFENSE**

The Junior Underwriters contend that the law permits them to assert the affirmative defense of "reasonable investigation" even when they do virtually nothing.  UW Mem. at 15-16 ("[E]ven if the Junior Underwriters had done no more than delegate the entirety of the due diligence investigation to the Lead Managers . . .  Section 11 permits such delegation and affords [them] an affirmative defense of due diligence in circumstances in which the managing underwriters have performed adequate due diligence.").  The Junior Underwriters' interpretation

of the law is in conflict with the plain terms of Section 11, contradicts the formal guidance of the SEC, and would erode the prophylactic purpose of that statute.

Section 11 provides that an underwriter may evade liability for untrue statements in the "non-expertised" portion of a registration statement only by showing that "he had, after reasonable investigation, reasonable ground to believe and did believe . . ." that the statements were true.  15 U.S.C. § 77k(b)(3)(A);  *see also* LP Mem. at 1, 3-4, 13-15.  The statute is clear that the "reasonable investigation" affirmative defense is unique to each person seeking to assert it and, accordingly, each underwriter must separately establish that "he" conducted a reasonable investigation.  *See* LP Mem. at 13-15.  Tellingly, in their lengthy opposition papers the Junior Underwriters do not even address the plain language of the very statute governing this motion.[3]

The Junior Underwriters also try to sidestep the SEC's interpretation of Section 11's "reasonable investigation" defense – devoting less than half a page to the SEC Release in their hundreds of pages of responsive papers.  *See* UW Mem. at 20.  As discussed in Lead Plaintiffs' opening memorandum, the SEC has taken the position that junior underwriters are not permitted to passively delegate the entire investigation to the lead underwriters if they wish to invoke the "reasonable investigation" defense in Section 11.  LP Mem. at 3, 14-16;  SEC Release, at *6. The Junior Underwriters' only response is to contend that the "broader focus" of the release is that participating underwriters may delegate investigatory duties to the managing underwriter. UW Mem. at 20.  This is unconvincing.  While the SEC acknowledges that some delegation may be appropriate in certain circumstances, it expressly interprets Section 11 as requiring each

---

[3] Nor do the Junior Underwriters respond to the fact that Lead Plaintiffs' interpretation of Section 11 is confirmed by comparing the language in Section 11 setting forth the requirements for "non-expertised" statements (which includes the language "after reasonable investigation") with the requirements for "expertised" statements (which does not require an investigation).  The Junior Underwriters would rewrite the statute by having the Court ignore this language.  *See* LP Mem. at 15.

underwriter to, at a minimum, (1) assure itself that the "program of investigation and actual investigation" undertaken by the leads was adequate, and (2) take "some steps" to conduct diligence, which "at least" must include assuring itself that the lead underwriters made a reasonable investigation. SEC Release, at *6; LP Mem. at 3-4. In the SEC's view, "the participant's checks on the manager are vital since they may provide additional assurance of verification of the statements in the registration statement." *Id.* As shown in the Lead Plaintiffs' opening memorandum, the Junior Underwriters' own deposition testimony demonstrates that they did nothing that could possibly satisfy this standard. *See* LP Mem. at 9-12, 17-18.

Rather than addressing the language of Section 11 or the SEC Release, the Junior Underwriters focus on a handful of cases they claim hold that Section 11's affirmative defense is available to underwriters who rely exclusively on the actions of the lead underwriters and others. *See* UW Mem. at 14-19 (citing cases). Their reliance on these cases is misplaced. They primarily involve motions to certify a defendant class of underwriters – where courts were focused on judicial efficiency and the requirements of Rule 23 rather than substantive interpretations of Section 11. For instance, in certifying a defendant class of ninety-one underwriters in *In re Gap Stores Securitie Litigation*, 79 F.R.D. 283 (N.D. Cal. 1978), the court noted the possibility that it "may be faced with ninety-one separate determinations of participant due diligence," *id.* at 305, and acknowledged that "[w]hether participating and lead underwriters will be held to the same standard of care and whether participating underwriters may delegate any or all of their investigatory responsibility to the lead underwriter are open questions," *id.* at 300.

Moreover, in the class certification decisions cited by defendants, the courts seemed to presume that – unlike here – the record would eventually show that the junior underwriters did

participate in due diligence in some respects. *Id.* at 305 ("only the facts will show . . . if it is plausible to surmise that a majority of the participants performed their statutory duties in exactly the same way, as for example, by attending a 'due diligence meeting' called by the managers"); *In re Consumer Power Co. Sec. Litig.*, 105 F.R.D. 583, 612 (E.D. Mich. 1985) (granting certification of defendant class of underwriters and noting that "after the [due diligence] investigation, the lead underwriter shares its acquired knowledge with the other underwriters in a "due diligence meeting"). Here, the Junior Underwriters did not attend any "due diligence meetings," did not review the results of the lead underwriters' investigation, and did not do anything else that entitles them to assert Section 11's affirmative defense.[4]

Relying on the cases discussed above, the Junior Underwriters contend that Lead Plaintiffs' and the SEC's interpretation of Section 11 would "produce an absurd result" by holding a junior underwriter liable for failure to verify that the lead underwriters were conducting an adequate investigation when "if he had done so [it] would have proven to him that the manager had acted with due diligence." UW Mem. at 20 (citation omitted). They miss a

---

[4] The Junior Underwriters' reliance on a number of other cases where the court was determining whether to certify a defendant class of underwriters is unpersuasive for the same reasons. *See In re Itel Sec. Litig.*, 89 F.R.D. 104, 111 (N.D. Cal. 1981) (certifying class of defendant underwriters and expressly stating that *Gap Stores* noted that the "question of whether participating underwriters may delegate their investigatory responsibilities to the lead underwriter is an 'open' one"); *In re Activision Sec. Litig.*, 621 F. Supp. 415 (N.D. Cal. 1985) (certifying class of defendant underwriters); *Hammond v. Hendrickson*, No. 85 C 9829, 1986 WL 8437, at *9 (N.D. Ill, July 30, 1986) (same). These cases all involved preliminary determinations at the outset of a litigation as to whether common issues would predominate over individual issues and do nothing to overcome the plain language of Section 11 and the requirements of the SEC Release. Notably, in a release issued following the *Gap Stores* case, the SEC expressly noted that the court in *Gap Stores* possibly disagreed with the SEC's interpretation of Section 11, but the SEC nonetheless reaffirmed its approach. *See* Circumstances Affecting the Determination of What Constitutes Reasonable Investigation, Securities Act Release No. 6335, 1981 WL 31062 (Aug. 6, 1981). Likewise unpersuasive is the Junior Underwriters' citation to *Competitive Associates, Inc. v. Int'l Health Sciences, Inc.*, No. 72 Civ. 1848 (CLB), 1975 WL 349 (S.D.N.Y. Jan. 22, 1975). In that case, Judge Brieant did not discuss the SEC Release (which does not seem to have been brought to his attention by either party), and his discussion does not state that the junio underwriters in that case chose to blindly rely on the lead

*(Cont'd)*

critical point:  if the Junior Underwriters do nothing to verify that the leads conducted an

adequate investigation, it is impossible to know whether "some" effort on their part would have

improved the investigation and cured the offending disclosures.  Perhaps the Junior Underwriters

would have asked a question or sought information that did not occur to the lead underwriters, or

perhaps the process of forcing the lead underwriters to explain their efforts would have caused

them to do a better investigation.  But because the Junior Underwriters chose to do nothing, "it

can never be known what would have been uncovered or what additional disclosures would have

been demanded."  *WorldCom*, 346 F. Supp. 2d at 683-84 (S.D.N.Y. 2004).[5]

Thus, while no court appears to have addressed the issue on a complete factual record

like the one presented here, Judge Cote's comprehensive opinion in *WorldCom* belies the

contention by the Junior Underwriters and SIFMA that "no judicial decision supports the

outcome that Plaintiffs advance in this motion."  UW Mem. at 20; *see also* SIFMA Mem. at 2.

Additionally, in *In re ZZZZ Best Sec. Litig.*, No. CV-87-3574-RSWL (BX), 1994 WL 746649, at

*2 & *9 (C.D. Cal. Oct. 26, 1994), the court addressed a situation where non-managing

underwriters "completely relied on the due diligence investigation (allegedly) performed by [the

lead underwriters]," and determined that this "complete abdication [of] responsibility" was

evidence of <u>recklessness</u> sufficient to allow a <u>fraud</u> claim under Section 10(b) of the Securities

Exchange Act to proceed to trial against the junior underwriters.  *See also WorldCom* 346 F.

---

underwriters, as the Junior Underwriters did here.  To the contrary, the opinion suggests that the junior
underwriters in that case undertook "necessary procedures" to satisfy Section 11.  *Id.*  at *19.

[5] While the Junior Underwriters largely ignore Judge Cote's opinion thoroughly addressing Section 11's
affirmative defense of "reasonable investigation" as it applies to underwriters, they cite another opinion in
the same case that addressed the bar order under the PSLRA for a settlement between Lead Plaintiffs and
certain underwriters.  *See* UW Mem. at 16 (citing *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288
(DLC), 2005 WL 591189 (S.D.N.Y. Mar. 14, 2005)).  This opinion in no way stands for – or even
addresses – the notion, which Judge Cote had already rejected, that Section 11 allows junior underwriters
to benefit from the affirmative defense of "reasonable investigation" when they conducted none.

Supp. 2d at 678, ("Section 11(b) plainly commands that underwriters conduct an <u>investigation</u> as

to portions of a registration statement not made on the authority of an expert") (emphasis in

original); *see also Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643, 697 (S.D.N.Y. 1968)

(possible that junior underwriters could be liable even if leads proved a due diligence defense).

## II.    THE JUNIOR UNDERWRITERS CANNOT USE PURPORTED INDUSTRY PRACTICE OR DISTORTED INTERPETATIONS OF THE LEGISLATIVE HISTORY TO REWRITE SECTION 11

Recognizing that they cannot satisfy the language of Section 11 or the requirements of

the SEC Release, the Junior Underwriters argue that the "standard operating procedure in the

investment banking industry," along with scattered quotations from the legislative history of the

Securities Act, "confirms" that their interpretation of Section 11 is correct.  UW Mem. at 21.

These arguments lack merit.

### A.    The Supposed "Custom and Practice" of The Underwriting Industry Is Irrelevant And Does Not Raise A Material Issue of Fact Sufficient To Avoid Summary Judgment

The Junior Underwriters have filed three expert reports totaling more than one hundred

pages.  *See* Declaration of Douglas K. Rudley ("Rudley Decl.");  Declaration of Guy F. Erb

("Erb Decl.");  Declaration of Robert M. Daines ("Daines Decl.").  Confronted with damning

deposition testimony that the Junior Underwriters took no affirmative steps to investigate the

accuracy of Refco's IPO Registration Statement or to verify that anyone else was doing so,  *see*

LP Mem. at 9-12, these experts excuse this passivity because it is supposedly "industry custom"

for junior underwriters to delegate all due diligence responsibilities to lead underwriters.  Thus,

they offer their opinion that the Junior Underwriters have "satisfied the standard of care required

in a due diligence defense under Section 11."  *See* Rudley Decl. ¶ 2; Erb Decl.¶ 2; Daines Decl. ¶

7.  The proffered expert testimony on these subjects is irrelevant, improper and should not be

considered by the Court.

In providing a defense to Section 11 for those who make "reasonable" investigations, Congress expressly specified that "the standard of reasonableness shall be that required of a prudent man in the management of his own property." 15 U.S.C. § 77k(c). Had Congress wanted underwriters to be able to escape liability merely by complying with self-generated industry custom or practice, it could have easily said so. Instead, Section 11 sets forth what the legislative history describes as a "fiduciary" standard of care,[6] which is consistent with the purpose of investor protection that underlies Section 11.[7] To avail itself of this affirmative defense, an underwriter must do <u>something</u> affirmative; that is, show that it made the kind of investigation that a "prudent man" would have made before investing his own money. *See BarChris*, 283 F. Supp. at 697 (underwriters "may not rely solely on the company's officers or on the company's counsel" because "[a] prudent man in the management of his own property would not rely on them."). Expert testimony is wholly unnecessary to this inquiry, because a fact-finder is "fully capable without the aid of expert opinion to apply the standard of the reasonably prudent man." *Castles Auto & Truck Serv., Inc. v. Exxon Corp.*, No. 95-3183, 1997 WL 585748, at *2 n.2 (4th Cir. Sept. 23, 1997).

---

[6] H.R. Conf. Rep. 73-1838, 1934 WL 1291, at *41 (May 31, 1934) ("The amendment to section 11(c) [to include the present definition of reasonableness] removes possible uncertainties as to the standard of reasonableness by substituting for the present language the accepted common law definition of the duty of a fiduciary.").

[7] As stated in the legislative history of the Securities Act:

> The character of civil liabilities imposed by this bill are described in detail elsewhere. Their essential characteristic consists of a requirement that all those responsible for statements upon the face of which the public is solicited to invest its money shall be held to standards like those imposed by law upon a fiduciary. Honesty, care, and competence are the demands of trusteeship. These demands are made by the bill on the directors of the [issuer], its experts, and the underwriters who sponsor the issue.

H.R. Rep. 73-85, 1933 WL 983, at *5 (May 4, 1933).

SIFMA contends that Section 11's "prudent man" standard "necessarily incorporates industry standards" and that evidence of the "custom and practice" among underwriters is therefore relevant.  SIFMA Mem. at 12.  This argument ignores that the reasonableness standard is not that of a prudent <u>underwriter</u>, but that of a "prudent man in the management of his own property."  15 U.S.C. § 77k(c).  What is customary among underwriters selling securities to <u>others</u> has no bearing whatsoever on whether the Junior Underwriters' conduct was consistent with that of a prudent man in the management of his <u>own</u> property.  In any event, it goes without saying that underwriters cannot overcome the requirements of a statute passed by Congress (and interpreted by the SEC) simply by forming a contrary "industry practice."  *Travelers Cas. & Sur. Co. v. Ace Am. Reinsurance Co.*, 392 F. Supp. 2d 659, 666 (S.D.N.Y. 2005) ("any defense of industry custom or good faith does not trump the rule of law"); *ZZZZ Best*, 1994 WL 746649, at *2 (finding that an industry practice of relying totally on lead underwriters was a "complete abdication [of] responsibility" and potentially "reckless" enough to support a fraud claim under Section 10(b) even though junior underwriters argued "that such total reliance was justified and 'customary in the industry'"); *see also BarChris*, 283 F. Supp. at 688 ("a prudent man would not act in an important matter without any knowledge of the relevant facts").[8]

Not only do the Junior Underwriters seek to use their experts to establish an inappropriate standard of care at odds with the standard specified in the statute itself but they then have their experts opine that the Junior Underwriters have satisfied that straw-man standard.  *See, e.g.,* Rudley Decl. ¶ 2; Erb. Decl. ¶ 74; UW Mem. at 22.  This is thinly disguised expert testimony

---

[8] The irrelevancy of "industry practice" to this motion is underscored by the astonishingly lax practices that the Junior Underwriters' experts claim are industry standard.  For instance, one expert states that the responsibilities of junior underwriters are "so routine that an underwriting firm <u>many [sic] not even realize it is carrying them out.</u>"  Rudley Decl. ¶ 29.  Whatever Congress meant by the term "reasonable investigation," it surely meant for each underwriter to <u>be aware</u> it was conducting an investigation.

regarding a purely legal issue, and as such it improperly invades the province of the Court.[9]  It is

settled law that witnesses may not "express opinions as to whether [the] conduct measures up to

the requisite legal standard."  *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 511 n.15 (2d Cir.

1977); *see also In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001)

("this Court has repeatedly held that the testimony of an expert on matters of law is inadmissible

for *any* purpose") (emphasis in original).

It is up to the Court, of course, to take the undisputed record facts and apply them to the

legal requirements of Section 11, and the self-serving statements by the Junior Underwriters'

experts that <u>they</u> have examined the record and the legal requirements of Section 11 and that <u>they</u>

have determined that the Junior Underwriters have satisfied Section 11's standard of care cannot

be used to create a factual issue to avoid summary judgment.  *See also In re Apple Computer*

*Sec. Litig.,* 886 F.2d 1109, 1116 (9th Cir. 1988) ("[W]here the evidence is as clear as that in this

record, the court is not required to defer to the contrary opinion of plaintiffs' 'expert.'").

### B.    The Junior Underwriters' Distortions Of The Legislative History And "Policy" Arguments Are Erroneous And Do Not Raise A Material Issue of Fact Sufficient To Avoid Summary Judgment

While the Junior Underwriters and SIFMA contend that Section 11's legislative history

suggests that it should be read to allow junior underwriters to delegate all responsibility to the

lead underwriters without verifying that the leads have done an adequate job (UW Mem. at 24;

SIFMA Mem. at 8-12), they do not cite any legislative history standing for that proposition.  *See*

UW Mem. at 21-27.  The only legislative history offered is the 1933 testimony of a former

---

[9] By way of example, one of the Junior Underwriters' own experts concedes that "of course, it is the responsibility of the junior underwriters to assure themselves that such reliance [on the leads] is reasonable."  Rudley Decl., ¶28.  This view, while correct, is nonetheless a purely legal determination regarding the requirements of Section 11 – but such determinations are within the sole domain of the Court.

investment banker, Penn Harvey, for the proposition that when Congress passed the Securities Act it was aware of an industry practice for junior underwriters to partially rely on lead underwriters.  UW Mem. at 27.  Of course, after Harvey testified, Congress revamped the country's entire system of securities regulation – which hardly suggests that Congress intended to enshrine pre-existing business practices.  In any event, the ambiguous testimony of one investment banker does not suggest that Congress was endorsing the notion that junior underwriters may do <u>nothing</u> and still get the benefit of Section 11's affirmative defense.  Try as they might, neither the Junior Underwriters nor SIFMA can identify any "legislative history" that extends this affirmative defense to one who opts to do nothing affirmative.

Lacking any pertinent legislative history to support their position, the Junior Underwriters turn to secondary "authority" in an effort to alter the plain meaning of the statute.  While the Junior Underwriters cite a 1933 law review article "by William O. Douglas shortly before he became the Chairman of the SEC" (UW Mem. at 24), they ignore the actual statements of the SEC Release issued forty years later, which provides the SEC's conclusive interpretation of Section 11.  In any event, in the very same article from which the Junior Underwriters selectively quote, Douglas stated that a junior underwriter may not merely rely on the reputation and character of the leads in asserting Section 11's affirmative defense:

> It [a junior underwriter] could hardly be said to have made a reasonable investigation if it merely accepted the originator's [the lead underwriter] word . . . <u>Acceptance of the originator's word where the originator admittedly was a banking house of great character, repute, and reliability could hardly pass as a substitute for this underwriters' own "reasonable investigation"</u>.

William O. Douglas & George E. Bates*, Some Effects of the Securities Act Upon Investment Banking*, 1 U. Chi. L. Rev. 283, 291, n.31 (1933).  The Junior Underwriters' citation to other "leading academics" is likewise unavailing.  In *WorldCom*, Judge Cote rejected similar arguments based on law review articles written by many of these same academics and noted that

these secondary authorities were, at best "calls for a legislative change" that could not alter the requirements of the law written by Congress.  346 F. Supp. 2d at 671.

The Junior Underwriters also make a series of policy arguments in an effort to convince the Court that their reading of Section 11 "promotes efficiency" and encourages "inclusion of junior underwriters in syndicates."  UW Mem. at 26.  These arguments are based on the false premise that Lead Plaintiffs' interpretation of Section 11 purportedly would require each Junior Underwriter to conduct "a full, independent investigation" into the issuer, which would be a "costly and usually pointless duplication of the efforts which the lead underwriter should take." UW Mem. at 23.  This is incorrect.  As Lead Plaintiffs pointed out in their opening memorandum, and as confirmed by the SEC, Section 11 does not necessarily require that the Junior Underwriters duplicate the efforts of the lead underwriters, but it does require, at a minimum, that the Junior Underwriters "take some steps" to verify that a "reasonable investigation" took place.  This undoubtedly requires more than blind and incurious reliance on the reputation of the lead underwriters.[11]  *See* LP Mem. at 3, 14-15.

Finally, any contention that requiring the Junior Underwriters to adhere to the plain requirements of Section 11 would raise the cost of capital or interfere with efficient underwritings (UW Mem. at 26-27) must be viewed with considerable skepticism in light of the SEC Release.  The SEC describes its mission as "to protect investors, maintain fair, orderly, and

---

[11] Each of the Junior Underwriters' expert reports is similarly premised on this fundamental misrepresentation of Lead Plaintiffs' position.  *See* UW Mem. at 27 ("to create a legal rule requiring <u>full participation</u> of the junior underwriters in the diligence of the issuer would lead to the restriction of syndicates, with fewer or no junior underwriters") (citing Daines Decl. ¶¶56-58;  Erb Decl. ¶46;  Rudley Decl. ¶ 41)).  The Junior Underwriters repeated citations to Ernest L Folk, III, *Civil Liabilities Under the Federal Securities Acts: The BarChris Case*, 55 Va. L. Rev. 1 (1969), are unavailing for the same reason. Professor Folk discussed the implications of requiring junior underwriters to conduct a full independent investigation but did not even consider the impossibility of imposing lesser duties on junior underwriters, such as the duty to monitor the performance of the senior underwriter.  *Id.* at 57.

efficient markets, and facilitate capital formation."  Consistent with this mission, the SEC struck

a balance in interpreting Section 11 to require junior underwriters to verify that lead underwriters

were conducting an adequate investigation.  SEC Release, at *6.  The SEC's determination that

"the participant's checks on the manager are <u>vital</u>" (*id.*) trumps any "policy" arguments by the

Junior Underwriters' experts that such checks would create "greater costs to issuers and

shareholders in accessing the capital markets" or "lead[] to a less diversified shareholder base."

UW Mem. at 27 (citing Daines Decl. ¶¶ 22, 57, 61; Erb Decl. ¶ 36, 46;  Rudley Decl. ¶ 20); *see*

*also SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2009 WL 196023, at *29 (S.D.N.Y. Jan. 27,

2009) ("The Commission's interpretations [in a release] of the [the federal securities laws] and of

its own regulations thereunder are entitled to deference'") (quoting *SEC v. McNulty*, 137 F.3d

732, 741 (2d Cir. 1998)).

## III.  THE JUNIOR UNDERWRITERS' EFFORT TO MANUFACTURE A MATERIAL FACTUAL DISPUTE AS TO WHETHER THEY CONDUCTED A "REASONABLE INVESTIGATION" CANNOT FORESTALL SUMMARY JUDGMENT

As demonstrated in Lead Plaintiffs' opening papers, the Junior Underwriters have

admitted that they conducted no investigation themselves into whether the statements in Refco's

IPO registration statement were accurate.  *See* LP Mem. at 9-10.  Moreover, the Junior

Underwriters have admitted that they did nothing to verify whether the supposed investigation

being performed by other underwriters was adequate.  *See* LP Mem. at 10-12.  Faced with the

reality that the binding testimony of their 30(b)(6) witnesses has stripped them of the only

affirmative defense to liability potentially available to them under Section 11, the Junior

Underwriters try to manufacture the appearance of legally relevant "factual disputes" regarding

their due diligence.  There are none.

**A.**    **Any Investigation Conducted By The Lead Underwriters Is Irrelevant To This Motion And Does Not Create A Material Issue of Fact**

The Junior Underwriters spill an immense amount of ink describing the supposed due diligence efforts of the lead and co-managing underwriters. *See* UW Mem. at 8-11, 30-33 (and numerous exhibits and declarations cited therein). But the materials submitted by the Junior Underwriters regarding the supposed conduct of the <u>other</u> underwriters does not raise a factual issue sufficient to overcome summary judgment against the Junior Underwriters. If Lead Plaintiffs' interpretation of Section 11 is adopted by the Court, then the efforts (or lack thereof) by the <u>lead</u> underwriters is irrelevant because the sole question is whether the factual record demonstrates that the actions of the Junior Underwriters, either to investigate Refco on their own or confirm that the lead underwriters were doing so, allow them to assert Section 11's affirmative defense.[14] The fact that the Junior Underwriters spend so much of their motion detailing the irrelevant activities of the lead and co-managing underwriters – <u>activities that were by their own testimony unknown to the Junior Underwriters prior to Refco's IPO</u> (LP Mem. at 9-12) – demonstrates that the Junior Underwriters have virtually nothing to say about what they themselves did to investigate Refco prior to selling millions of worthless Refco shares to the public.

**B.**    **The Junior Underwriters' Efforts To Distort The Factual Record Is Belied By Their Own Deposition Testimony And Is Otherwise Unavailing**

Recognizing the consequences of their failure either to participate in the investigation or even to check on its adequacy, the Junior Underwriters flee from their sworn testimony and now contend that they (1) in fact did take some steps themselves to investigate the accuracy of

---

[14] As stated in Lead Plaintiffs' opening memorandum, the record in this matter has already revealed a lack of adequate diligence on the part of the lead underwriters. These issues, however, are not relevant to this motion and Lead Plaintiffs will not address them here.

Refco's IPO; and (2) reasonably relied on lawyers and accountants with whom never

communicated and in many cases could not even identify.  *See* UW Mem. at 15-21.  These post-

hoc rationalizations find no support in the record and cannot raise an issue of material fact.

> **1.    The Junior Underwriters Cannot Raise A Material Issue of Fact By
> Submitting Declarations That Contradict Their Sworn Deposition
> Testimony Confirming That They Took No Steps To Investigate The
> Accuracy of Refco's IPO Registration Statement**

The Junior Underwriters testified that they conducted no due diligence themselves.  *See*

LP Mem. at 9-12; *see also* RSF at 20-22, 56-66, 75-76;  Exhibit B (attached hereto).  Faced with

the legal consequences of that choice, they now submit declarations contradicting their sworn

testimony and contending that they did take "certain steps" (meager as they may be) to conduct

due diligence prior to Refco's IPO.  The stark conflicts between the Junior Underwriters'

testimony and the positions they take in opposing summary judgment (including statements in

their declarations) are detailed in the charts attached hereto as Exhibits A and B.[15]

In their opposition papers, the Junior Underwriters contend that they "at a minimum

reviewed portions of the preliminary prospectus" and "relied upon their knowledge of, and

experience with, the Lead Managers."  UW Mem. at 2-3.  First, this flatly contradicts the

---

[15]It is well-settled that parties may not submit declarations at odds with their earlier sworn testimony in order to manufacture a fact dispute to avoid summary judgment, and that such declarations should be disregarded. *See, e.g., Reynolds v. Sealift, Inc.,* No. 07-5519, 2009 WL 424387, *2 (S.D.N.Y. Feb. 20, 2009) (excluding summary judgment affidavit which "by describing events to which knowledge was previously disclaimed, contradicted prior deposition testimony");  *Hayes v. New York City Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996) ("a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony"); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts [the plaintiff's] own prior deposition testimony"); *Int'l Gateway Exch., LLC v. Western Union Fin. Servs., Inc.*, 333 F. Supp. 2d 131, 144-45 (S.D.N.Y. 2004) (plaintiff "cannot retract" the testimony of its 30(b)(6) witness in response to a summary judgment motion; citing case stating that affidavit should be disregarded on a motion for summary judgment if it contradicts affiant's own prior deposition testimony).

testimony of several of the Junior Underwriters.  For instance, William Blair's corporate

representative testified:

> Q:    Did William Blair review draft prospectuses prior to the Refco IPO?
>
> A:    No.
>
> Q:    Did William Blair review a final prospectus prior to the Refco IPO?
>
> A:    Not prior to the IPO.

RSF at 56-57.  Likewise, Siebert's corporate representative testified as follows:

> Q:    Did anyone from Siebert review a draft prospectus?
>
> A:    We did not.
>
> Q:    Did Siebert review the Refco IPO prospectus prior to it being publicly filed?
>
> A:    It did not.

RSF at 58.  Similarly, Utendahl's corporate representative testified as follows:

> Q:    And had [Utendahl] reviewed the Refco IPO prospectus prior to August 10th?
>
> A:    No.

RSF at 57-58.

Second, as to those who arguably set eyes on some portion of the prospectus – the only

affirmative steps they can cite – that "effort" falls far short of creating a material issue of fact

sufficient to overcome summary judgment.  *See* RSF at 58-59 ("Q:  Did anyone from Ramirez

review this document [the prospectus] in connection with the Refco IPO?  A:  When we were

invited into the transaction I did a cursory review of this document.  Q:  Did anyone from

Ramirez make any comments or revisions to [the preliminary prospectus] in connection with the

Refco IPO?  A:  No");  *see also* RSF at 20-22, 60-66.  Merely looking at portions of a

prospectus, standing alone, cannot constitute a reasonable investigation sufficient to support the

affirmative defense of under Section 11.  The record is undisputed that none of the Junior

Underwriters made any attempt to verify the contents of the prospectus, offer edits to the

prospectus, or communicate with any other underwriter, attorney or accountant about the contents of the prospectus or registration statement.  Nor did the Junior Underwriters bother to participate in due diligence calls, speak to Refco's management, communicate with Refco's auditor or attorneys, visit Refco's offices, visit any of Refco's customers, or make any other effort to verify the accuracy of Refco's IPO Registration Statement.  *See* LP Mem. at 10.

Without making an attempt to confirm that the statements in the prospectus were accurate, and without checking with the other underwriters to verify what they had done to confirm this (*id.* at 10-12), the Junior Underwriters had no reasonable basis to believe that these statements were true.  Indeed, while the Junior Underwriters now contend that their purported review of portions of the prospectus and reliance on the reputations of the lead underwriters somehow constitutes an independent due diligence investigation into Refco, this was plainly not their view at their Rule 30(b)(6) depositions.  Rather, each of the Junior Underwriters testified that they conducted no due diligence in connection with the Refco IPO.  *See* LP Mem. at 9-12; *see also* Exhibit B (attached).  They cannot abandon their sworn testimony now that they realize its legal consequences.  As the court observed in the seminal *BarChris* case:

> The purpose of Section 11 is to protect investors.  To that end the underwriters are made responsible for the truth of the prospectus.  If they may escape that responsibility by taking at face value representations made to them by the company's management, then the inclusion of underwriters among those liable under Section 11 affords the investors no additional protection.  To effectuate the statute's purpose, the phrase 'reasonable investigation' must be construed to require more effort on the part of the underwriters than the mere accurate reporting in the prospectus of 'dat[a] presented' to them by the company….  In order to make the underwriters' participation in this enterprise of any value to the investors, the underwriters must make some reasonable attempt to verify the data submitted to them.  They may not rely solely on the company's officers or on the company's counsel.  A prudent man in the management of his own property would not rely on them.

283 F. Supp. at 697.[16]  *See also id. at 688.* ("a prudent man would not act in an important matter

without any knowledge of the relevant facts, in sole reliance upon representations of persons

who are comparative strangers and upon general information which does not purport to cover the

particular case," and to permit such reliance to support an affirmative defense "is not a sensible

construction of Section 11, when one bears in mind its fundamental purpose of requiring full and

truthful disclosure for the protection of investors"); *Margo v. Weiss*, No. 96 CIV. 3842 (MBM),

1998 WL 2558, at *6 (S.D.N.Y. Jan. 5, 1998) ("due diligence is not satisfied by passive reliance

upon an allegedly deceptive statement").

    The Junior Underwriters next contend that their indifference to what diligence the lead

underwriters might or might not be conducting with regard to Refco was "reasonable" under the

prudent man standard because they "relied upon their knowledge of, and experience with, the

Lead Managers" from other transactions.  UW Mem. at 6.  The assertion that junior underwriters

can passively rely on the supposed "good reputations" of the lead underwriters, however, is

inconsistent with the plain language and purpose of Section 11 – which is designed to encourage

underwriters to <u>investigate</u> (or, at a minimum in the case of junior underwriters, <u>verify</u> that others

are investigating) the issuer and the statements in the registration statement.  *See* SEC Release, at

*6.  Passive and incurious "reliance" on the reputation of the lead underwriters no more satisfies

the Junior Underwriters' due diligence obligations than passive "reliance" on the reputation of

Refco's management would have satisfied the lead underwriters obligations.  Indeed, Judge Cote

has rejected the notion that utterly passive reliance on others could satisfy Section 11's

---

[16] Of course, here the Junior Underwriters' conduct was even more delinquent then failing to verify
information submitted, or statements made, to them – as they testified, the Junior Underwriters did not
even ask for any information from anyone.  *See* Exhibit B;  LP Mem. at 9-12.

affirmative defense even for an outside director who, unlike the Junior Underwriters, at least

bothered to review <u>some</u> materials:

> [The director] has not shown that he conducted <u>any</u> sort of investigation, much less a reasonable investigation in light of all relevant circumstances; <u>instead, he has emphasized his 'intelligent and well-reasoned reliance' on his fellow directors, experts, and professionals who were in the position to evaluate WorldCom, and his review of the materials management gave to the Board.</u> While reliance on management's presentations to the Board, <u>after a careful examination of the materials provided to the Board,</u> may suffice in some cases, the assertions in this case raise questions as to whether it was incumbent on [director] Roberts to engage in a more active dialogue with management and perhaps even with the Company's auditors and underwriters.

*In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 WL 638268, at *12 (S.D.N.Y.

Mar. 21, 2005).

       In sum, the post-hoc effort to generate the appearance of some affirmative conduct is

foreclosed by the binding deposition testimony (*see* Exhibit B) and, even if somehow credited, is

inadequate to raise a question of fact.

        **2.**     **<u>The Junior Underwriters' Deposition Testimony Belies The Notion That They Reasonably Relied On Due Diligence Performed By Others</u>**

       Unable to manufacture a material factual dispute regarding their own efforts, the Junior

Underwriters attempt to claim that they reasonably relied on work done "on their behalf" by

counsel hired by the lead underwriters, Cravath Swaine & Moore LLP, and Refco's auditors,

Grant Thornton LLP.  Any purported reliance by the Junior Underwriters on work done by these

entities is unreasonable as a matter of law.

       <u>First</u>, although the Junior Underwriters expend many pages discussing the due diligence

efforts supposedly performed on their behalf by Cravath, they fail to mention that they never

communicated with Cravath, never asked to review information compiled by Cravath, and in

many instances, did not even know that Cravath was involved with the Refco IPO.  For instance,

Siebert's corporate representative testified as follows:

Q:      Who were the lawyers for the underwriting syndicate in the
        Refco IPO?

A:      I don't recall.

Q:      Do -- are you familiar with the law firm Cravath, Swaine &
        Moore?

A:      No, I'm not.

Q:      Who did Siebert regard as providing legal counsel to it in
        connection with the Refco IPO in 2005?

A:      I don't know.

Q:      Did Siebert ever communicate with any attorneys in connection
        with the Refco IPO?

A:      It did not.

LP Mem. at 9-12;  RSF at 20-22.  Likewise, Williams Capital's corporate representative testified

as follows:

Q:      Who were underwriters' counsel for the Refco IPO?

A:      That I don't remember.

Q.      [D]id Williams Capital have any communication with the
        underwriters' counsel in connection with the Refco IPO?

A:      We did not.

*Id.*  Similarly, Utendahl's corporate representative testified as follows:

Q:      Do you have any reason to believe that Utendahl communicated
        in any way with underwriters' counsel in connection with the
        Refco IPO?

A:      No.

*Id.*;  RSF at 20 ("Q: Did William Blair know whether the other underwriters retained counsel to

assist in performing due diligence?  A: I don't know.  Q: Did William Blair retain counsel to

assist in performing due diligence?  A: No.")

        This record eviscerates the Junior Underwriters' contention that their supposed "reliance"

on the work done by Cravath raises an issue of fact sufficient to defeat summary judgment.  It is

not conceivable that a "prudent man" managing his own property would rely blindly on the

vague notion that work was being done by unknown lawyers without taking <u>some steps</u> to know

what the lawyers were doing, or asking <u>some</u> questions about what the lawyers found.  Thus, the

supposed work of Cravath does not raise an issue of fact as to the Junior Underwriters.[17]

     <u>Second</u>, the Junior Underwriters claim that they relied on a "comfort letter" that was

supplied by Grant Thornton <u>after</u> Refco's IPO was sold to the public.  UW Mem. at 29-30.  As

with their purported reliance on Cravath, however, that reliance is not reasonable in light of the

fact that the Junior Underwriters never reviewed, or asked to review, the "comfort letter" prior to

the Refco IPO, nor did they have a single communication with Grant Thornton about the comfort

letter or anything else.  For instance, Utendahl's corporate representative testified as follows:

> Q:    Did Refco have an auditor in connection with the Refco IPO?
>
> A:    I don't remember.
>
> Q:    Do you have any reason to believe that someone or anyone from Utendahl did in fact communicate with Refco's auditor in connection with the Refco IPO?
>
> A:    No.
>
> Q:    Did Utendahl rely on the due diligence conducted by Refco's auditor in connection with the Refco IPO?
>
> A:    I wouldn't know.  Again, we rely again with the lead.

---

[17] Moreover, the Junior Underwriters' purported reliance on Cravath would not be reasonable even if one were to ignore their own Rule 30(b)(6) deposition testimony.  In their motion papers, the Junior Underwriters state that Cravath was hired by certain of the lead underwriters in connection with the 2004 Refco LBO, and from that point forward operated at the sole direction of the lead underwriters, without having a single interaction with the Junior Underwriters.  According to the Junior Underwriters, almost all of the supposed "diligence" performed by Cravath was done well <u>before</u> – in some cases, a year before – the Junior Underwriters became involved in the Refco IPO.  *See* UW Mem. at 12-14.  There is not a shred of record evidence that the Junior Underwriters asked to review the product of this so-called "historical diligence," sought to confirm that it was done, or discussed it with Cravath.  To the extent that Cravath purportedly made a few phone calls or obtained certain information from Refco in the final days before the IPO closed and after the Junior Underwriters had become involved (UW. Mem. at 13), the record is undisputed that the Junior Underwriters did not review that information or even know that these actions had taken place.  In these circumstances – where the Junior Underwriters seek to blindly benefit from work done by Cravath prior to their involvement in the Refco IPO (without verifying what Cravath did or even learning that it was done) – the Junior Underwriters' purported "reliance" on Cravath does not create a material issue of fact sufficient to avoid summary judgment.

LP Mem. at 9-12.  Similarly, William Blair's corporate representative testified as follows:

> Q:      Did William Blair ever speak to Refco's auditors in connection with
>         the Refco IPO?
>
> A:      No.

Likewise, Siebert's corporate representative testified as follows:

> Q:      Do you know who Refco's auditors were at the time of the Refco IPO?
>
> A:      I don't recall.
>
> Q:      Have you heard of the accounting firm Grant Thornton?
>
> A:      Yes.
>
> Q:      Do you know if they played any role in the Refco IPO?
>
> A:      I don't recall.

*Id.*;  RSF at 64 ("Q: Did BMO have any communications with Refco's auditors in connection with any due diligence on the Refco IPO?  A:  Not that I am aware of.  Q:  Did BMO ask Refco's auditors to provide it with any documents in connection with any due diligence done on the Refco IPO?  A:  Not that I am aware.")

Again, the Junior Underwriters cannot reasonably rely – and no prudent man managing his own property would do so – on information they did not request, see, verify, or even know existed.  Any purported reliance on the comfort letters is further undercut by an examination of the letter itself, which provides no "comfort" whatsoever on the unaudited financial information contained in Refco's IPO Registration Statement.  For instance, the "comfort letter" states that "the foregoing procedures are substantially less in scope than an audit . . .they would not necessarily reveal matters of significance . . . Accordingly, we make no representation regarding the sufficiency of the foregoing procedures for your purposes."  *See* Wilson Decl. Ex. 140;  *see also WorldCom,* 346 F. Supp. 2d. at 666 ("Comfort letters do not expertise any portion of the registration statement that is otherwise non-expertised.").  The comfort letter also does not provide any assurances relating to the untrue and misleading statements and omissions regarding

Refco's related party transactions and does nothing to establish a defense with respect to those statements.  *See* LP Mem. at 8-9.  Accordingly, the Junior Underwriters' attempts to use the comfort letter to cure the record deficiencies in their due diligence are unavailing.[18]

## IV.    REFCO'S QUARTLERLY FINANCIAL STATEMENTS WERE NOT EXPERTISED

Lead Plaintiffs' summary judgment motion focuses solely on the indisputably untrue statements in the "non-expertised" portions of Refco's IPO Registration Statement, including statements in Refco's unaudited financial results for the periods ended May 31, 2004 and May 31, 2005.  LP Mem. at 7, 16-17.  These statements, relating to Refco's income, assets, receivables and related party transactions, were not audited by Grant Thornton and, as a matter of law, are not statements made on the authority of an expert for purposes of Section 11's due diligence defense.  Nonetheless the Junior Underwriters contend that the fact that Grant Thornton audited <u>other</u> financial statements in Refco's IPO Registration Statement "entitled the Junior Underwriters to rely on the same treatment of the same figures in Refco's unaudited May 31, 2005 financial statements."  UW Mem. at 35.  This contention is at odds with the law.

In *WorldCom*, Judge Cote examined whether unaudited quarterly financial information could be considered "expertised" within the meaning of Section 11, and determined that it was clear that "underwriters remain responsible for unaudited interim financial information as in the case of other non-expertised information."  346 F. Supp. 2d at 671 ("current law continues to

---

[18] The Junior Underwriters' purported reliance on "negative assurance" letters from Refco's counsel and a boilerplate certification from certain Refco officers is similarly unavailing.  *See* UW Mem. at 29.  To begin with, there is no evidence in the record that any of the Junior Underwriters actually communicated with Refco's officers or Refco's counsel as part of a due diligence investigation.  Moreover, the "negative assurance" letter and officers' certificates were not addressed to the Junior Underwriters, and were issued on August 16, 2005 – after the Refco IPO was complete.  *See* Wilson Decl. Ex. 146, 69.  The negative assurance letters also expressly state that they make no representations as to the accuracy of Refco's financial statements.  *Id.*

place a burden upon an underwriter to conduct a reasonable investigation of non-expertised

statements in a registration statement, including an issuer's interim financial statements").

Indeed, the Junior Underwriters do not cite a single case that stands for the proposition that

unaudited financial information is somehow "expertised" simply because <u>other</u> financial

information in a registration statement was audited.  Nor could they, given that the law is clear

that unaudited financial information is not expertised:

> In any suit for damages under Section 11, the directors and <u>underwriters should
> not be able to rely on . . .reports on interim financial data included in a
> registration statement</u> as statements 'purporting to be made on the authority of an
> expert . . . under Section 11(b)(3)(C), Rather, <u>underwriters</u> and directors <u>should be
> required</u>, as has previously been the case whenever unaudited financials are
> included in a registration statement, <u>to demonstrate affirmatively under Section
> 11(b)(3)(A) that, after conducting a reasonable investigation, they had reasonable
> ground to believe, and did believe, that the interim financial data was true</u>.

*WorldCom*, 346 F. Supp. 2d at 666 (quoting SEC Release No. 6127, 1979 WL 170299

(Sept. 20, 1979) (emphasis in original).[19]

## V.    NO PURPOSE IS SERVED BY DELAYING DETERMINATION OF THE MOTION, WHICH PRESENTS NARROW LEGAL ISSUES AND WILL EXPEDITE THE RESOLUTION OF THIS LITIGATION

As a final argument, the Junior Underwriters contend that Lead Plaintiffs' motion is

"premature."  UW Mem. at 35-39.  The Court has permitted the briefing on the motion to

proceed over the Junior Underwriters' initial objections based on these same arguments.  *See*

RSF at 77-78.  The arguments continue to lack merit.

First, the Junior Underwriters contend that "all parties" should have input into "determining what statements in the IPO Registration Statement, <u>if any</u>, were, in fact, materially false and misleading." UW Mem. at 36. Notably, however, the Junior Underwriters do not contend that Refco's IPO Registration Statement was <u>not</u> materially false and misleading – indeed, any such contention would defy credulity given the record and the public events surrounding Refco. *See* LP. Mem. at 5-9. They do not submit any expert or other evidence claiming that the IPO Registration Statement was accurate, but ask the Court for permission to drag the litigation out for additional months or years before eventually conceding the inevitable. This delay would not only be unproductive; it is improper in the face of the admissions by Refco itself (in SEC filings made on October 10, 2005) and the THL Defendants who controlled Refco at the time of the IPO (in their answer filed in this case). *See* Rule 56.1 Statement at 13. In any event, even if the Court declines to determine now that the IPO Registration Statement was false, the Court can and should determine the fundamental issue on this motion: whether the Junior Underwriters' passive reliance on the lead underwriters entitles them to assert Section 11's affirmative defense of "reasonable investigation." This determination will materially streamline this litigation and advance the ultimate disposition of the case.

Second, the Junior Underwriters argue that it would be "prejudicial to decide the Motion before expert discovery has been completed." UW Mem. at 37. The Junior Underwriters have

---

[19] Nor does the Junior Underwriters' contention that Refco's unaudited financial information was "expertised" make any sense in the context of this case. The final audit of Refco's financial results was for the fiscal year ended February 28, 2005. Because Refco collapsed in October 2005, the Company's financial results for the period ending May 31, 2005 were <u>never</u> audited by an accounting firm – a fact that the Junior Underwriters knew or should have known at the time of the Refco IPO. The notion that Grant Thornton's audits for earlier financial periods somehow "expertised" the non-audited information from <u>subsequent</u> periods should be rejected. This is particularly true in this case, where Refco's financial statements were manipulated by nearly $500 million after the close of Grant Thornton's final audit of Refco's financial statements.

managed to submit three expert declarations in opposition, however, and as discussed above, those reports address irrelevant issues (such as the custom and practice among underwriters) that are not disputed for purposes of this motion, or purport to offer improper legal conclusions. The Junior Underwriters do not contend that they need additional experts, and the expert reports they have submitted are not germane to the resolution of this motion. There is no reason to delay the motion to facilitate additional irrelevant expert discovery.

Finally, the Junior Underwriters recycle their argument that a class certification decision must precede summary judgment so that "the decision is binding as to a defined and predetermined class of plaintiffs." UW Mem. at 38. As Lead Plaintiffs have previously stated, this argument is not persuasive in the context of <u>plaintiffs</u> moving for summary judgment because if defendants prevail it simply means that there are fact issues that must be decided at trial. This eliminates the "win-win" situation that may otherwise encourage class members to "opt out" of the Class in the event of an adverse ruling. *See Wilson v. Guardian Angel Nursing, Inc.*, No. 3:07-0069, 2008 U.S. Dist. LEXIS 92250 (M.D. Tenn. Nov. 12, 2008) (determining summary judgment motion brought by named plaintiffs prior to class certification); *Helms v. Consumerinfo.com, Inc*., 436 F. Supp. 2d 1220, 1224 (N.D. Ala. 2005) (same). Because the Junior Underwriters' arguments seeking a lengthy delay on Lead Plaintiffs' summary judgment motion are motivated primarily by a desire to avoid resolving issues on the merits rather than a legitimate concern about binding absent class members, there is no basis for delaying the motion.

## CONCLUSION

Because there is no genuine dispute that the IPO Registration Statement included material untrue statements, and because the Junior Underwriters cannot possibly sustain their burden with respect to any potential affirmative defense, the Junior Underwriter Defendants should be found liable to the Lead Plaintiffs as alleged in Count V (Section 11) of the Complaint.

Dated:  May 29, 2009

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**

By /s/ John P. Coffey_____
Max W. Berger
John P. Coffey
Salvatore J. Graziano
John C. Browne
Jeremy P. Robinson
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

**GRANT & EISENHOFER P.A.**

By /s/ Stuart M. Grant _____
Stuart M. Grant
James J. Sabella
Brenda F. Szydlo
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500

  - and -

Megan D. McIntyre
Christine M. Mackintosh
1201 N. Market Street
Wilmington, DE 19801
(302) 622-7000

*Co-Lead Counsel for Lead Plaintiffs Pacific Investment*
*Management Company, LLC and RH Capital LLC and the Putative Class*

**EXHIBIT A**
*(Testimony Regarding Review of Prospectus)*

| Junior Underwriter | Sworn 30(b)(6) Deposition Testimony Given During Litigation | Declaration Submitted With Summary Judgment Papers |
|---|---|---|
| **Muriel Siebert & Co.** | Q:  Did anyone from Siebert review a draft prospectus?<br><br>A:  We did not.<br><br>Q:  Did Siebert review the Refco IPO prospectus prior to it being publically filed?<br><br>A:  It did not.<br><br>Q:  Is it correct that Siebert – that no one from Siebert reviewed any drafts of this document prior to it being made public?<br><br>A:  That's correct<br><br>-Myles Turner<br>October 24, 2008<br>RSF at 58 | "Prior to accepting the invitation, <u>Siebert reviewed portions of the preliminary prospectus</u>, determined who the lead managers were and that they were Tier One investment banks, evaluated whether the firm had sufficient capital to participate in the offering, and considered whether the offering was a good fit with Siebert's retail customers."<br><br>-Myles Turner<br>May 4, 2009<br>Declaration ¶ 23 |
| **Utendahl Capital Partners L.P** | Q:  And had you reviewed the Refco IPO prospectus prior to August 10th?<br><br>A:  No.<br><br>***<br><br>Q:  Did anyone from Utendahl review this document [the prospectus] prior to it being filed in connection with the Refco IPO?<br><br>A:  Not that I know.  Not that I'm aware of.<br><br>-Jose R. Reyes<br>November 18, 2008<br>RSF at 57 | "Prior to accepting the invitation from Credit Suisse to participate on August 1, 2009, <u>UCP determined from the preliminary prospectus</u> that Credit Suisse, Goldman, Sachs & Co., and Banc of America Securities LLC were the lead managers (the "Lead Managers") for the Refco IPO and that Deutsche Bank Securities, Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, J.P. Morgan Securities, Inc., Sandler O'Neill & Partners, L.P. and HSBC Securities (USA) Inc. (collectively, the "Co-Managers") were the co-managers for the Refco IPO."<br><br>-Jose R. Reyes<br>April 30, 2009<br>Declaration ¶ 14 |

1

| **Junior Underwriter** | **Sworn 30(b)(6) Deposition Testimony Given During Litigation** | **Declaration Submitted With Summary Judgment Papers** |
|---|---|---|
| **William Blair & Co.** | Q:  Did William Blair review draft prospectuses prior to the Refco IPO?<br><br>A:  No.<br><br>Q:  Did William Blair review a final prospectus prior to the Refco IPO?<br><br>A:  Not prior to the IPO.<br><br>Q:  Did William Blair review a final prospectus at any point in time?<br><br>A:  After the IPO was priced and it was available, yes.<br><br><div align="center">-James E. Washburn<br>November 12, 2008<br>RSF at 56-57</div> | "Prior to accepting the invitation, <u>William Blair reviewed portions of the preliminary prospectus</u>, determined who the lead managers were, consulted internally with the Corporate Finance Department to determine if the firm had an existing relationship with Refco, and considered whether there was sufficient demand in the marketplace for these securities."<br><br><div align="center">-James E. Washburn<br>April 30, 2009<br>Declaration ¶ 21</div> |

# Exhibit B

*(Selected Junior Underwriter Testimony Regarding Due Diligence)*

| **Utendahl Capital Partners L.P.** | |
|---|---|
| *(November 18, 2008 Rule 30(b)(6) Testimony of Jose R. Reyes)* | |
| Q: | So you know for sure that no one from Utendahl performed due diligence in connection with the Refco IPO, correct? |
| A: | Correct. |
| Q: | Did anyone from Utendahl make comments or revisions to any draft of the IPO prospectus filed in the Refco IPO? |
| A: | Not that I'm aware of. |
| | *** |
| Q: | Well, what I'd like to know is what specific activities did Utendahl either conduct itself or participate in as an underwriter involved in the Refco IPO?  What did Utendahl do? |
| A: | <u>Just accept an invitation to the transaction – to the transaction, that was really it</u>. |
| Q: | Nothing else whatsoever in connection with the Refco IPO? |
| A: | No. |
| Q: | So it's true that no one from Utendhal participated in or conducted due diligence in connection with the Refco IPO? |
| A: | Due diligence, no. |
| | *** |
| Q: | [D]id Utendahl take any steps whatsoever to ensure that the public disclosure documents relating to the Refco IPO were accurate and complete? |
| A: | No, not that I'm aware of, no.  In terms of disclosure documents, no. |
| Q: | Do you have any reason to believe that Utendahl was at all involved in assuring that the materials publicly disclosed in respect to the Refco IPO were accurate and complete? |
| A: | No. |
| | *** |
| Q: | What, if anything, did Utendahl do to satisfy itself as to the adequacy or reasonableness of the due diligence investigation conducted by CSFB, the lead manager on the Refco IPO? |
| A: | <u>Oh, nothing</u>. |
| Q: | Nothing whatsoever? |
| A: | I mean <u>we never participated in due diligence in any capacity on this transaction</u>.  It was all on the lead. |

1

| **Utendahl Capital Partners L.P.** |
| --- |
| *(November 18, 2008 Rule 30(b)(6) Testimony of Jose R. Reyes)* |

Q:   Did Utendahl ever request – in connection with the Refco IPO, did Utendahl ever request any information or documents from anyone involved with performing due diligence in connection with the Refco IPO?

A:   No, not that I'm aware of.

Q:   Did Utendahl ever receive information or documents from anyone involved with performing due diligence in connection with the Refco IPO?

A:   No, not that I'm aware of

<div align="right">

Rule 56.1 Statement, ¶ 48;  RSF at 57-58

*See also* Rule 56.1 Statement ¶ 62
</div>

| **William Blair & Co.** |
| --- |
| *(November 12, 2008 Rule 30(b)(6) Testimony of James E. Washburn)* |

Q:   Can you please tell me everything that William Blair did, if anything to perform due diligence on Refco in connection with the Refco IPO?

A:   <u>We did not perform any independent due diligence.</u>  We relied on the lead managers.

Q:   And when you say you did not perform any independent due diligence, what due diligence did you perform, if any?

A:   None.

<div align="center">***</div>

Q:   What, if anything, did William Blair do to verify that the due diligence being performed by other members of the syndicate and relied upon by William Blair was adequate?

A:   Nothing.

Q:   Other than the other underwriters, <u>did William Blair rely on any other person or entity to conduct due diligence on Refco</u>?

A:   No.

<div align="center">2</div>

| | |
|---|---|
| **William Blair & Co.** | |
| *(November 12, 2008 Rule 30(b)(6) Testimony of James E. Washburn)* | |

| | |
|---|---|
| Q: | Prior to the Refco IPO becoming effective, which was on or about August 10th, 2005, <u>did William Blair do any investigation whatsoever into the accuracy of the statements made in the IPO prospectus</u>? |
| A: | No. |
| | *** |
| Q: | And all of the stuff that you just described to me, that process in deciding whether you wanted to join the underwriting syndicate, you would not – <u>William Blair does not characterize that as due diligence, correct</u>? |
| A; | No. |
| Q: | I am correct in saying that it's not due diligence. |
| A: | <u>That is not due diligence.</u> |
| | *** |
| Q: | Did William Blair review draft prospectuses prior to the Refco IPO. |
| A: | No. |
| Q: | Did William Blair review a final prospectus prior to the Refco IPO? |
| A: | No. |

<div align="right">

Rule 56.1 Statement, ¶ 48;  RSF at 20-22, 56-57, 60-61

*See also* Rule 56.1 Statement ¶ 60

</div>

| | |
|---|---|
| **Muriel Siebert & Co.** | |
| *(October 24, 2008 Rule 30(b)(6) Testimony of Myles Turner)* | |

| | |
|---|---|
| Q: | Did Siebert review the Refco IPO prospectus prior to it being publicly filed? |
| A: | It did not. |
| Q: | Did Siebert conduct any investigation of Refco prior to accepting the role of underwriter in the Refco IPO? |
| A: | It did not. |

| **Muriel Siebert & Co.** |
|---|
| *(October 24, 2008 Rule 30(b)(6) Testimony of Myles Turner)* |

Q:      In connection with its role as an underwriter on the Refco IPO, <u>did Siebert ever request any information or documents from anyone involved in the Refco IPO?</u>

A:      It did not.

Q:      Did Siebert ever communicate with any attorneys in connection with the Refco IPO?

A:      It did not.

<div align="center">***</div>

Q:      Did Siebert ever provide comments on any aspect of the prospectus filed in respect to the I – the Refco IPO?

A:      To the best of my knowledge, it did not.

<div align="center">***</div>

Q:      Can you describe for me exactly what happened within Siebert that resulted in Siebert's acceptance of the role of underwriter in the Refco IPO?

A:      The only thing that happened within Siebert for us to capture a role in the IPO of Refco was a call from Credit Suisse First Boston to my syndicate manager on or about late July 2005.

Q:      What considerations were involved in Siebert's internal approval of its acting as an underwriter in connection with Refco's IPO?

A:      <u>There were no considerations taken to participate as a junior underwriter in the Refco IPO.</u>

<div align="center">***</div>

Q:      What – what actions specifically, if any, did Siebert take to – to satisfy itself as to the adequacy of the due diligence performed by any other book runner – by any other underwriters in the Refco IPO?

A:      <u>Siebert took no actions.</u>

Rule 56.1 Statement, ¶ 52;  RSF at 20-22, 59-59

*See also* Rule 56.1 Statement ¶ 66

4

| **The Williams Capital Group.** |
|---|
| *(November 4 Rule 30(b)(6) Testimony of Jonathan W. Levin)* |

Q:     At any point in time did Williams Capital ask the underwriters, the other underwriters to change any language in the prospectus for the Refco IPO?

A:     Not to my knowledge.

Q:     And without unduly narrowing that, at any point in time did Williams Capital ask anyone to change the language in the prospectus for the Refco IPO?

A:     Not to my knowledge.

Q:     Did Williams Capital have any communications with the more senior underwriters to review the due diligence that you presumed the senior underwriters were doing?

A:     We did not.

Q:     Was there any process in place in the underwriting syndicate for the Refco IPO where a junior underwriter could communicate concerns or issues with the more senior underwritings?

A:     No. That's not business protocol.

<div align="center">***</div>

Q:     What, if anything did Williams Capital do to satisfy itself that the statements being made in the IPO prospectus were accurate?

A:     We relied exclusively on Credit Suisse First Boston, Goldman Sachs, Bank of America, underwriters' counsel and the co-managers to put together a document that accurately reflected the statements made in the – in the prospectus.

Q:     And did Williams Capital review any of the work that those entities did in preparing the IPO prospectus?

A:     No. We relied on them.

Q:     Who were the underwriters' counsel for the Refco IPO?

A:     That I don't remember.

<div align="center">***</div>

<div align="center">5</div>

| **The Williams Capital Group.** |
| *(November 4 Rule 30(b)(6) Testimony of Jonathan W. Levin)* |

Q:      So I think I know the answer, but did Williams Capital have any communications with the underwriters' counsel in connection with the Refco IPO?

A:      <u>We did not.</u>

Q:      Does Williams Capital have any knowledge as to whether the more senior underwriters in the Refco IPO conducted due diligence procedures – let me be more specific – on Refco's financial statements beyond just relying on the audit opinions?

A:      <u>We have no knowledge of whether they did or did not.</u>

Rule 56.1 Statement, ¶ 54;  RSF, at 20-22, 56-57, 59

*See also* Rule 56.1 Statement ¶ 68

---

| **Ramirez & Co.** |
| *(November 7, 2008 Rule 30(b)(6) Testimony of Lawrence F. Goldman)* |

Q:      [W]hat specific activities did Ramirez participate in as an underwriter involved in the due diligence conducted in connection with the Refco IPO?

A:      We were not involved in the due diligence process.

***

Q:      So to close off, did Ramirez conduct any due diligence whatsoever in connection with the Refco IPO?

A:      <u>No, Ramirez & Company did not.</u>

***

Q:      Did Ramirez at any time ever request any information or documents from anyone involved in the due diligence process that was performed in connection with the Refco IPO?

[…]

A:      No.

| |
|---|
| **Ramirez & Co.**<br>*(November 7, 2008 Rule 30(b)(6) Testimony of Lawrence F. Goldman)* |

Q:     Can you describe the internal process or processes that Ramirez conducted that resulted in Ramirez's acceptance of the role of underwriter in the Refco IPO?

A:     Yes.  Firstly, as we notify our CFO and our compliance officer and Ramirez.  Then secondly, we do a review of the – not a thorough review, but a <u>cursory review</u> of the public filing, preliminary prospectus.  And then we make a decision whether or not to accept the invitation.

                                    ***

Q:     And what investigation of Refco did Ramirez conduct prior to accepting the role of underwriter in the Refco IPO?

A:     We again, we read the public filings, which is a preliminary prospectus.  I don't recall specifically, but I would speculate we may have looked at recent headlines, but we – our basic investigation is to read the public filings – public – preliminary prospectus.

Q:     You mentioned two possibilities in your last answer.  One was to read the preliminary prospectus and the second one was to read news headlines.  Were there any other steps taken by Ramirez in investigating – to investigate Refco prior to accepting the role of underwriter in the Refco IPO?

A:     Not that I recall.

Q:     So is it correct to say that Ramirez did not review drafts of this prospectus in connection with its role as an underwriter on the Refco IPO?

A:     Correct.

Q:     Did anyone from Ramirez make any comments on any drafts?

A:     No.

| **Ramirez & Co.** |
| *(November 7, 2008 Rule 30(b)(6) Testimony of Lawrence F. Goldman)* |

***

Q:     I think I know what your answer is going to be, but what specific activities did Ramirez participate in as an underwriter involved in the due diligence conducted in connection with the Refco IPO?

A:     We were not involved in the due diligence process.

***

Q:     Did Ramirez communicate in any way with Refco's management in connection with the Refco IPO?

A:     No.  We did send a thank you letter after the transaction.

Q:     Is that the only communication that Ramirez had with Refco's management in relation to the Refco IPO?

A:     That's the only communication.

Q:     Did Ramirez at any time ever request any information or documents from anyone involved in the due diligence process that was performed in connection with the Refco IPO?

A:     No.

***

Q:     And did Ramirez take any steps whatsoever to test and verify that the due diligence conducted by the other underwriters was adequate in connection with the Refco IPO?

A:     No

***

Rule 56.1 Statement, ¶ 50;  RSF, at 20-22, 58-59
*See also* Rule 56.1 Statement ¶ 64

8